# Exhibit 6

Exhibit 6

**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General | *Washington, D.C. 20530*

May 6, 2004

## MEMORANDUM FOR THE ATTORNEY GENERAL

*Re: Review of the Legality of the* b1, b3 *Program* (~~TS//SI~~- b1, b3 /~~NF~~)


BACKGROUND

A. September 11, 2001 .... 5
B. Initiation of b1, b3 .... 6
C. Reauthorizations and the Reauthorization Process .... 8
D. b1, b3 .... 9
E. Operation of the Program and the Modifications of March b5 2004 .... 11
F. Prior Opinions of this Office .... 17

ANALYSIS

I. b1, b3 Under Executive Order 12,333 .... 18
II. b1, b3 – Statutory Analysis .... 19
A. Prior Opinions of this Office – Constitutional Avoidance .... 22
B. Analysis of b1, b3 Under FISA Must Take Into Account the September 2001 Congressional Authorization for Use of Military Force .... 29
1. The Congressional Authorization provides express authority for b1, b3 .... 29
2. At a minimum, the Congressional Authorization bolsters the case for applying the canon of constitutional avoidance .... 35
C. If FISA Purported To Prohibit Targeted, Wartime Surveillance Against the Enemy Under b1, b3 It Would Be Unconstitutional As Applied .... 37
1. Even in peacetime, absent congressional action, the President has inherent constitutional authority, consistent with the Fourth Amendment, to order warrantless foreign intelligence surveillance .... 37
2. FISA is unconstitutional as applied in this context .... 43
a. Even outside the context of wartime surveillance of the enemy, the scope of Congress's power to restrict the President's inherent authority to conduct foreign intelligence surveillance is unclear .... 44
b. In the narrow context of interception of enemy communications in the midst of an armed conflict, FISA is unconstitutional as applied .... 51




Derived from: "Presidential Authorization for Specified Electronic Surveillance Activities During a Limited Period to Detect and Prevent Acts of Terrorism Within the United States," dated Oct. 4, 2001, and subsequent related Presidential authorizations

b5

3. b1, b3 ............ 74
III. b1, b3 ............................ 81
A. b1, b3 ..... 83
B. b1, b3 .. 86
C. b1, b3 ...... 89
IV. b1, b3 ................................ 96
A. b1, b3 ................................ 96
B. b1, b3 ...................... 98
C. b5 ....... 99
D. b1, b3 ..... 100
V. b1, b3 Under the Fourth Amendment ........................................ 100
A. b1, b3 Interceptions Are Reasonable Under Balancing-of-Interests Analysis . 101
B. b1, b3 ...................... 106
CONCLUSION ................................................................ 108

You have asked this Office to undertake a thorough reexamination of the b1, b3 program as it is currently operated to confirm that the actions that the President has directed the Department of Defense to undertake through the National Security Agency (NSA) are lawful. b1, b3 is a highly classified and strictly compartmented program of electronic surveillance within the United States that President Bush directed the Department of Defense to undertake on October 4, 2001 in response to the attacks of September 11, 2001. Specifically, the program is designed to counter the threat of further terrorist attacks on the territorial United States by detecting communications that will disclose terrorist operatives, terrorist plans, or other information that can enable the disruption of such attacks, particularly the identification of al Qaeda operatives within the United States. The President's initial directive to the Secretary of Defense authorized the b1, b3 program for 30 days. Since then, the President has periodically (roughly every 30 to 45 days) reauthorized the program. (~~TS/SI/COMINT/~~ b1, b3 ~~/NF~~)

After describing the initiation of b1, b3 modifications to the program, and its current operation, including the periodic reauthorizations by the President, this memorandum provides a legal analysis of the program in four parts. In Part I, we briefly examine b1, b3 under Executive Order 12,333, 46 Fed. Reg. 59, 941 (Dec. 4, 1981), the Executive Order governing the responsibilities and conduct of various entities in the intelligence community.

b1, b3, b5

(~~TS//SI~~- b1, b3 //~~NF~~)

In Part II, we address the statutory framework that governs the interception of communications in the United States and its application to b1, b3 international communications involving suspected terrorists. Specifically, we address the Foreign Intelligence Surveillance Act (FISA), as amended, 50 U.S.C. §§ 1801-1862 (2000 & Supp. I 2001), and relevant related provisions in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2521 ("Title III") (2000 & Supp. I 2001).[1]

b1, b3, b5

(~~TS//SI~~ b1, b3 //~~NF~~)

b5 we turn to a new analysis of b1, b3 in relation to FISA based on the recognition that a proper legal review should not examine FISA in isolation. Rather, in the context of b1, b3 in the ongoing conflict with al Qaeda, the restrictions in FISA must be read in light of the express authorization enacted by Congress on September 18, 2001 providing the President authority "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11. Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (Sept. 18, 2001) (reported as a note to 50 U.S.C.A. § 1541) ("Congressional Authorization"). The Congressional Authorization is significant for our analysis in two respects. First, it is properly understood as an express authorization for surveillance activities – b1, b3 – targeted against al Qaeda and affiliated organizations that come within its terms. Second, even if it did not provide express authority for b1, b3, at a minimum the Congressional Authorization creates sufficient ambiguity concerning the application of FISA in this context that the canon of constitutional avoidance can properly be invoked to construe the Congressional Authorization to overcome restrictions in FISA in this context. (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

. We conclude that in the circumstances of the current armed conflict with al Qaeda, the restrictions set out in FISA, as applied to targeted efforts to intercept the communications of the enemy in order to prevent further armed attacks on the United States, would be an unconstitutional infringement

[1] Unless otherwise noted, all United States Code citations in this memorandum are to the 2000 edition. (U)

on the constitutionally assigned powers of the President. The President has inherent constitutional authority as Commander in Chief and sole organ for the nation in foreign affairs to conduct warrantless surveillance of enemy forces for intelligence purposes to detect and disrupt armed attacks on the United States. Congress does not have the power to restrict the President's exercise of that authority.

b1, b3, b5

b1, b3, b5

b1, b3, b5

Finally, in Part V, we examine b1, b3 under the requirements of the Fourth Amendment. Although no statutory requirements prevent the President from conducting surveillance under b1, b3, electronic surveillance under b1, b3 must still comply with the requirements of the Fourth Amendment. We reaffirm our conclusions (i) that as to b1, b3 activities come within an exception to the Warrant Clause and satisfy the Fourth Amendment's requirement of reasonableness, and (ii) b1, b3 The activities authorized under b1, b3 are thus constitutionally permissible. (TS//SI- b1, b3 //NF)

## BACKGROUND (U)

### A. September 11, 2001 (U)

On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial airliners, each apparently carefully selected because it was fully loaded with fuel for a transcontinental flight, were hijacked by al Qaeda operatives. Two were targeted at the Nation's financial center in New York and were deliberately flown into the two towers of the World Trade Center. The third was targeted at the headquarters of the Nation's armed forces, the Pentagon. The fourth was apparently headed toward Washington, D.C., when passengers struggled with the hijackers and the plane crashed in Pennsylvania. Subsequent debriefings of captured al Qaeda operatives have confirmed that the intended target of this plane was either the White House or the Capitol building, which suggests that its intended mission was a decapitation strike -- an attempt to eliminate critical governmental leaders by killing either the President or a large percentage of the members of the Legislative Branch. These attacks resulted in approximately 3,000 deaths – the highest single-day death toll from foreign hostile action in the Nation's history. They also shut down air travel in the United States for several days, closed the New York Stock Exchange for days, and caused billions of dollars in damage to the economy. (U)

On September 14, 2001, the President declared a national emergency "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sept. 14, 2001). The United States also launched a massive military response, both at home and abroad. In the United States, combat air patrols were immediately established over major metropolitan areas and were maintained 24 hours a day until April 2002.[2] The United States also immediately began plans for a military response directed at al Qaeda's base of operations in Afghanistan. On September 14, 2001, both houses of Congress passed a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11. Congressional Authorization § 2(a). Congress also expressly

---

b1, b5

acknowledged that the attacks rendered it "necessary and appropriate" for the United States to exercise its right "to protect United States citizens both at home and abroad," and acknowledged in particular that the "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl. Acting under his constitutional authority as Commander in Chief, and with the support of Congress, the President dispatched forces to Afghanistan and, with the cooperation of the Northern Alliance, toppled the Taliban regime from power. Military operations to seek out resurgent elements of the Taliban regime and al Qaeda fighters continue in Afghanistan to this day. *See, e.g.*, Mike Wise and Josh White, *Ex-NFL Player Tillman Killed in Combat*, Wash. Post, Apr. 24, 2004, at A1 (noting that "there are still more than 10,000 U.S. troops in the country and fighting continues against remnants of the Taliban and al Qaeda"). (S)

As the President made explicit in his Military Order of November 13, 2001, authorizing the use of military commissions to try terrorists, the attacks of September 11 "created a state of armed conflict." Military Order, § 1(a), 66 Fed. Reg. 57,833, 57,833 (Nov. 13, 2001); *see also* Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions To Try Terrorists* 22-28 (Nov. 6, 2001) (concluding that attacks established a state of armed conflict permitting invocation of the laws of war). Indeed, shortly after the attacks NATO took the unprecedented step of invoking article 5 of the North Atlantic Treaty, which provides that an "armed attack against one or more of [the parties] shall be considered an attack against them all." North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246; *see also* Statement by NATO Secretary General Lord Robertson (Oct. 2, 2001), *available at* http://www.nato.int/docu/speech/2001/s011002a.htm ("[I]t has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the Washington Treaty . . . ."). The President also determined in his Military Order that al Qaeda terrorists "possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United Sates Government," and concluded that "an extraordinary emergency exists for national defense purposes." Military Order, § 1(c), (g), 66 Fed. Reg. at 57,833-34. (U)

**B. Initiation of** b1, b3 (TS//SI- b1, b3 //NF)

Against this unfolding background of events in the fall of 2001, there was substantial concern that al Qaeda was preparing a further attack within the United States. Al Qaeda had demonstrated its ability to infiltrate agents into the United States undetected and have them carry out devastating attacks, and it was suspected that further agents were likely already in position within the Nation's borders. Indeed, to this day finding al Qaeda sleeper agents in the United States remains one of the top concerns in the war on terrorism. As FBI Director Mueller recently stated in classified testimony before Congress, "[t]he task of finding and neutralizing al-Qa'ida operatives that have already entered the U.S. and have established themselves in American society is one of our most serious intelligence and law enforcement challenges." Testimony of

Robert S. Mueller, III, Director, FBI, Before the Senate Select Comm. on Intelligence 5 (Feb. 24, 2004) (~~S/ORCON,NF~~). (~~S//NF~~)

To counter that threat, on October 4, 2001, the President directed the b5 to use the capabilities of the Department of Defense, in particular the National Security Agency (NSA), to undertake a program of electronic surveillance designed to

b1, b3

countering the threat of further al Qaeda attacks within the United States.

b1, b3

communications for which there was probable cause to believe that at least one party to the communication b1, b3, b5 *Presidential Authorization for Specified Electronic Surveillance Activities During a Limited Period to Detect and Prevent Acts of Terrorism Within the United States* b3, b5 (Oct. 4, 2001) (~~TS/SI/COMINT~~/ b1, b3 /~~NF~~) ("October 2001 Authorization").

b1, b3, b5

(~~TS//SI-~~ b1, b3 /~~NF~~)

The President further directed that the Department of Defense should minimize the information collected concerning American citizens, consistent with the object of detecting and preventing terrorism. *See* October 2001 Authorization b3, b5 The October 4, 2001 Presidential Authorization stated:

b3, b5

October 2001 Authorization b3, b5 Subsequent Presidential Authorizations have repeated identical language. (~~TS//SI-~~ b1, b3 /~~NF~~)

The President based his decision to initiate the program on specific findings concerning the nature of the threat facing the United States and the actions that were necessary to protect national security. First, the President found that b3, b5

Second, the President noted that he had considered the magnitude and probability of deaths and destruction that could result from further terrorist attacks; the need to detect and prevent such attacks, particularly through effective electronic surveillance that could be initiated swiftly and with secrecy; the possible intrusion into the privacy of American citizens that might result from the electronic surveillance being authorized; the absence of more narrowly tailored means of obtaining the information that was the object of the surveillance; and the b3, b5 Upon consideration of these factors, the President determined that b3, b5 and that this emergency constituted b3, b5 that supported conducting the described surveillance without resort to judicial warrants. b3, b5 The President noted, however, that he intended to inform the appropriate members of the Senate and the House of Representatives as soon as that could be done consistent with national defense needs. b3, b5.[3] (~~TS//SI~~ b1, b3 ~~//NF~~)

### C. Reauthorizations and the Reauthorization Process (~~TS//SI~~ b1, b3 ~~//NF~~)

As noted above, the President's Authorization of October 4, 2001, was limited in duration and set its own expiration date for thirty days from the date on which it was signed. Since then, the b1, b3 program has been periodically reauthorized by the President, with each authorization lasting a defined time period, typically 30 to 45 days. The restriction of each authorization to a limited duration has ensured that the basic findings described above upon which the President assesses the need for the b1, b3 program are re-evaluated by the

[3] We note that, in compliance with the President's instructions, the chairmen and ranking minority members of the House and Senate intelligence committees were briefed periodically on b1, b3 by the Director of the NSA in 2002 and 2003.

b1, b3, b5

President and his senior advisors based on current information every time that the program is reauthorized. (~~TS//SI~~ b1, b3 //~~NF~~)

The reauthorization process operates as follows. As the period of each reauthorization nears an end, the Director of Central Intelligence (DCI) prepares a memorandum for the President outlining selected current information concerning the continuing threat that al Qaeda poses for conducting attacks in the United States, as well as information describing the broader context of al Qaeda plans to attack U.S. interests around the world. Both the DCI and the b5 review that memorandum and sign a recommendation that the President should reauthorize b1, b3 based on the continuing threat posed by potential terrorist attacks within the United States. That recommendation is then reviewed by this Office. Based upon the information provided in the recommendation, and also taking into account information available to the President from all sources, this Office assesses whether there is a sufficient factual basis demonstrating a threat of terrorist attacks in the United States for it to continue to be reasonable under the standards of the Fourth Amendment for the President to authorize the warrantless searches involved in b1, b3 (The details of the constitutional analysis this Office has applied are reviewed in Part V of this memorandum.) As explained in more detail below, since the inception of b1, b3 intelligence from various sources (particularly from interrogations of detained al Qaeda operatives) has provided a continuing flow of information indicating that al Qaeda has had, and continues to have, multiple redundant plans for executing further attacks within the United States. These strategies are at various stages of planning and execution, and some have been disrupted. They include plans for b1, b3 After reviewing each of the proposed b1, b3 reauthorizations, this Office has advised you that the proposed reauthorization would satisfy relevant constitutional standards of reasonableness under the Fourth Amendment, as described in this Office's earlier memoranda. Based on that advice, you have approved as to form and legality each reauthorization to date, except for the Authorization of March 11, 2004 (discussed further below), and forwarded it to the President for his action. (~~TS//SI~~ b1, b3 //~~NF~~)

Each authorization also includes the instructions noted above to minimize the information collected concerning American citizens, consistent with the objective of detecting and preventing terrorism, b3, b5 (~~TS//S~~ b1, b3 //~~NF~~)

### D. Modifications to b1, b3 Authority (~~TS//SI~~ b1, b3 //~~NF~~)

The scope of the authorization for electronic surveillance under b1, b3 has changed over time. The changes are most easily understood as being divided into two phases: (i) those that occurred before March 2004, and (ii) those that occurred in March b5 2004. (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

---

b5

b1, b3, b5

All subsequent reauthorizations until March 11, 2004 provided the b5 with authority using the same operative terms. (~~TS//SI~~ b1, b3 //~~NF~~)

**E. Operation of the Program and the Modifications of March b5 2004** (~~TS//SI~~ b1, b3 //~~NF~~)

A second, more substantial series of changes to b1, b3 took place in March b5 2004. To understand these changes, it is necessary to understand some background concerning how the NSA accomplishes the collection activity authorized under b1, b3 (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

b1, b3, b5

---

b1, b3, b5

b1, b3, b5

Pages 12 – 14

Withheld in Full

b1, b3, b5

b1, b3, b5

Third, the March 11, 2004 Authorization also makes clear that these changes are consistent with all past Authorizations,

b1, b3, b5

(~~TS//SI~~ b1, b3 //~~NF~~)

Finally, the President, exercising his constitutional authority under Article II determined that the March 11, 2004 Authorization and all prior Authorizations were lawful exercises of the President's authority under Article II, including the Commander-in-Chief Clause. b5 (~~TS//SI~~- b1, b3 //~~NF~~)

b1, b3, b5

---

10 b1, b3, b5

In the March 19, 2004 Modification, the President also clarified the scope of the authorization b1, b3 He made clear that the Authorization applied where there were reasonable grounds to believe that a communicant was an agent of an international terrorist group

b1, b3, b5

March 19, 2004 b5 (TS//SI b1, b3 //NF)

b1, b3, b5

This memorandum analyzes b1, b3 as it currently operates.[11] To summarize, that includes solely the following authorities:

(1) the authority to intercept the content of international communications "for which, based on the factual and practical considerations of everyday life on which reasonable and prudent persons act, there are reasonable grounds to believe . . . [that] a party to such communication is a group engaged in international terrorism, or activities in preparation therefor, or any agent of such a group," as long as that

---

b1, b3, b5

group is al Qaeda, an affiliate of al Qaeda or another international terrorist group that the President has determined both (a) is in armed conflict with the United States and (b) poses a threat of hostile action within the United States;[12]

b1, b3, b5

b1, b3, b5

**F. Prior Opinions of this Office (U)**

This Office has issued several opinions analyzing constitutional and other legal issues related to the b1, b3 program. On October 4, 2001, b1, b3, b5 we evaluated the legality of a hypothetical electronic surveillance program b1, b3, b5

On November 2, 2001, we expressly examined the authorities granted by the President in the November 2, 2001 Authorization of b1, b3 and concluded that they were lawful. b1, b3, b5

Finally, on October 11, 2002, we issued an opinion confirming the application of our prior analysis to the reauthorization of the program then pending, which was to continue the program until November 21, 2002. b1, b3, b5 (~~TS~~/b1, b3/~~SI//ORCON/NF~~/ b1, b3

12 b1, b3 (~~TS//SI~~ b1, b3 //~~NF~~) b1, b3, b5

b1, b3, b5

(~~TS//SI~~ b1, b3 //~~NF~~)

You have asked us to undertake a thorough review of the current program to ensure that it is lawful. (~~TS//SI~~ b1, b3 //~~NF~~)

ANALYSIS (U)

**I. b1, b3 Under Executive Order 12,333 (~~TS//SI~~ b1, b3 //~~NF~~)**

b1, b3, b5

b1, b3, b5

b1, b3, b5

---

b1, b3, b5

b1, b3, b5

II. b1, b3 **Statutory Analysis (~~TS//SI~~ b1, b3 //~~NF~~)**

In this Part, we turn to an analysis of b1, b3 under relevant statutes regulating the government's interception of communications, specifically under the framework established by the Foreign Intelligence Surveillance Act and title III of the Omnibus Crime Control and Safe Streets Act of 1968. Generally speaking, FISA sets out several authorities for the government to use in gathering foreign intelligence (including authority to intercept communications, conduct physical searches, and install pen registers); establishes certain procedures that must be followed for these authorities to be used (procedures that usually involve applying for and obtaining an order from a special court); and, for some of these authorities, provides that the processes provided by FISA are the *exclusive* means for the government to engage in the activity described. Title III and related provisions codified in title 18 of the United States Code provide authorities for the use of electronic surveillance for law enforcement purposes. b1, b3

(~~TS//SI~~ b1, b3 //~~NF~~)

Generally speaking, FISA provides what purports to be, according to the terms of the statute, the exclusive means for intercepting the content of communications in the United States for foreign intelligence purposes. Specifically, FISA sets out a definition of "electronic surveillance"[15] – a definition that includes any interception in the United States of the contents of

---

[15] FISA defines "[e]lectronic surveillance" as:

(1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes;

(2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent

a "wire communication" to or from a person in the United States – and provides specific procedures that must be followed for the government to engage in "electronic surveillance" as thus defined for foreign intelligence purposes. As a general matter, for electronic surveillance to be conducted, FISA requires that the Attorney General or Deputy Attorney General approve an application for an order that must be submitted to a special Article III court created by FISA – the Foreign Intelligence Surveillance Court (FISC). *See* 50 U.S.C. § 1804 (2000 & Supp. I 2001).[16] The application for an order must demonstrate, among other things, that there is probable cause to believe that the target is a foreign power or an agent of a foreign power. *See id.* § 1805(a)(3)(A). It must also contain a certification from the Assistant to the President for National Security Affairs or an officer of the United States appointed by the President with the advice and consent of the Senate and having responsibilities in the area of national security or defense that the information sought is foreign intelligence information (as defined by FISA), that cannot reasonably be obtained by normal investigative means. *See id.* § 1804(a)(7). FISA further requires details about the methods that will be used to obtain the information and the particular facilities that will be the subject of the interception. *See id.* § 1804(a)(4), (a)(8). (~~TS//SI~~- b1, b3 //NF)

FISA expressly makes it a felony offense, punishable by up to 5 years in prison, for any person intentionally to conduct electronic surveillance under color of law except as provided by statute. *See* 50 U.S.C. § 1809.[17] This provision is complemented by an interlocking provision in Title III – the portion of the criminal code that provides the mechanism for obtaining wire taps for law enforcement purposes. Section 2511 of title 18 makes it an offense, also punishable by up to 5 years in prison, for any person to intercept a communication except as specifically provided in that chapter. 18 U.S.C. § 2511(1)(a), (4)(a). One of the exceptions expressly provided is that it is not unlawful for "an officer, employee, or agent of the United States . . . to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, *as authorized by that Act*." *Id.* § 2511(2)(e) (emphasis added). On their face, these provisions make FISA, and the authorization process it requires, the exclusive lawful means for the Executive to engage in "electronic surveillance," as defined in the Act for foreign intelligence

---

of any party thereto, if such acquisition occurs in the United States . . . ;

(3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or

(4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f) (2000 & Supp. I 2001). (~~TS//SI~~- b1, b3 //NF)

[16] Section 104 of FISA speaks only of the Attorney General, but section 101(g) defines "Attorney General" to include the Deputy Attorney General. *See* 50 U.S.C. § 1801(g). (~~TS//SI~~- b1, b3 //NF)

[17] *See also* 50 U.S.C. § 1810 (providing for civil liability as well). (~~TS//SI~~- b1, b3 //NF)

purposes. Indeed, this exclusivity is expressly emphasized in section 2511(2)(f), which states that "procedures in this chapter or chapter 121 [addressing access to stored wire and electronic communications and customer records] and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted." *Id.* § 2511(2)(f) (2000 & Supp. I 2001). (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

As we explain in Part II.B, a proper analysis of b1, b3 must not consider FISA in isolation. Rather, it must take into account the Congressional Authorization for Use of Military Force. We conclude that the Congressional Authorization is critical for b1, b3 in two respects. First, its plain terms can properly be understood as an express authorization for surveillance targeted specifically at al Qaeda and affiliated terrorist organizations. The Congressional Authorization effectively exempts such surveillance from the requirements of FISA. Second, even if it does not provide such express

---

b1, b3, b5

authority, at a minimum the Congressional Authorization creates sufficient ambiguity concerning the application of FISA that it justifies applying the canon of constitutional avoidance to construe the Congressional Authorization and FISA in conjunction such that FISA does not preclude the surveillance ordered by the President in b1, b3 Finally, in Part II.C we explain that, even if constitutional narrowing could not be applied to avoid a conflict between b1, b3 and FISA, b1, b3 the President has ordered, which specifically targets communications of the enemy in time of war, would be lawful because the restrictions of FISA would be unconstitutional as applied in this context as an impermissible infringement on the President's constitutional powers as Commander in Chief. (~~TS//SI-~~ b1, b3 /~~/NF~~)

### A. Prior Opinions of this Office – Constitutional Avoidance (U)

Reading FISA to prohibit b1, b3 would, at a minimum, raise serious doubts about the constitutionality of the statute. As we explain in greater detail below, *see* Part II.C.1, the President has inherent constitutional authority to conduct warrantless electronic surveillance for foreign intelligence purposes. Indeed, it was established at the time FISA was enacted that the President had such an inherent constitutional power. *See, e.g.*, *United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974) (*en banc*). A statute that purports to eliminate the President's ability to exercise what the courts have recognized as an inherent constitutional authority – particularly a statute that would eliminate his ability to conduct that surveillance during a time of armed conflict for the express purpose of thwarting attacks on the United States – at a minimum raises serious constitutional questions. (~~TS//SI-~~ b1, b3 /~~/NF~~)

When faced with a statute that may present an unconstitutional infringement on the powers of the President, our first task is to determine whether the statute may be construed to avoid the constitutional difficulty. As the Supreme Court has explained, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (citations omitted); *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); *Ashwander v. TVA*, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring). In part, this rule of construction reflects a recognition that Congress should be presumed to act constitutionally and that one should not "lightly assume that Congress intended to . . . usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). As a result, "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *St. Cyr*, 533 U.S. at 299; *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 506-07 (1979). (U)

This Office has always adhered to the rule of construction described above and generally will apply all reasonable interpretive tools to avoid an unconstitutional encroachment upon the

President's constitutional powers where such an interpretation is possible. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the [Administrative Procedure Act]. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."). As the Supreme Court has recognized, moreover, the canon of constitutional avoidance has particular importance in the realm of national security and national defense, where the President's constitutional authority is at its highest. *See Department of the Navy v. Egan*, 484 U.S. 518, 527, 530 (1988) (explaining that presidential authority to protect classified information flows directly from a "constitutional investment of power in the President" and that as a result "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"); William N. Eskridge, Jr., *Dynamic Statutory Interpretation* 325 (1994) (describing "[s]uper-strong rule against congressional interference with the president's authority over foreign affairs and national security"); *cf. Public Citizen v. Department of Justice*, 491 U.S. 440, 466 (1989) ("Our reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government."). Thus, this Office will typically construe a general statute, even one that is written in unqualified terms, to be implicitly limited so as not to infringe on the President's Commander-in-Chief powers. *Cf. id.* at 464-66 (applying avoidance canon even where statute created no ambiguity on its face). Only if Congress provides a clear indication that it is attempting to regulate the President's authority as Commander in Chief and in the realm of national security will we construe the statute to apply.[19] (U)

The constitutional avoidance canon, however, can be used to avoid a serious constitutional infirmity in a statute only if a construction avoiding the problem is "fairly possible," *Crowell v. Benson*, 285 U.S. at 62, and not in cases where "Congress specifically has provided otherwise," *Egan*, 484 U.S. at 530. "Statutes should be construed to avoid constitutional questions, but this interpretive canon is not a license . . . to rewrite language

[19] For example, this Office has concluded that, despite statutory restrictions upon the use of Title III wiretap information and restrictions on the use of grand jury information under Federal Rule of Criminal Procedure 6(e), the President has an inherent constitutional authority to receive all foreign intelligence information in the hands of the government necessary for him to fulfill his constitutional responsibilities and that statutes and rules should be understood to include an implied exception so as not to interfere with that authority. *See* Memorandum for the Deputy Attorney General from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Effect of the Patriot Act on Disclosure to the President and Other Federal Officials of Grand Jury and Title III Information Relating to National Security and Foreign Affairs* 1 (July 22, 2002); Memorandum for Frances Fragos Townsend, Counsel, Office of Intelligence Policy and Review, from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, *Re: Title III Electronic Surveillance Material and the Intelligence Community* 13-14 (Oct. 17, 2000); Memorandum for Gerald A. Schroeder, Acting Counsel, Office of Intelligence Policy and Review, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Grand Jury Material and the Intelligence Community* 14-17 (Aug. 14, 1997); *see also Rainbow Navigation, Inc. v. Department of the Navy*, 783 F.2d 1072, 1078 (D.C. Cir. 1986) (Scalia, J.) (suggesting that an "essentially domestic statute" might have to be understood as "subject to an implied exception in deference to" the President's "constitutionally conferred powers as commander-in-chief" that the statute was not meant to displace). (U)

enacted by the legislature." *Salinas v. United States*, 522 U.S. 52, 59-60 (1997) (internal quotation marks omitted). If Congress has made it clear that it intends FISA to provide a comprehensive restraint on the Executive's ability to conduct foreign intelligence surveillance, then the question whether FISA's constraints are unconstitutional cannot be avoided. (TS//SI- b1, b3 NF)

b1, b3, b5

b1, b3, b5

b1, b3, b5

Pages 25 – 28

Withheld in Full

b1, b3, b5

**B. Analysis of b1, b3 Under FISA Must Take Into Account the September 2001 Congressional Authorization for Use of Military Force** (TS//SI- b1, b3 /NF)

In the particular context of b1, b3 however, FISA cannot properly be examined in isolation. Rather, analysis must also take into account the Congressional Authorization for Use of Military Force passed specifically in response to the September 11 attacks. As explained below, that Congressional Authorization is properly read to provide explicit authority Moreover, even if it did not itself provide authority for b1, b3 at a minimum the Congressional Authorization makes the application of FISA in this context sufficiently ambiguous that the canon of constitutional avoidance properly applies to avoid a conflict here between FISA and b1, b3 (TS//SI- b1, b3 /NF)

**1. The Congressional Authorization provides express authority for b1, b3** (TS//SI- b1, b3 //NF)

On September 18, 2001 Congress voted to authorize the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." Congressional Authorization § 2(a). In authorizing "*all* necessary and appropriate force" (emphasis added), the Authorization necessarily included the use of signals intelligence capabilities, which are a critical, and traditional, tool for finding the enemy so that destructive force can be brought to bear on him. The Authorization, moreover, expressly gave the President authority to undertake activities both domestically and overseas. Thus, the operative terms state that the President is authorized to use force "in order to prevent any future acts of international terrorism against the United States," *id.*, an objective which, given the recent attacks within the Nation's borders and the continuing use of combat air patrols throughout the country at the time Congress acted, certainly contemplated the possibility of military action within the United States. The preambulatory clauses, moreover, recite that the United States should exercise its rights "to protect United States citizens both *at home* and abroad." *Id.* pmbl. (emphasis added). As commentators have acknowledged, the broad terms of the Congressional Authorization "creat[e] very nearly plenary presidential power to conduct the present war on terrorism, through the use of military and other means, against enemies both abroad and possibly even within the borders of the United States, as identified by the President, and without apparent limitation as to duration, scope, and tactics." Michael Stokes Paulsen, Youngstown *Goes to War*, 19 Const. Comment. 215, 222-23 (2002); *see also id.* at 252 (stating that the Authorization "constitutes a truly extraordinary congressional grant to the President of extraordinary discretion in the use of military power for an indefinite period of time"). (U)

The application of signals intelligence activities to international communications to detect communications between enemy forces and persons within the United States should be understood to fall within the Congressional Authorization because intercepting such communications has been a standard practice of Commanders in Chief in past major conflicts

where there was any possibility of an attack on the United States. As early as the Civil War, the "advantages of intercepting military telegraphic communications were not long overlooked. [Confederate] General Jeb Stuart actually had his own personal wiretapper travel along with him in the field." Samuel Dash et al., *The Eavesdroppers* 23 (1971). Shortly after Congress declared war on Germany in World War I, President Wilson (citing only his constitutional powers and the declaration of war) ordered the censorship of messages sent outside the United States via submarine cables, telegraph and telephone lines. *See* Exec. Order No. 2604 (Apr. 28, 1917) (attached at Tab G).[23] A few months later, the Trading with the Enemy Act authorized government censorship of "communications by mail, cable, radio, or other means of transmission passing between the United States and any foreign country." Pub. L. No. 65-91, § 3(d), 40 Stat. 411, 413 (1917). On December 8, 1941, the day after Pearl Harbor was attacked, President Roosevelt gave the Director of the FBI "temporary powers to direct all news censorship and to *control all other telecommunications traffic* in and out of the United States." Jack A. Gottschalk, *"Consistent with Security"... A History of American Military Press Censorship*, 5 Comm. & L. 35, 39 (1983) (emphasis added); *see also* Memorandum for the Secretary of War, Navy, State, Treasury, Postmaster General, Federal Communications Commission, from Franklin D. Roosevelt (Dec. 8, 1941), in *Official and Confidential File of FBI Director J. Edgar Hoover*, Microfilm Reel 3, Folder 60 (attached at Tab I). President Roosevelt soon supplanted that temporary regime by establishing an Office of Censorship in accordance with the War Powers Act of 1941. *See* Pub. L. No. 77-354, § 303, 55 Stat. 838, 840-41 (Dec. 18, 1941); Gottschalk, 5 Comm. & L. at 40. The censorship regime gave the government access to "communications by mail, cable, radio, or other means of transmission passing between the United States and any foreign country." *Id.*; *see also* Exec. Order No. 8985, § 1, 6 Fed. Reg. 6625, 6625 (Dec. 19, 1941) (attached at Tab J). In addition, the United States government systematically listened surreptitiously to electronic communications as part of the war effort. *See* Dash, *Eavesdroppers* at 30 ("During [World War II] wiretapping was used extensively by military intelligence and secret service personnel in combat areas abroad, as well as by the FBI and secret service in this country."). (~~TS//SI~~ b1, b3 //~~NF~~)

In light of such prior wartime practice, the b1, b3 activities conducted b1, b3 appear to fit squarely within the sweeping terms of the Congressional Authorization. The use of signals intelligence to identify and pinpoint the enemy is a traditional component of wartime military operations employed to defeat the enemy and to prevent enemy attacks in the United States. Here, as in other conflicts, it happens that the enemy may use public communications networks, and some of the enemy may already be in the United States. While those factors may be present in this conflict to a greater degree than in the past, neither is novel. Moreover, both factors were well known at the time Congress acted. Wartime interception of international communications on public networks to identify communications that may be of assistance to the enemy should thus be understood as one of the standard methods of dealing

---

[23] The scope of the order was later extended to encompass messages sent to "points without the United States or to points on or near the Mexican border through which messages may be despatched for purpose of evading the censorship herein provided." Exec. Order No. 2967 (Sept. 26, 1918) (attached at Tab H). (~~TS//SI~~ b1, b3 /~~NF~~)

with the enemy that Congress can be presumed to have authorized in giving its approval to "*all* necessary and appropriate force" that the President would deem required to defend the Nation. Congressional Authorization § 2(a) (emphasis added).[24] (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3 moreover, is specifically targeted at communications for which there is a reason to believe that one of the communicants is an agent of al Qaeda or one of its affiliated organizations. The b1, b3 is thus, as the terms of the Congressional Authorization indicate, directed "against those . . . organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001" and is undertaken "in order to prevent any future acts of international terrorism against the United States."[25] Congressional Authorization § 2(a). As noted above, section 111 of FISA, 50 U.S.C. § 1811, provides that the President may undertake electronic surveillance without regard to the restrictions in FISA for a period of 15 days after a congressional declaration of war. The legislative history of FISA indicates that this exception was limited to 15 days because that period was thought sufficient for the President to secure legislation easing the restrictions of FISA for the conflict at hand. *See* H.R. Conf. Rep. No. 95-1720, at 34, *reprinted in* 1978 U.S.C.C.A.N. 4048, 4063 (stating that "the conferees intend that this period will allow time for consideration of any amendment to this act that may be appropriate during a wartime emergency"). The Congressional Authorization functions as precisely such legislation: it is emergency legislation passed to address a specific armed conflict and expressly designed to authorize whatever military actions the Executive deems appropriate to safeguard the United States. In it the Executive sought and received a blanket authorization from Congress for all uses of the military against al Qaeda that might be necessary to prevent future terrorist attacks against the United States. The mere fact that the Authorization does not expressly amend FISA is not material. By its plain terms it gives clear authorization for "all necessary and appropriate force" against al Qaeda that the President deems required "to protect United States citizens both at home and abroad" from those (including al Qaeda) who "planned, authorized, committed, or aided" the September 11 attacks. Congressional Authorization pmbl.,

---

[24] In other contexts, we have taken a similar approach to interpreting the Congressional Authorization. Thus, for example, detaining enemy combatants is also a standard part of warfare. As a result, we have concluded that the Congressional Authorization expressly authorizes such detentions, even of American citizens. *See* Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. § 4001(a) to Military Detention of United States Citizens* 6 (June 27, 2002); *accord Hamdi v. Rumsfeld*, 316 F.3d 450, 467 (4th Cir. 2003) (holding that "capturing and detaining enemy combatants is an inherent part of warfare" and that the "'necessary and appropriate force' referenced in the congressional resolution necessarily includes" such action), *cert. granted*, 124 S. Ct. 981 (2004). *But see Padilla v. Rumsfeld*, 352 F.3d 695, 722-23 (2d Cir. 2003) (holding that, except "in the battlefield context where detentions are necessary to carry out the war," the Congressional Authorization is not sufficiently "clear" and "unmistakable" to override the restrictions on detaining U.S. citizens in § 4001), *cert. granted*, 124 S. Ct. 1353 (2004). (U)

[25] As noted above, *see supra* pp. 16, 17, b1, b3 is limited to communications suspected to be those of al Qaeda, al Qaeda-affiliated organizations and other international terrorist groups that the President determines both (i) are in armed conflict with the United States and (ii) pose a threat of hostile action within the United States. b1, b3

(~~TS//SI~~ b1, b3 //~~NF~~)

§ 2(a). It is perfectly natural that Congress did not attempt to single out into subcategories every aspect of the use of the armed forces it was authorizing, for as the Supreme Court has recognized, even in normal times outside the context of a crisis "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take." *Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981). Moreover, when dealing with military affairs, Congress may delegate in broader terms than it uses in other areas. *See, e.g., Loving v. United States*, 517 U.S. 748, 772 (1996) (noting that "the same limitations on delegation do not apply" to duties that are linked to the Commander-in-Chief power); *cf. Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("[B]ecause of the changeable and explosive nature of contemporary international relations . . . Congress – in giving the Executive authority over matters of foreign affairs – must of necessity paint with a brush broader than that it customarily wields in domestic areas."). Thus, the Congressional Authorization can be treated as the type of wartime exception that was contemplated in FISA's legislative history. Even if FISA had not envisioned legislation limiting the application of FISA in specific conflicts, the Congressional Authorization, as a later-in-time – and arguably more specific – statute must prevail over FISA to the extent of any inconsistency.[26] (~~TS//SI~~ b1, b3 //~~NF~~)

The Congressional Authorization contains another provision that is particularly significant in this context. Congress expressly recognized that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Congressional Authorization, pmbl. That provision gives express congressional recognition to the President's inherent constitutional authority to take action to defend the United States even without congressional support. That is a striking recognition of presidential authority from Congress, for while the courts have long acknowledged an inherent authority in the President to take action to protect Americans abroad, *see, e.g., Durand v. Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4186), and to protect the Nation from attack, *see, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1863), at least since the War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973), codified at 50 U.S.C. §§ 1541-1548, there has been no comparable recognition of such inherent authority by Congress, and certainly not a sweeping recognition of authority such as that here. *Cf.* 50 U.S.C. § 1541(c) (recognizing President's inherent constitutional authority to use force in response to an attack on the United States). This provision cannot be discounted, moreover, as mere exuberance in the immediate aftermath of September 11, for the same terms were repeated by Congress more than a year later in the Authorization for Use of Military Force Against Iraq Resolution of 2002. Pub. L. No. 107-243,

---

[26] It is true that repeals by implication are disfavored and we should attempt to construe two statutes as being "capable of co-existence." *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1017, 1018 (1984). In this instance, however, the ordinary restrictions in FISA cannot continue to apply if the Congressional Authorization is appropriately construed to have its full effect. The ordinary constraints in FISA would preclude the President from doing precisely what the Congressional Authorization allows: using "all necessary and appropriate force . . . to prevent any future acts of international terrorism against the United States" by al Qaeda. Congressional Authorization § 2(a). Not only did the Congressional Authorization come later than FISA, but it is also more specific in the sense that it applies only to a particular conflict, whereas FISA is a general statute intended to govern *all* "electronic surveillance" (as defined in 50 U.S.C. § 1801(f)). If FISA and the Congressional Authorization "irreconcilabl[y] conflict," then the Congressional Authorization must prevail over FISA to the extent of the inconsistency. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976). (TS//SI- b1, b3 //NF)

pmbl., 116 Stat. 1498, 1500 (Oct. 16, 2002) ("[T]he President has authority under the Constitution to take action in order to deter and prevent acts of international terrorism against the United States . . . ."). That recognition of inherent authority, moreover, is particularly significant in the FISA context because, as explained above, one of the specific amendments implemented by FISA was removing any acknowledgment from section 2511(3) of title 18 of the Executive's inherent constitutional authority to conduct foreign intelligence surveillance. At least in the context of the conflict with al Qaeda, however, Congress appears to have acknowledged a sweeping inherent Executive authority to "deter and prevent" attacks that logically should include the ability to carry out signals intelligence activities necessary to detect such planned attacks. (~~TS//SI~~- b1, b3 //~~NF~~)

To be sure, the broad construction of the Congressional Authorization outlined above is not without some difficulties. Some countervailing considerations might be raised to suggest that the Authorization should not be read to extend into the field covered by FISA. In particular, shortly after the Authorization was passed Congress turned to consider a number of legislative proposals from the Administration, some of which specifically amended FISA. *See, e.g.*, USA PATRIOT Act, Pub. L. No. 107-56, § 218, 115 Stat. 272, 291 (Oct. 26, 2001) (amending section 104(a)(7)(B) of FISA to require that the acquisition of foreign intelligence information be a "significant purpose" of the surveillance order being sought, rather than "the purpose"). Thus, it might be argued that the Congressional Authorization cannot properly be construed to grant the President authority to undertake electronic surveillance without regard to the restrictions in FISA because, if the Congressional Authorization actually had applied so broadly, the specific amendments to FISA that Congress passed a few weeks later in the PATRIOT Act would have been superfluous. (~~TS//SI~~- b1, b3 //~~NF~~)

We do not think, however, that the amendments to FISA in the PATRIOT Act can justify narrowing the broad terms of the Congressional Authorization. To start with, the Authorization addresses the use of the armed forces solely in the context of the particular armed conflict of which the September 11 attacks were a part. To come within the scope of the Authorization, surveillance activity must be directed "against those nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." Congressional Authorization § 2(a). The Authorization thus eliminates the restrictions of FISA solely for that category of foreign intelligence surveillance cases. Subsequent amendments to FISA itself, however, modified the authorities for foreign intelligence surveillance in *all* cases, whether related to the particular armed conflict with al Qaeda or not. Given the broader impact of such amendments, it cannot be said that they were superfluous even if the Congressional Authorization broadly authorized electronic surveillance directed against al Qaeda and affiliated organizations. (~~TS//SI~~ b1, b3 //~~NF~~)

That understanding is bolstered by an examination of the specific amendments to FISA that were passed, because each addressed a shortcoming in FISA that warranted a remedy for all efforts to gather foreign intelligence, not just for efforts in the context of an armed conflict, much less the present one against al Qaeda. Indeed, some addressed issues that had been identified as requiring a legislative remedy long before the September 11 attacks occurred. For these

amendments, the September 11 attacks merely served as a catalyst for spurring legislative change that was required in any event. For example, Congress changed the standard required for the certification from the government to obtain a FISA order from a certification that "the purpose" of the surveillance was obtaining foreign intelligence to a certification that "a significant purpose" of the surveillance was obtaining foreign intelligence. *See* USA PATRIOT Act § 218, 115 Stat. at 291 (codified at 50 U.S.C. §§ 1804(a)(7)(B), 1823(a)(7)(B)). That change was designed to help dismantle the "wall" that had developed separating criminal investigations from foreign intelligence investigations within the Department of Justice. *See generally In re Sealed Case*, 310 F.3d 717, 725-30 (Foreign Intel. Surv. Ct. of Rev. 2002). The "wall" had been identified as a significant problem hampering the government's efficient use of foreign intelligence information well before the September 11 attacks and in contexts unrelated to terrorism. *See, e.g., Final Report of the Attorney General's Review Team on the Handling of the Los Alamos National Laboratory Investigation* 710, 729, 732 (May 2000); General Accounting Office, *FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters Is Limited* (GAO-01-780) 3, 31 (July 2001). Indeed, this Office was asked as long ago as 1995 to consider whether, under the terms of FISA as it then existed, an application for a surveillance order could be successful without establishing that the "primary" purpose of the surveillance was gathering foreign intelligence. *See* Memorandum for Michael Vatis, Deputy Director, Executive Office for National Security, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Standards for Searches Under Foreign Intelligence Surveillance Act* (Feb. 14, 1995). The PATRIOT Act thus provided the opportunity for addressing a longstanding shortcoming in FISA that had an impact on foreign intelligence gathering generally. (U)

Similarly, shortly after the PATRIOT Act was passed, the Administration sought additional legislation expanding to 72 hours (from 24 hours) the time period the government has for filing an application with the FISC after the Attorney General has authorized the emergency initiation of electronic surveillance. *See* Intelligence Authorization Act for Fiscal Year 2002, Pub. L. No. 107-108, § 314(a), 115 Stat. 1394, 1402 (Dec. 28, 2001). That change was also needed for the proper functioning of FISA generally, not simply for surveillance of agents of al Qaeda. In the wake of the September 11 attacks, there was bound to be a substantial increase in the volume of surveillance conducted under FISA, which would strain existing resources. As a result, it was undoubtedly recognized that, in order for the emergency authority to be useful as a practical matter in *any* foreign intelligence case, the Department of Justice would need more than 24 hours to prepare applications after initiating emergency surveillance. Similar broadly based considerations underpinned the other amendments to FISA that were enacted in the fall of 2001. (~~TS//SI-~~ b1, b3 ~~//NF~~)

As a result, we conclude that the enactment of amendments to FISA after the passage of the Congressional Authorization does not compel a narrower reading of the broad terms of the Authorization. The unqualified terms of the Congressional Authorization are broad enough on their face to include authority to conduct signals intelligence activity within the United States. We believe that the Congressional Authorization can thus be read to provide specific authority during this armed conflict that overrides the limitations in FISA. The Supreme Court has

repeatedly made clear that in the field of foreign affairs and particularly in the field of war powers and national security, congressional enactments will be broadly construed where they indicate support for the exercise of Executive authority. *See, e.g., Haig v. Agee*, 453 U.S. 280, 293-303 (1981); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543-45 (1950); *cf. Agee*, 453 U.S. at 291 (in "the areas of foreign policy and national security . . . congressional silence is not to be equated with congressional disapproval"); *Dames & Moore v. Regan*, 453 U.S. 654, 678-82 (1981) (even where there is no express congressional authorization, legislation in related field may be construed to indicate congressional acquiescence in Executive action). Here, the broad terms of the Congressional Authorization are easily read to encompass authority for signals intelligence activities directed against al Qaeda and its affiliates. (~~TS//SI~~ b1, b3 //~~NF~~)

**2. At a minimum, the Congressional Authorization bolsters the case for applying the canon of constitutional avoidance (~~TS//SI~~ b1, b3 /~~NF~~)**

Even if we did not believe that the Congressional Authorization provided a clear result on this point, at the very least the Congressional Authorization – which was expressly designed to give the President broad authority to respond to the threat posed by al Qaeda as he saw fit – creates a significant ambiguity concerning whether the restrictions of FISA apply to electronic surveillance undertaken in the context of the conflict with al Qaeda. That ambiguity decisively tips the scales in favor of applying the canon of constitutional avoidance to construe the Congressional Authorization and FISA in combination so that the restrictions of FISA do not apply to the President's actions as Commander in Chief in attempting to thwart further terrorist attacks on the United States. As noted above, in this wartime context the application of FISA to restrict the President's ability to conduct surveillance he deems necessary to detect and disrupt further attacks would raise grave constitutional questions. The additional ambiguity created by the Congressional Authorization suffices, in our view, to warrant invoking the canon of constitutional avoidance and thus justifies reading the Congressional Authorization to eliminate the constitutional issues that would otherwise arise if FISA were construed to limit the Commander in Chief's ability to conduct signals intelligence to thwart terrorist attacks. Application of the canon is particularly warranted, moreover, given Congress's express recognition in the terms of its Authorization that the President has inherent authority under the Constitution to take steps to protect the Nation against attack. The final preambulatory clause of the Authorization squarely states that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Congressional Authorization pmbl. As commentators have recognized, this clause "constitutes an extraordinarily sweeping congressional recognition of independent presidential *constitutional* power to employ the war power to combat terrorism." Paulsen, 19 Const. Comment. at 252. That congressional recognition of inherent presidential authority bolsters the conclusion that, when FISA and the Congressional Authorization are read together, the canon of constitutional avoidance should be applied because it cannot be said that Congress has unequivocally indicated an intention to risk a constitutionally dubious exercise of power by restricting the authority of the Commander in Chief to conduct signals intelligence in responding to the terrorist attacks. (~~TS//SI~~ b1, b3 /~~NF~~)

In sum, the constitutional avoidance canon is properly applied to conclude that the Congressional Authorization removes the restrictions of FISA for electronic surveillance undertaken by the Department of Defense and directed "against those nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001."[27] b1, b3, b5 fits that description.[28] (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

As a result, we believe that a thorough and prudent approach to analyzing the legality of b1, b3 must also take into account the possibility that FISA may be read as prohibiting the electronic surveillance activities at issue here. We turn to that analysis below. (~~TS//SI~~- b1, b3 //~~NF~~)

---

27 b1, b3, b5

28 b1, b3, b5

### C. If FISA Purported To Prohibit Targeted, Wartime Surveillance Against the Enemy Under b1, b3 , It Would Be Unconstitutional as Applied (~~TS//SI~~ b1, b3 //~~NF~~)

Assuming that FISA cannot be interpreted to avoid the constitutional issues that arise if it does, in fact, prohibit b1, b3, b5 we must next examine whether FISA, as applied in the particular circumstances of surveillance directed by the Commander in Chief in the midst of an armed conflict and designed to detect and prevent attacks upon the United States, is unconstitutional. We conclude that it is. (~~TS//SI~~ b1, b3 //~~NF~~)

#### 1. Even in peacetime, absent congressional action, the President has inherent constitutional authority, consistent with the Fourth Amendment, to order warrantless foreign intelligence surveillance (~~TS//SI~~ b1, b3 //~~NF~~)

We begin our analysis by setting to one side for the moment both the particular wartime context at issue here and the statutory constraints imposed by FISA to examine the pre-existing constitutional authority of the President in this field in the absence of any action by Congress. It has long been established that, even in peacetime, the President has an inherent constitutional authority, consistent with the Fourth Amendment, to conduct warrantless searches for foreign intelligence purposes. The Constitution vests power in the President as Commander in Chief of the armed forces, *see* U.S. Const. art. II, § 2, and, in making him Chief Executive, grants him authority over the conduct of the Nation's foreign affairs. As the Supreme Court has explained, "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (internal quotation marks and citations omitted). These sources of authority grant the President inherent power both to take measures to protect national security information, *see, e.g.*, *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988), and more generally to protect the security of the Nation from foreign attack. *Cf. The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1863). To carry out these responsibilities, the President must have authority to gather information necessary for the execution of his office. The Founders, after all, intended the President to be clothed with all authority necessary to carry out the responsibilities assigned to him as Commander in Chief and Chief Executive. *See, e.g.*, *The Federalist* No. 23, at 147 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) (explaining that the federal government will be "cloathed with all the powers requisite to the complete execution of its trust"); *id.* No. 41, at 269 (James Madison) ("Security against foreign danger is one of the primitive objects of civil society. . . . The powers requisite for attaining it must be effectually confided to the fœderal councils."); *see also Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950) ("The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, grant of war power includes all that is necessary and proper for carrying these powers into execution." (citation omitted)). Thus, it has long been recognized that he has authority to hire spies, *see, e.g.*, *Totten v. United States*, 92 U.S. 105, 106 (1876), and his authority to collect intelligence necessary for the conduct of foreign affairs has frequently been acknowledged. *See Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S.

103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world."); *Curtiss-Wright*, 299 U.S. at 320 ("He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials."). (TS//SI- b1, b3 //NF)

When it comes to collecting foreign intelligence information within the United States, of course, the President must exercise his inherent authorities consistently with the requirements of the Fourth Amendment.[29] Determining the scope of the President's inherent constitutional authority in this field, therefore, requires analysis of the requirements of the Fourth Amendment – at least to the extent of determining whether or not the Fourth Amendment imposes a warrant requirement on searches conducted for foreign intelligence purposes. If it does, then a statute such as FISA that also imposes a procedure for judicial authorization cannot be said to encroach upon authorities the President would otherwise have.[30] (TS//SI- b1, b3 //NF)

The Fourth Amendment prohibits "unreasonable searches and seizures" and directs that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. In "the criminal context," as the Supreme Court has pointed out, "reasonableness usually requires a showing of probable cause" and a warrant. *Board of Educ. v. Earls*, 536 U.S. 822, 828 (2002). The warrant and probable cause requirement, however, is far from universal. Rather, the "Fourth Amendment's central requirement is one of reasonableness," and the rules the Court has developed to implement that requirement "[s]ometimes . . . require warrants." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *see also, e.g.*, *Earls*, 536 U.S. at 828 ("The probable cause standard, however, is peculiarly related to criminal investigations and may be unsuited to determining the reasonableness of administrative searches where the Government seeks to *prevent* the development of hazardous conditions." (emphasis added; internal quotation marks omitted)). (U)

In particular, the Supreme Court has repeatedly made clear that in situations involving "special needs" that go beyond a routine interest in law enforcement, there may be exceptions to the warrant requirement. Thus, the Court has explained that there are circumstances "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)); *see also McArthur*, 531 U.S. at 330 ("We nonetheless have made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal

---

[29] The Fourth Amendment does not protect aliens outside the United States. *See United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). (U)

[30] We assume for purposes of the discussion here that b1, b3 is subject to the requirements of the Fourth Amendment. In Part V of this memorandum, we address the reasonableness under the Fourth Amendment b1, b3 In addition, we note that there may be a basis for concluding that b1, b3 is a military operation to which the Fourth Amendment does not even apply. *See infra* n.84. (TS//SI- b1, b3 //NF)

intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."). It is difficult to encapsulate in a nutshell the different circumstances the Court has found qualifying as "special needs" justifying warrantless searches. But generally when the government faces an increased need to be able to react swiftly and flexibly, or when there are interests in public safety at stake beyond the interests in law enforcement, the Court has found the warrant requirement inapplicable. (U)

Thus, among other things, the Court has permitted warrantless searches to search property of students in public schools, *see New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) (noting that warrant requirement would "unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools"), to screen athletes and students involved in extra-curricular activities at public schools for drug use, *see Vernonia*, 515 U.S. at 654-655; *Earls*, 536 U.S. at 829-38, and to conduct drug testing of railroad personnel involved in train accidents, *see Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 634 (1989). Indeed, in many special needs cases the Court has even approved *suspicionless* searches or seizures. *See, e.g.*, *Earls*, 536 U.S. at 829-38 (suspicionless drug testing of public school students involved in extra-curricular activities); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 449-55 (1990) (road block to check all motorists for signs of drunken driving); *United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976) (road block near the border to check vehicles for illegal immigrants). *But see City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000) (striking down use of roadblock to check for narcotics activity because its "primary purpose was to detect evidence of ordinary criminal wrongdoing"). (U)

The field of foreign intelligence collection presents another case of "special needs beyond the normal need for law enforcement" where the Fourth Amendment's touchstone of reasonableness can be satisfied without resort to a warrant. In foreign intelligence investigations, the targets of surveillance are agents of foreign powers who may be specially trained in concealing their activities from our government and whose activities may be particularly difficult to detect. The Executive requires a greater degree of flexibility in this field to respond with speed and absolute secrecy to the ever-changing array of foreign threats it faces. The object of searches in this field, moreover, is securing information necessary to protect the national security from the hostile designs of foreign powers, including even the possibility of a foreign attack on the Nation. (~~TS//SI~~ b1, b3 //~~NF~~)

Given those distinct interests at stake, it is not surprising that every federal court that has ruled on the question has concluded that, even in peacetime, the President has inherent constitutional authority, consistent with the Fourth Amendment, to conduct searches for foreign intelligence purposes without securing a judicial warrant. *See United States v. Clay*, 430 F.2d 165, 172 (5th Cir. 1970); *United States v. Brown*, 484 F.2d 418 (5th Cir. 1973); *United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974) (en banc); *United States v. Buck*, 548 F.2d 871, 875 (9th Cir. 1977); *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980). *But cf. Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) (en banc) (dictum in plurality opinion suggesting that warrant would be required even in foreign intelligence investigation). (~~TS//SI~~ b1, b3 //~~NF~~)

To be sure, the Supreme Court has left this precise question open. In *United States v. United States District Court*, 407 U.S. 297 (1972) (*Keith*), the Supreme Court concluded that the Fourth Amendment's warrant requirement applies to investigations of purely *domestic* threats to security – such as domestic terrorism. The Court made clear, however, that it was not addressing Executive authority to conduct *foreign* intelligence surveillance: "[T]he instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." *Id.* at 308; *see also id.* at 321-322 & n.20 ("We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents."). (~~TS//SI~~ b1, b3 //~~NF~~)

Indeed, four of the courts of appeals noted above decided – after *Keith*, and expressly taking *Keith* into account – that the President has inherent authority to conduct warrantless surveillance in the foreign intelligence context. As the Fourth Circuit observed in *Truong*, "the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would . . . unduly frustrate the President in carrying out his foreign affairs responsibilities." 629 F.2d at 913 (internal quotation marks omitted). The court pointed out that a warrant requirement would be a hurdle that would reduce the Executive's flexibility in responding to foreign threats that "require the utmost stealth, speed, and secrecy." *Id.* It also would potentially jeopardize security by increasing "the chance of leaks regarding sensitive executive operations." *Id.* It is true that the Supreme Court had discounted such concerns in the domestic security context, *see Keith*, 407 U.S. at 319-20, but as the Fourth Circuit explained, in dealing with hostile agents of foreign powers, the concerns are arguably more compelling. More important, in the area of foreign intelligence the expertise of the Executive is paramount. While courts may be well-adapted to ascertaining whether there is probable cause to believe that a crime under domestic law has been committed, they would be ill-equipped to review executive determinations concerning the need to conduct a particular search or surveillance to secure vital foreign intelligence. *See Truong*, 629 F.2d at 913-14. *Cf. Curtiss-Wright*, 299 U.S. at 320 ("[The President] has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information."). It is not only the Executive's expertise that is critical, moreover. As the Fourth Circuit pointed out, the Executive has a constitutionally superior position in matters pertaining to foreign affairs and national security: "Perhaps most crucially, the executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs." *Truong*, 629 F.2d at 914. The court thus concluded that there was an important separation of powers interest in not having the judiciary intrude on the field of foreign intelligence collection: "[T]he separation of powers requires us to acknowledge the principal responsibility of the President for foreign affairs and concomitantly for foreign intelligence surveillance." *Id.*; *cf. Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). We agree with that analysis.[31] (~~TS//SI~~ b1, b3 //~~NF~~)

---

[31] In addition, there is a further basis on which *Keith* is readily distinguished. As *Keith* made clear, one of the significant concerns driving the Court's conclusion in the domestic security context was the inevitable connection between perceived threats to domestic security and political dissent. As the Court explained: "Fourth

In the specific context of b1, b3 moreover, the case for inherent executive authority to conduct surveillance in the absence of congressional action is substantially stronger for at least two reasons. First and foremost, all of the precedents outlined above addressed inherent executive authority under the foreign affairs power to conduct surveillance *in a routine peacetime context.*[32] They did not even consider the authority of the Commander in Chief to gather intelligence in the context of an ongoing armed conflict in which the mainland United States had already been under attack and in which the intelligence-gathering efforts at issue were designed to thwart further armed attacks. The case for inherent executive authority is necessarily much stronger in the latter scenario, which is precisely the circumstance presented by b1, b3 (~~TS//SI~~ b1, b3 //~~NF~~)

Second, it also bears noting that in the 1970s the Supreme Court had barely started to develop the "special needs" jurisprudence of warrantless searches under the Fourth Amendment. The first case usually considered part of that line of decisions is *United States v. Martinez-Fuerte*, 428 U.S. 543, decided in 1976 – after three courts of appeals decisions addressing warrantless foreign intelligence surveillance had already been handed down. The next Supreme Court decision applying a rationale clearly in the line of "special needs" jurisprudence was not until 1985, *see New Jersey v. T.L.O.*, 469 U.S. 325,[33] and the jurisprudence was not really developed until the 1990s. Thus, the courts of appeals decisions described above all decided in favor of an inherent executive authority to conduct warrantless foreign intelligence searches even before the Supreme Court had clarified the major doctrinal developments in Fourth Amendment law that now provide the clearest support for such an authority. (~~TS//SI~~- b1, b3 //~~NF~~)

Executive practice, of course, also demonstrates a consistent understanding that the President has inherent constitutional authority, in accordance with the dictates of the Fourth Amendment, to conduct warrantless searches and surveillance within the United States for

---

Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.'" *Keith*, 407 U.S. at 314; *see also id.* at 320 ("Security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent."). Surveillance of domestic groups necessarily raises a First Amendment concern that generally is not present when the subjects of the surveillance are the agents of foreign powers.

b5

One of the important factors driving the Supreme Court's conclusion that the warrant requirement should apply in the domestic security context is thus simply absent in the foreign intelligence realm. (~~TS//SI~~- b1, b3 /~~NF~~)

[32] The surveillance in *Truong*, while in some sense connected to the Vietnam conflict and its aftermath, took place in 1977 and 1978, *see* 629 F.2d at 912, after the close of active hostilities. (~~TS//SI~~- b1, b3 /~~NF~~)

[33] The term "special needs" appears to have been coined by Justice Blackmun in his concurrence in *T.L.O. See* 469 U.S. at 351 (Blackmun, J., concurring in judgment). (~~TS//SI~~- b1, b3 /~~NF~~)

foreign intelligence purposes. Wiretaps for such purposes have been authorized by Presidents at least since the administration of Roosevelt in 1940. *See, e.g., United States v. United States District Court*, 444 F.2d 651, 669-71 (6th Cir. 1971) (reproducing as an appendix memoranda from Presidents Roosevelt, Truman, and Johnson). Before the passage of FISA in 1978, all foreign intelligence wiretaps and searches were conducted without any judicial order pursuant to the President's inherent authority. *See, e.g., Truong*, 629 F.2d at 912-14; *United States v. Bin Laden*, 126 F. Supp. 2d 264, 273 (S.D.N.Y. 2000) ("Warrantless foreign intelligence collection has been an established practice of the Executive Branch for decades."). When FISA was first passed, moreover, it addressed solely electronic surveillance and made no provision for physical searches. *See* Pub. L. No. 103-359, § 807, 108 Stat. 3423, 3443-53 (1994) (adding provision for physical searches). As a result, after a brief interlude during which applications for orders for physical searches were made to the FISC despite the absence of any statutory procedure, the Executive continued to conduct searches under its own inherent authority. Indeed, in 1981, the Reagan Administration, after filing an application with the FISC for an order authorizing a physical search, filed a memorandum with the court explaining that the court had no jurisdiction to issue the requested order and explaining that the search could properly be conducted without a warrant pursuant to the President's inherent constitutional authority. *See* S. Rep. No. 97-280, at 14 (1981) ("The Department of Justice has long held the view that the President and, by delegation, the Attorney General have constitutional authority to approve warrantless physical searches directed against foreign powers or their agents for intelligence purposes."). This Office has also repeatedly recognized the constitutional authority of the President to engage in warrantless surveillance and searches for foreign intelligence purposes.[34] (~~TS//SI-~~ b1, b3 //~~NF~~)

---

34 b5

*Intelligence – Warrantless Electronic Surveillance – Common Carriers*, 2 Op. O.L.C. 123 (1978); *Warrantless Foreign Intelligence Surveillance – Use of Television – Beepers*, 2 Op. O.L.C. 14, 15 (1978) ("[T]he President can authorize warrantless electronic surveillance of an agent of a foreign power, pursuant to his constitutional power to gather foreign

These examples, too, all relate to assertions of executive authority in a routine, peacetime context. Again, the President's authority is necessarily heightened when he acts during wartime as Commander-in-Chief to protect the Nation from attack. Thus, not surprisingly, as noted above, Presidents Wilson and Roosevelt did not hesitate to assert executive authority to conduct surveillance – through censoring communications – upon the outbreak of war. *See supra* p. 30. (~~TS//SI~~ b1, b3 //~~NF~~)

**2. FISA is unconstitutional as applied in this context (~~TS//SI~~ b1, b3 //~~NF~~)**

While it is thus uncontroversial that the President has inherent authority to conduct warrantless searches for foreign intelligence purposes in the absence of congressional action, the restrictions imposed in FISA present a distinct question: whether the President's constitutional authority in this field is exclusive, or whether Congress may, through FISA, impose a requirement to secure judicial authorization for such searches. To be more precise, analysis of b1, b3 presents an even narrower question: namely, whether, in the context of an ongoing armed conflict, Congress may, through FISA, impose restrictions on the means by which the Commander in Chief may use the capabilities of the Department of Defense to gather intelligence about the enemy in order to thwart further foreign attacks on the United States. (~~TS//SI~~ b1, b3 //~~NF~~)

As discussed below, the conflict of congressional and executive authority in this context presents a difficult question – one for which there are few if any precedents directly on point in the history of the Republic. In almost every previous instance in which the country has been threatened by war or imminent foreign attack and the President has taken extraordinary measures to secure the national defense, Congress has acted to support the Executive through affirmative legislation granting the President broad wartime powers,[35] or else the Executive has acted in

---

intelligence."). (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

[35] As explained above, we believe that the better construction of the Congressional Authorization for Use of Military Force in the present conflict is that it also reflects precisely such a congressional endorsement of Executive action and authorizes b1, b3 In this part of our analysis, however, we are assuming, in the alternative, that the Authorization cannot be read so broadly and that FISA by its

exigent circumstances in the absence of any congressional action whatsoever (for example, President Lincoln's actions in 1861 in proclaiming a blockade of the southern States and instituting conscription). In the classic separation of powers analysis set out by Justice Jackson in *Youngstown*, such circumstances describe either "category I" situations – where the legislature has provided an "express or implied authorization" for the Executive – or "category II" situations – where Congress may have some shared authority over the subject, but has chosen not to exercise it. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952); *see also Dames & Moore v. Regan*, 453 U.S. 654, 668-69 (1981) (generally following Jackson's framework). Here, however, we confront an exercise of Executive authority that falls into "category III" of Justice Jackson's classification. *See* 343 U.S. at 637-38. The President (for purposes of this argument in the alternative) is seeking to exercise his authority as Commander in Chief to conduct intelligence surveillance that Congress has expressly restricted by statute. (~~TS//SI~~ b1, b3 /~~NF~~)

At bottom, therefore, analysis of the constitutionality of FISA in the context of b1, b3 centers on two questions: (i) whether the signals intelligence collection the President wishes to undertake is such a core exercise of Commander-in-Chief control over the armed forces during armed conflict that Congress cannot interfere with it at all or, (ii) alternatively, whether the particular restrictions imposed by FISA are such that their application would impermissibly frustrate the President's exercise of his constitutionally assigned duties as Commander in Chief. (~~TS//SI~~ b1, b3 /~~NF~~)

As a background for that context-specific analysis, however, we think it is useful first to examine briefly the constitutional basis for Congress's assertion of authority in FISA to regulate the President's inherent powers over foreign intelligence gathering even in the general, peacetime context. Even in that non-wartime context, the assertion of authority in FISA, and in particular the requirement that the Executive seek orders for surveillance from Article III courts, is not free from constitutional doubt. Of course, if the constitutionality of some aspects of FISA is open to any doubt even in the run-of-the-mill peacetime context, it follows *a fortiori* that the legitimacy of congressional encroachments on Executive power will only be more difficult to sustain where they involve trenching upon decisions of the Commander in Chief in the midst of a war. Thus, after identifying some of the questions surrounding the congressional assertion of authority in FISA generally, we proceed to the specific analysis of FISA as applied in the wartime context of b1, b3 (~~TS//SI~~ b1, b3 //~~NF~~)

**a. Even outside the context of wartime surveillance of the enemy, the scope of Congress's power to restrict the President's inherent authority to conduct foreign intelligence surveillance is unclear** (~~TS//SI~~ b1, b3 //~~NF~~)

To frame the analysis of the specific, wartime operation of b1, b3 it is important to note at the outset that, even in the context of general foreign intelligence collection

---

terms prohibits b1, b3 absent an order from the FISC. (~~TS//SI~~ b1, b3 //~~NF~~)

in non-wartime situations, the source and scope of congressional power to restrict executive action through FISA is somewhat uncertain. We start from the fundamental proposition that in assigning to the President as Chief Executive the preeminent role in handling the foreign affairs of the Nation, the Constitution grants substantive powers to the President. As explained above, the President's role as sole organ for the Nation has long been recognized as carrying with it substantive powers in the field of national security and foreign intelligence. This Office has traced the source of this authority to the Vesting Clause of Article II, which states that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1. Thus, we have explained that the Vesting Clause "has long been held to confer on the President plenary authority to represent the United States and to pursue its interests outside the borders of the country, subject only to limits specifically set forth in the Constitution itself and to such statutory limitations as the Constitution permits Congress to impose by exercising one of its enumerated powers" *The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159, 160-61 (1986) ("*Timely Notification Requirement Op.*"). Significantly, we have concluded that the "conduct of secret negotiations and intelligence operations lies at the very heart of the President's executive power." *Id.* at 165. The President's authority in this field is sufficiently comprehensive that the entire structure of federal restrictions for protecting national security information has been created solely by presidential order, not by statute. *See generally Department of the Navy v. Egan*, 484 U.S. 518, 527, 530 (1988); *see also New York Times Co. v. United States*, 403 U.S. 713, 729-30 (1971) (Stewart, J., concurring) ("[I]t is the constitutional duty of the Executive – as a matter of sovereign prerogative and not as a matter of law as the courts know law – through the promulgation and enforcement of executive regulations, to protect the confidentiality necessary to carry out its responsibilities in the field of international relations and national defense."). Similarly, the NSA is entirely a creature of the Executive – it has no organic statute defining or limiting its functions. (~~TS//SI~~ b1, b3 //~~NF~~)

Moreover, it is settled beyond dispute that, although Congress is also granted some powers in the area of foreign affairs, certain presidential authorities in that realm are wholly beyond the power of Congress to interfere with by legislation. For example, as the Supreme Court explained in *Curtiss-Wright*, the President "makes treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiations the Senate cannot intrude; and Congress itself is powerless to invade it." 299 U.S. at 319. Similarly, President Washington established early in the history of the Republic the Executive's absolute authority to maintain the secrecy of negotiations with foreign powers, even against congressional efforts to secure information. *Id.* at 320-21 (quoting Washington's 1796 message to the House of Representatives regarding documents relative to the Jay Treaty). Recognizing presidential authority in this field, this Office has stated that "congressional legislation authorizing extraterritorial diplomatic and intelligence activities is superfluous, and . . . statutes infringing the President's inherent Article II authority would be unconstitutional." *Timely Notification Requirement Op.*, 10 Op. O.L.C. at 164. (U)

Whether the President's power to conduct foreign intelligence searches within the United States is one of the inherent presidential powers with which Congress cannot interfere presents a

difficult question. It is not immediately obvious which of Congress's enumerated powers in the field of foreign affairs would provide authority to regulate the President's use of constitutional methods of collecting foreign intelligence. Congress has authority to "regulate Commerce with foreign Nations," to impose "Duties, Imposts and Excises," and to "define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." U.S. Const. art. I, § 8, cls. 1, 3, 10. But none of those powers suggests a specific authority to regulate the Executive's intelligence-gathering activities. Of course, the power to regulate both foreign and interstate commerce gives Congress authority generally to regulate the facilities that are used for carrying communications, and that may arguably provide Congress sufficient authority to limit the interceptions the Executive can undertake. A general power to regulate commerce, however, provides a weak basis for interfering with the President's preeminent position in the field of national security and foreign intelligence. Intelligence gathering, after all, is as this Office has stated before, at the "heart" of Executive functions. Since the time of the Founding it has been recognized that matters requiring secrecy – and intelligence in particular – are quintessentially Executive functions. *See, e.g.*, *The Federalist* No. 64, at 435 (John Jay) ("The convention have done well therefore in so disposing of the power of making treaties, that although the president must in forming them act by the advice and consent of the senate, yet he will be able to manage the business of intelligence in such manner as prudence may suggest.").[36] (~~TS//SI~~- b1, b3 //~~NF~~)

---

[36] Two other congressional powers – the power to "make Rules for the Government and Regulation of the land and naval Forces," and the Necessary and Proper Clause, U.S. Const. art. I, § 8, cls. 14, 18 – are even less likely sources for congressional authority in this context. (~~TS//SI~~- b1, b3 //~~NF~~)

As this Office has previously noted, the former clause should be construed as authorizing Congress to "prescrib[e] a code of conduct governing military life" rather than to "control actual military operations." Letter for Hon. Arlen Specter, U.S. Senate, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel 8 (Dec. 16, 1987); *see also Chappell v. Wallace*, 462 U.S. 296, 301 (1983) (noting that the clause responded to the need to establish "rights, duties, and responsibilities in the framework of the military establishment, including regulations, procedures, and remedies related to military discipline"); *cf.* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Power as Commander in Chief to Transfer Captured Terrorists to the Control and Custody of Foreign Nations* 6 (Mar. 13, 2002) (Congress's authority to make rules for the government and regulation of the land and naval forces is limited to the discipline of U.S. troops, and does not extend to "the rules of engagement and treatment concerning enemy combatants"). (U)

The Necessary and Proper Clause, by its own terms, allows Congress only to "carry[] into Execution" other powers granted in the Constitution. Such a power could not, of course, be used to limit or impinge upon one of those other powers (the President's inherent authority to conduct warrantless surveillance under the Commander-in-Chief power). *Cf.* George K. Walker, *United States National Security Law and United Nations Peacekeeping or Peacemaking Operations*, 29 Wake Forest L. Rev. 435, 479 (1994) ("The [Necessary and Proper] clause authorizes Congress to act with respect to its own functions as well as those of other branches except where the Constitution forbids it, or in the limited number of instances where exclusive power is specifically vested elsewhere. The power to preserve, protect, and defend, as Commander-in-Chief, is solely vested in the President. Thus, although the Congress might provide armed forces, Congress cannot dictate to the President how to use them.") (internal quotation marks and footnotes omitted); Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 740 ("The Necessary and Proper Clause permits Congress to assist the president in the exercise of his powers; it does not grant Congress a license to reallocate or abridge powers already vested by the Constitution."). (U)

The legislative history of FISA amply demonstrates that the constitutional basis for the legislation was open to considerable doubt even at the time the statute was enacted and that even supporters of the bill recognized that the attempt to regulate the President's authority in this field presented an untested question of constitutional law that the Supreme Court might resolve by finding the statute unconstitutional. For example, while not opposing the legislation, Attorney General Levi nonetheless, when pressed by the Senate Judiciary Committee, testified that the President has an inherent constitutional power in this field "which cannot be limited, no matter what the Congress says." *See Foreign Intelligence Surveillance Act of 1976: Hearing Before the Subcomm. on Crim. Laws and Procs. of the Senate Comm. on the Judiciary*, 94th Cong. 17 (1976) ("*1976 FISA Hearing*"). Similarly, former Deputy Attorney General Laurence Silberman noted that previous drafts of the legislation had properly recognized that if the President had an inherent power in this field – "inherent," as he put it, "meaning beyond congressional control" – there should be a reservation in the bill acknowledging that constitutional authority. He concluded that the case for such a reservation was "probably constitutionally compelling." *Foreign Intelligence Electronic Surveillance: Hearings Before the Subcomm. on Legislation of the House Perm. Select Comm. on Intelligence* 217, 223 (1978) (statement of Laurence H. Silberman).[37] Senator McClellan, a member of the Judiciary Committee, noted his view that, as of 1974, given a constitutional power in the President to conduct warrantless intelligence surveillance, "no statute could change or alter it." *1976 FISA Hearing* at 2. And even if the law had developed since 1974, he still concluded in 1976 that "under any reasonable reading of the relevant court decisions, this bill approaches the outside limits of our Constitutional power to prescribe restrictions on and judicial participation in the President's responsibility to protect this country from threats from abroad, whether it be by electronic surveillance or other lawful means." *Id.* Indeed, the Conference Report took the unusual step of expressly acknowledging that, while Congress was attempting to foreclose the President's reliance on inherent constitutional authority to conduct surveillance outside the dictates of FISA, "the establishment by this act of exclusive means by which the President may conduct electronic surveillance does not foreclose a different decision by the Supreme Court." H.R. Conf. Rep. No. 95-1720, at 35, *reprinted in* 1978 U.S.C.C.A.N. 4048, 4064. The Conference Report thus effectively acknowledged that the congressional foray into regulating the Executive's inherent authority to conduct foreign intelligence surveillance – even in a non-war context – was sufficiently open to doubt that the statute might be struck down. (~~TS//SI~~- b1, b3 ~~/NF~~)

Even Senator Kennedy, one of the most ardent supporters of the legislation, acknowledged that it raised substantial constitutional questions that would likely have to be resolved by the Supreme Court. He admitted that "[i]f the President does have the [inherent constitutional] power [to engage in electronic surveillance for national security purposes], then depreciation of it in Congressional enactments cannot unilaterally diminish it. As with claims of

[37] The 2002 *per curiam* opinion of the Foreign Intelligence Surveillance Court of Review (for a panel that included Judge Silberman) noted that, in light of intervening Supreme Court cases, there is no longer "much left to an argument" that Silberman had made in his 1978 testimony about FISA's being inconsistent with "Article III case or controversy responsibilities of federal judges because of the secret, non-adversary process." *In re Sealed Case*, 310 F.3d 717, 732 n.19. That constitutional objection was, of course, completely separate from the one based upon the President's inherent powers. (~~TS//SI~~ b1, b3 ~~/NF~~)

Executive privilege and other inherent Presidential powers, the Supreme Court remains the final arbiter." *1976 FISA Hearing* at 3. Moreover, Senator Kennedy and other senators effectively highlighted their own perception that the legislation might well go beyond the constitutional powers of Congress as they repeatedly sought assurances from Executive branch officials concerning the fact that "this President has indicated that he would be bound by [the legislation]" and speculated about "[h]ow binding is it going to really be in terms of future Presidents?" *Id.* at 16; *see also id.* at 23 (Sen. Hruska) ("How binding would that kind of a law be upon a successor President who would say . . . I am going to engage in that kind of surveillance because it is a power derived directly from the Constitution and cannot be inhibited by congressional enactment?"). The senators' emphasis on the current President's acquiescence in the legislation, and trepidation concerning the positions future Presidents might take, makes sense only if they were sufficiently doubtful of the constitutional basis for FISA that they conceived of the bill as more of a practical compromise between a particular President and Congress rather than an exercise of authority granted to Congress under the Constitution, which would necessarily bind future Presidents as the law of the land. (TS//SI b1, b3 //NF)

Finally, other members of Congress focused on the point that, whatever the scope of Congress's authority to impose some form of restriction on the President's conduct of foreign intelligence surveillance, the particular restriction imposed in FISA – requiring resort to an Article III court for a surveillance order – raised its own separation-of-powers problem. Four members of the House's Permanent Select Committee on Intelligence criticized this procedure on constitutional grounds and argued that it "would thrust the judicial branch into the arena of foreign affairs and thereby improperly subject 'political' decisions to 'judicial intrusion.'" H.R. Rep. No. 95-1283, Pt. 1, at 111 (1978). They concluded that it "is clearly inappropriate to inject the Judiciary into this realm of foreign affairs and national defense which is constitutionally delegated to the President and to the Congress." *Id.* at 114. Similar concerns about constitutionality were raised by dissenters from the Conference Report, who noted that "this legislation attempts to do that which it cannot do: transfer a constitutionally granted power from one branch of government to another." 124 Cong. Rec. 33,787, 33,788 (Oct. 5, 1978). (TS//SI b1, b3 //NF)

The only court that has addressed the relative powers of Congress and the President in this field, as far as we are aware, has suggested that the balance tips decidedly in the President's favor. The Foreign Intelligence Surveillance Court of Review recently noted that all courts to have addressed the issue have "held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information." *In re Sealed Case*, 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002). On the basis of that unbroken line of precedent, the Court "[took] for granted that the President does have that authority," and concluded that, "assuming that is so, FISA could not encroach on the President's constitutional power." *Id.*[38] Although that statement was made without extended analysis, it is the only judicial statement on

[38] In the past, other courts have declined to express a view on that issue one way or the other. *See, e.g.*, *Butenko*, 494 F.2d at 601 ("We do not intimate, at this time, any view whatsoever as the proper resolution of the possible clash of the constitutional powers of the President and Congress."). (TS//SI b1, b3 NF)

point, and it comes from the specialized appellate court created expressly to deal with foreign intelligence issues under FISA. (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

b1, b3, b5

b1, b3, b5

---

b1, b3, b5

b1, b3, b5

**b. In the narrow context of interception of enemy communications in the midst of an armed conflict, FISA is unconstitutional as applied** (~~TS//SI~~ b1, b3 //~~NF~~)

For analysis of b1, b3 however, we need not address such a broad question, nor need we focus our analysis solely on the President's general authority in the realm of foreign affairs as Chief Executive. To the contrary, the activities authorized in b1, b3 are also – and indeed, primarily – an exercise of the President's authority as Commander in Chief. That authority, moreover, is being exercised in a particular factual context that involves using the resources of the Department of Defense in an armed conflict to defend the Nation from renewed attack at the hands of an enemy that has already inflicted the single deadliest foreign attack in the Nation's history. As explained above, each Presidential Authorization for a renewal of the b1, b3 authority is based on a review of current threat information from which the President concludes that al Qaeda

b5

March 11, 2004 Authorization b5 In addition, the Authorization makes clear that the electronic surveillance is being authorized "for the purpose of detection and prevention of terrorist acts within the United States." *Id.* b5 Surveillance designed to detect communications that may reveal critical information about an attack planned by enemy forces is a classic form of signals intelligence operation that is a key part of the military strategy for defending the country. Especially given that the enemy in this conflict has already demonstrated an ability to insert agents into the country surreptitiously to carry out attacks, the imperative demand for such intelligence as part of the military plan for defending the country is obvious.

b5

Accordingly, our analysis focuses solely on those circumstances. It bears emphasis, moreover, that the question of congressional authority to regulate the Executive's powers to gather foreign intelligence has never been addressed in such a context. (~~TS//SI~~ b1, b3 //~~NF~~)

Even in that narrow context, the conflict between the restrictions imposed by Congress in FISA and the President's inherent authorities as Commander in Chief presents a complex and in many respects novel question. As set out below, we now conclude that, at least in the narrow circumstances presented by b1, b3 in the current conflict with al Qaeda and its affiliated terrorist organizations, the President has exclusive constitutional authority, derived from his dual roles as Commander in Chief and sole organ for the Nation in foreign affairs, to

order warrantless foreign intelligence surveillance targeted at communications of the enemy that Congress cannot override by legislation. Provisions in FISA that, by their terms, would prohibit b1, b3 are thus unconstitutional as applied in this context. (~~TS//SI~~ b1, b3 ~~//NF~~)

As noted above, there are few precedents to provide concrete guidance concerning exactly where the line should be drawn defining core Commander-in-Chief authorities with which Congress cannot interfere. This Office has long concluded, based on decisions of the Supreme Court, that the Commander-in-Chief Clause is a substantive grant of authority to the President. *See, e.g.*, Memorandum for Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* 5 (May 22, 1970) ("*Cambodian Sanctuaries*") ("[T]he designation of the President as Commander-in-Chief of the Armed Forces is a substantive grant of power."). It is thus well established in principle that the Clause provides some area of exclusive Executive authority beyond congressional control. The core of the Commander-in-Chief power is the authority to direct the armed forces in conducting a military campaign. Thus, the Supreme Court has made clear that the "President alone" is "constitutionally invested with the entire charge of hostile operations." *Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874); *see also United States v. Sweeny*, 157 U.S. 281, 284 (1895) ("[T]he object of the [Commander-in-Chief Clause] is evidently to vest in the President . . . such supreme *and undivided* command as would be necessary to the prosecution of a successful war." (emphasis added)); *The Federalist* No. 74, at 500 (Hamilton) ("Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand. The direction of war implies the direction of the common strength; and the power of directing and employing the common strength, forms an usual and essential part in the definition of the executive authority."). Similarly, the Court has stated that, "[a]s commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy." *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850). As Chief Justice Chase explained in 1866, Congress's power "extends to all legislation essential to the prosecution of war with vigor and success, *except such as interferes with the command of the forces and the conduct of campaigns*. That power and duty belong to the President as commander-in-chief." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J., concurring) (emphasis added); *cf. Stewart v. Kahn*, 78 U.S. (11 Wall.) 493, 506 (1870) ("The measures to be taken in carrying on war . . . are not defined [in the Constitution]. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution."). (~~TS//SI~~ b1, b3 ~~/NF~~)

The President's authority, moreover, is at its height in responding to an attack upon the United States. As the Supreme Court emphasized in the *Prize Cases*, the President is "bound to resist force by force"; he need not await any congressional sanction to defend the Nation from attack and "[h]e must determine what degree of force the crisis demands." *The Prize Cases*, 67 U.S. (2 Black) 635, 668, 670 (1863). Based on such authorities, this Office has concluded that Congress has no power to interfere with presidential decisions concerning the actual management

of a military campaign. *See, e.g.*, Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* 11-14 (Apr. 8, 2002); *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61 (1941) ("[I]n virtue of his rank as head of the forces, he has certain powers and duties with which Congress cannot interfere." (internal quotation marks omitted)).[40] As we have noted, "[i]t has never been doubted that the President's power as Commander-in-Chief authorizes him, and him alone, to conduct armed hostilities which have been lawfully instituted." *Cambodian Sanctuaries* at 15. And as we explained in detail above, *see supra* pp. 29-30, the interception of enemy communications is a traditional element of the conduct of such hostilities during wartime and necessarily lies at core of the President's Commander-in-Chief power. (~~TS//SI~~ b1, b3 //~~NF~~)

We believe that b1, b3 comes squarely within the Commander in Chief's authority to conduct the campaign against al Qaeda as part of the current armed conflict and that congressional efforts to prohibit the President's efforts to intercept enemy communications through b1, b3 would be an unconstitutional encroachment on the Commander-in-Chief power. (~~TS//SI~~ b1, b3 //~~NF~~)

b5

[40] Along similar lines, Francis Lieber, a principal legal adviser to the Union Army during the Civil War, explained that the "direction of military movement 'belongs to command, and neither the power of Congress to raise and support armies, nor the power to make rules for the government and regulation of the land and naval forces, nor the power to declare war, gives it the command of the army. Here the constitutional power of the President as commander-in-chief is exclusive.'" Clarence A. Berdahl, *War Powers of the Executive in the United States* 118 (1921) (quoting Lieber, *Remarks on Army Regulations* 18). (U)

b5

b5

---

b5

b5

On the other side of the balance, there are instances in which executive practice has recognized some congressional control over the Executive's decisions concerning the armed forces. No example of which we are aware, however, involves an attempt at congressional regulation of the actual conduct of a campaign against enemy forces.[42] For example, just before

b5

[42] Many have pointed to the annual message that President Thomas Jefferson sent to Congress in 1801 as support for the proposition that executive practice in the early days of the Republic acknowledged congressional power to regulate even the President's command over the armed forces. *See, e.g.*, *Youngstown*, 343 U.S. at 64 n.10 (Jackson, J., concurring); Edward S. Corwin, *The President's Control of Foreign Relations* 131-33 (1917); Louis Fisher, *Presidential War Power* 25 (1995); *see also* Abraham D. Sofaer, *War, Foreign Affairs, and Constitutional Power: The Origins* 212 (1976) ("Most commentators have accepted this famous statement of deference to Congress as accurate and made in good faith."). In the message, Jefferson suggested that a naval force he had dispatched to the Mediterranean to answer threats to American shipping from the Barbary powers was "[u]nauthorized by the Constitution, without the sanction of Congress, to go beyond the line of defense." Sofaer, *War, Foreign Affairs, and Constitutional Power* at 212 (quoting 11 *Annals of Congress* 11-12). But the orders actually given to the naval commanders were quite different. They instructed the officers that, if upon their arrival

World War II, Attorney General Robert Jackson concluded that the Neutrality Act prohibited President Roosevelt from selling certain armed naval vessels (so-called "mosquito" boats) and sending them to Great Britain. *See Acquisition of Naval and Air Bases in Exchange for Over-Age Destroyers*, 39 Op. Att'y Gen. 484, 496 (1940). Thus, he concluded that Congress could control the Commander in Chief's ability to transfer that war materiel. That conclusion, however, does not imply any acceptance of direct congressional regulation of the Commander in Chief's control of the means and methods of engaging the enemy in an actual conflict. Indeed, Congress's authority in the context of controlling the sale of American naval vessels to another country was arguably bolstered in part by Congress's authority over "provid[ing] and maintain[ing] a Navy." U.S. Const. art. I, § 8, cl. 13. Similarly, in *Youngstown Sheet & Tube Co. v. Sawyer*, the Truman Administration readily conceded that, *if* Congress had by statute prohibited the seizure of steel mills, Congress's action would have been controlling. *See* Brief for Petitioner at 150, *Youngstown*, 343 U.S. 579 (1952) (Nos. 744 and 745) ("The President has made clear his readiness to accept and execute any Congressional revision of his judgment as to the necessary and appropriate means of dealing with the emergency in the steel industry."). There again, however, that concession concerning congressional control over a matter of economic production that might be related to the war effort implied no concession concerning control over the methods of engaging the enemy. (~~TS//SI~~- b1, b3 //NF)

Lastly, in terms of executive authorities, there are many instances in which the Executive, after taking unilateral action in a wartime emergency, has subsequently sought congressional ratification of those actions. Most famously, President Lincoln sought congressional sanction in 1861 for having enlisted temporary volunteers in the army and having enlarged the regular army and navy while Congress was in recess. *See Message to Congress in Special Session* (July 4, 1861), in *Abraham Lincoln: Speeches and Writings, 1859-1865* at 252 (Don E. Fehrenbacher ed. 1989). In his proclamation ordering these actions, Lincoln explained that his orders would "be submitted to Congress as soon as assembled." *Proclamation of May 3, 1861*, 12 Stat. 1260. Such examples shed relatively little light, however, on the distinct question of Presidential authority to defy Congress. A decision to seek congressional support can be prompted by many motivations, including a desire for political support, and thus does not necessarily reflect any legal determination that Congress's power on a particular subject is paramount. In modern times, after all, several administrations have sought congressional authorizations for use of military force without conceding that such authorizations were in any way constitutionally required and while preserving the ability to assert the unconstitutionality of the War Powers Resolution. *See, e.g., Statement on Signing the Resolution Authorizing the Use of Military Force Against Iraq*, 1 Pub. Papers of George Bush 40 (1991) ("[M]y request for congressional support did not . . .

---

in the Mediterranean they should discover that the Barbary powers had declared war against the United States, "you will then distribute your force in such manner . . . so as best to protect our commerce and chastise their insolence – by sinking, burning or destroying their ships and vessels wherever you shall find them." *Id.* at 210 (quoting *Naval Documents Related to the United States War With the Barbary Powers* 465-67 (1939)); *see also* David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801-1829* at 128 (2001) ("Neither the Administration's orders nor the Navy's actions reflected the narrow view of presidential authority Jefferson espoused in his Annual Message."); *Id.* at 127 ("Jefferson's pious words to Congress were to a considerable extent belied by his own actions."). (U)

constitute any change in the long-standing positions of the executive branch on either the President's constitutional authority to use the Armed Forces to defend vital U.S. interests or the constitutionality of the War Powers Resolution."). Moreover, many actions for which congressional support has been sought – such as President Lincoln's action in raising an army in 1861 – quite likely do fall primarily under Congress's Article I powers. *See* U.S. Const. art. I, § 8, cl. 12 (granting Congress power "to raise and support Armies"). Again, however, such actions are readily distinguishable from the direct control over the conduct of a campaign against the enemy. Past practice in seeking congressional support in various other situations thus sheds little light on the precise separation of powers issue here. (~~TS//SI~~ b1, b3 //~~NF~~)

There are two decisions of the Supreme Court that address a conflict between asserted wartime powers of the Commander in Chief and congressional legislation and that resolve the conflict in favor of Congress. They are *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). These are the cases invariably cited by proponents of a congressional authority to regulate the Commander-in-Chief power. We conclude, however, that both are distinguishable from the situation presented by b1, b3 in the conflict with al Qaeda and thus that they do not support the constitutionality of the restrictions in FISA as applied here. (~~TS//SI~~ b1, b3 //~~NF~~)

*Barreme* involved a libel brought to recover a ship seized by an officer of the United States Navy on the high seas during the Quasi War with France in 1799. The claimant sought return of the ship and damages from the officer on the theory that the seizure had been unlawful. The seizure had been based upon the officer's orders implementing an act of Congress suspending commerce between the United States and France. In essence, the orders from the President to the officer had directed him to seize any American ship bound *to* or *from* a French port. The ship in question was suspected of sailing *from* a French port. The statute on which the orders were based, however, had authorized solely the seizure of American ships bound *to* a French port. The Supreme Court concluded that the orders given by the President could not authorize a seizure beyond the terms of the statute – that is, they could not authorize anything beyond seizures of ships sailing *to* a French port. As the Court put it, "the legislature seem to have prescribed that the manner in which this law shall be carried into execution, was to exclude a seizure of any vessel not bound to a French port." *Id.* at 177-78 (emphasis omitted). As a result, the Court ruled not only that the seizure was not authorized, but also that the officer was liable in damages, despite having acted within his orders. *See id.* at 178-79. The decision has been broadly characterized by some as one in which the Court concluded that Congress could restrict by statute the means by which the President as Commander in Chief could direct the armed forces to carry on a war. *See, e.g.*, Glennon, *Constitutional Diplomacy* at 13 ("In *Little* . . . , an implied congressional prohibition against certain naval seizures prevailed over the President's constitutional power as commander-in-chief." (footnote omitted)); *Foreign and Military Intelligence, Book I: Final Rep. of the Senate Select Comm. to Study Gov'tal Operations with Respect to Intelligence Activities*, S. Rep. No. 94-755, at 39 (1976) (characterizing *Barreme* as "affirm[ing]" the "constitutional power of Congress" to limit "the types of seizures that could be made" by the Navy); *cf.* Henry P. Monaghan, *The Protective Power of the Presidency*, 93

Colum. L. Rev. 1, 24-25 (1993) (arguing that *Barreme* establishes the principle that the President has no authority to act "*contra legem*, even in an emergency"). (~~TS//SI~~ b1, b3 //~~NF~~)

We think such a characterization greatly overstates the scope of the decision, which is limited in three substantial ways. First, the operative section of the statute in question restricted the movements of and granted authority to seize *American* merchant ships.[43] It was not a provision that purported to regulate by statute the steps the Commander in Chief could take in confronting armed vessels of the *enemy*. Thus, neither in *Barreme* nor in any other case arising from the Quasi War (so far as we are aware) did the Supreme Court have occasion to rule on whether, even in the limited and peculiar circumstances of the Quasi War, Congress could have placed some restriction on the orders the Commander in Chief could issue concerning direct engagements with enemy forces.[44] We think that distinction is particularly important when the b1, b3 because b1, b3 is directed solely against b1, b3 where there is a reason for believing that one of the communicants is an enemy. (~~TS//SI~~ b1, b3 //~~NF~~)

Second, and relatedly, it is significant that the statute in *Barreme* was expressly cast, not as a limitation on the conduct of warfare, but rather as a measure on a subject within the core of Congress's responsibilities under Article I – regulating foreign commerce. *See supra* n.43

---

[43] The text of the first section of the act provided that "from and after the first day of March next no ship or vessel owned, hired or employed, wholly or in part, by any person resident within the United States, and which shall depart there from, shall be allowed to proceed directly, or from any intermediate port or place, to any port or place within the territory of the French republic." *Barreme*, 6 U.S. (2 Cranch) at 170 (quoting Act of February 9, 1799) (emphases omitted). Section 5 provided "[t]hat it shall be lawful for the President of the United States, to give instructions to the commanders of the public armed ships of the United States, to stop and examine any ship or vessel of the United States, on the high sea, which there may be reason to suspect to be engaged in any traffic or commerce contrary to the true tenor hereof; and if, upon examination, it shall appear that such ship or vessel is bound or sailing to any port or place within the territory of the French republic, or her dependencies, contrary to the intent of this act, it shall be the duty of the commander of such public armed vessel, to seize every such ship or vessel engaged in such illicit commerce . . . ." *Id.* at 171 (emphases omitted). (U)

[44] In fact, if anything the one case that came close to raising such a question tends to suggest that the Court would not have upheld such a restriction. In that case the Court was careful to construe the statutes involved so as not to restrict the ability of the armed vessels of the United States to engage armed vessels under French control. In *Talbot v. Seeman*, 5 U.S. (1 Cranch) 1 (1801), the *U.S.S. Constitution* had captured an armed merchant vessel, the *Amelia*, that, although originally under a neutral flag, had previously been captured and manned by a prize crew from the French navy. The Court explained that, under the statutes then in force, there was no law authorizing a public armed vessel of the United States to capture such a vessel because, technically, in contemplation of law it was still a neutral vessel until the French prize crew had brought it to port and had it formally adjudicated a lawful prize. *See id.* at 30-31. The Court concluded that the capture was lawful, however, because the captain of the *Constitution* had probable cause at the time of the capture to doubt the character of the ship. The Court went on to explain, moreover, that even if "the character of the *Amelia* had been completely ascertained," the capture still would have been lawful because "as she was an armed vessel under French authority, and in a condition to annoy the American commerce, it was [the American captain's] duty to render her incapable of mischief." *Id.* at 32. The Court reached that conclusion even though there was also no act of Congress authorizing public armed vessels of the United States to seize such vessels under French control. The Court concluded that the statutes must nevertheless be construed to permit, and certainly not to prohibit, such an action. *Id.* at 32-33. (U)

(quoting text of Act of February 9, 1799). It happened that many of the actions taken by the armed forces during the Quasi War involved solely enforcing restrictions such as that contained in the statute in *Barreme*. But that was part and parcel of the peculiar and limited nature of the war that gave it its name. The measures that Congress imposed restricting commerce took center stage in the "conflict" because the extent of full-blown hostilities between the armed forces was extremely limited. *See* Alexander DeConde, *The Quasi-War* 126 (1966) ("The laws themselves were half measures . . . . , were basically defensive, and were to expire when the commanders of French ships stopped their depredations against American commerce. This was why, from the American point of view, the clash with France was a quasi-war."). (~~TS//SI~~- b1, b3 //~~NF~~)

Finally, reviewing *Berreme* in light of both contemporary decisions addressing the nature of the conflict with France and later precedents, such as the *Prize Cases*, 67 U.S. (2 Black) 635 (1863), makes clear that the Supreme Court considered the unusual and limited nature of the maritime "war" with France a critical factor in concluding that statutes might constrain the Commander in Chief's directives to the armed forces. The Court's decision was fundamentally based on the premise that the state of affairs with France was not sufficiently akin to a full-scale war for the President to invoke under his own inherent authority the full rights of war that, in other cases, he might have at his disposal. As a result, he required the special authorization of Congress to act. The opinion of the lower court in the case, which is quoted at length in the report of the Supreme Court decision, makes this premise clear. As the lower court had explained: "If a war of a common nature had existed between the United States and France, no question would be made but the false papers found on board, the destruction of the log-book and other papers, would be a sufficient excuse for the capture, detention and consequent damages. It is only to be considered whether the same principles as they respect neutrals are to be applied to this case." *Id.* at 173 (emphasis omitted). (~~TS//SI~~- b1, b3 //~~NF~~)

The opinion of the Supreme Court, delivered by Chief Justice Marshall, echoes the same principle. In framing his discussion, Chief Justice Marshall made clear that "[i]t is by no means clear that the president of the United States whose high duty it is to 'take care that the laws be faithfully executed,' and who is commander in chief of the armies and navies of the United States, might not, without any special authority for that purpose, in the then existing state of things, have empowered the officers commanding the armed vessels of the United States, to seize and send into port for adjudication, American vessels which were forfeited by being engaged in this illicit commerce." *Id.* at 177. In other words, "in the then existing state of things" there was not a sufficiently clear state of war that the President might have exercised the rights of war to stop and examine the vessel and interdict commerce with the enemy. Instead, he required "special authority for that purpose." But if he required "special authority" from Congress, the extent of that authority could necessarily be limited by whatever restrictions Congress might impose. Of course, because the Court viewed "the then existing state of things" as insufficient for the President to invoke the rights of war under his own inherent authority, the Court had no occasion to address the power of Congress to limit the Commander in Chief's authority in such a case. (~~TS//SI~~- b1, b3 //~~NF~~)

This understanding is buttressed by contemporary decisions addressing other actions in the Quasi War. Such decisions make it clear, for example, that the Court considered the limited character of the war a peculiar state of affairs in international law. As Justice Moore explained four years earlier in *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800), "our situation is so extraordinary, that I doubt whether a parallel case can be traced in the history of nations." *Id.* at 39 (Moore, J.). Members of the Court also indicated their understanding that a more "perfect" state of war in itself could authorize the Executive to exercise the rights of war, because in such a war "its extent and operations are only restricted and regulated by the *jus belli*, forming a part of the law of nations." *Id.* at 44, 43 (Chase, J.). Indeed, the very same distinction between a full-fledged state of war (which would inherently authorize the President to invoke the rights of war as recognized under the law of nations) and a more qualified state of hostilities (where congressional authorization would be necessary) was also discussed, although it was not central to the holding, in *Bas v. Tingy*. The critical issue in the case was whether a particular statute defining the rights of salvage and the portions to be paid for salvage applied to a friendly vessel recaptured from the French, or whether its application was more restricted in time. Justice Washington explained his view that the law should apply "whenever such a war should exist between the United States and France, or any other nation, as according to the law of nations, or special authority, would justify the recapture of friendly vessels." *Id.* at 41-42 (Washington, J.). That phrasing clearly reflects the assumption that the recapture of a vessel might be authorized either by the type of war that existed in itself *or* by "special authority" provided by Congress. Similarly, Justice Washington went on to explain that in another case he had concluded as circuit justice that "neither the *sort of war that subsisted*, nor the special commission under which the American acted, authorised" the capture of a particular vessel. *Id.* at 42 (emphases altered). Again, this analysis reflects the assumption that the Quasi War was not the "sort of war" that permitted the Executive to exercise the full rights of war under the Commander in Chief's inherent authority, but that such wars could arise. Given the limited nature of the Quasi War, of course, in *Bas* the Court had no occasion to consider the question whether Congress might restrict the Commander in Chief's orders to the navy in a situation where the "sort of war that subsisted" would have allowed the President on his own authority to invoke the full rights of war under the law of nations. (~~TS//SI~~ b1, b3 //~~NF~~)

Understood in this light, it seems clear that in the Supreme Court's view, *Barreme* did not involve a situation in which there was a sufficiently full-scale war that would, in and of itself, suffice to trigger the powers of the President as Commander in Chief to direct the armed forces in a campaign. And thus the Court had no occasion to consider whether Congress might by statute restrict the President's power to direct the armed forces as he might see fit in such a conflict. Much less did the Court consider in *Barreme* the situation where a full-scale war was initiated by a foreign attack – a situation in which, as the Court later made clear in the *Prize Cases*, the President would need no special authority from Congress: "If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority." 67 U.S. (2 Black) at 668. (~~TS//SI~~ b1, b3 //~~NF~~)

The limited nature of the conflict at issue in *Barreme* distinguishes it from the current state of armed conflict between the United States and al Qaeda. This conflict has included a full-scale attack on the United States that killed thousands of civilians and precipitated an unprecedentedly broad Congressional Authorization for the Use of Military Force followed by major military operations by U.S. armed forces that continue to this day. (~~TS//SI~~ b1, b3 //~~NF~~)

The second Supreme Court decision that involves a direct clash between asserted powers of the Commander in Chief and Congress is *Youngstown*. Some commentators have invoked the holding in *Youngstown* and the analysis in Justice Jackson's concurrence to conclude that, at least when it occurs within the United States, foreign intelligence collection is an area where the Legislative and Executive branches share concurrent authority and that Congress may by statute comprehensively regulate the activities of the Executive. *See, e.g.*, David S. Eggert, Note, *Executive Order 12,333: An Assessment of the Validity of Warrantless National Security Searches*, 1983 Duke L. J. 611, 636-37; *cf.* John Norton Moore et al., *National Security Law* 1025 (1990). The case is also routinely cited more broadly as an affirmation of Congress's powers even in the face of claims by the Commander in Chief in wartime. It is true that *Youngstown* involved a situation in which the Executive, relying *inter alia* on the Commander-in-Chief power, attempted to take action that Congress had apparently foreclosed by statute, and that the Supreme Court held the executive action invalid. Beyond a superficial parallel at that level of generality, however, we do not think the analogy to *Youngstown* is apt. (~~TS//SI~~ b1, b3 //~~NF~~)

*Youngstown* involved an effort by the President – in the face of a threatened work stoppage – to seize and run steel mills. Steel was a vital resource for manufacturers to produce the weapons and other materiel that were necessary to support troops overseas in Korea. *See* 343 U.S. at 582-84. In drafting the Labor Management Relations Act of 1947 (also known as the Taft-Hartley Act) Congress had expressly considered the possibility of giving the President the power to effect such a seizure of industry in a time of national emergency. It had rejected that option, however, and instead provided different mechanisms for resolving labor disputes. *See id.* at 586. Other statutes, moreover, did provide certain mechanisms for seizing industries to ensure production vital to national defense. *See id.* at 585-86 & n.2. President Truman, however, chose not to follow any of these mechanisms and instead asserted inherent authority to seize the mills to ensure the production of steel. (~~TS//SI~~ b1, b3 //~~NF~~)

The Court rejected the President's assertion of powers under the Commander-in-Chief Clause primarily because the connection between the President's action and the core Commander-in-Chief function of commanding the armed forces was simply too attenuated. As the Court pointed out, "[e]ven though 'theater of war' [may] be an expanding concept," the case clearly did not involve the authority over "day-to-day fighting in a theater of war." *Id.* at 587. Instead, it involved a dramatic extension of the President's authority from control over military operations to control over an industry that was vital for supplying other industries that in turn produced items vital for the forces overseas. The almost limitless implications of the theory behind President Truman's approach – which could potentially permit the President unilateral authority to control any sector of the economy deemed vital to a war effort – was clearly an

important factor influencing the Court's decision. Indeed, Justice Jackson's influential concurring opinion reveals a clear concern for what might be termed foreign-to-domestic presidential bootstrapping. The United States became involved in the Korean conflict through President Truman's unilateral decision, without consulting Congress, to commit U.S. troops to the defense of South Korea when the North invaded in 1950. That was a national security and foreign policy decision to involve U.S. troops in a wholly foreign war. In *Youngstown*, the President was claiming authority, based upon that foreign war, to extend far-reaching presidential control into vast sectors of the domestic economy. Justice Jackson expressed "alarm[]" at a theory under which "a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture." *Id.* at 642 (Jackson, J., concurring). (~~TS//SI~~ b1, b3 //~~NF~~)

Critically, moreover, President Truman's action involved extending the Executive's authority into a field where the Constitution had assigned Congress, in the ordinary case, a preeminent role. As the majority explained, under the Commerce Clause, Congress "can make laws regulating the relationships between employers and employees, prescribing rules designed to settle labor disputes, and fixing wages and working conditions in certain fields of our economy. The Constitution did not subject this law-making power of Congress to presidential or military supervision or control." *Id.* at 588; *see also id.* at 587 ("This is a job for the Nation's lawmakers, not for its military authorities."). In addition, as Justice Jackson pointed out in concurrence, Congress is also given express authority to "'raise and *support* Armies'" and "'to *provide* and *maintain* a Navy.'" *Id.* at 643 (Jackson, J., concurring) (quoting U.S. Const. art. I, § 8, cls. 12, 13). These grants of authority seemed to give "Congress primary responsibility for supplying the armed forces," *id.*, and the crisis at hand involved a matter of supply. Thus, *Youngstown* involved an assertion of executive power that not only stretched far afield from core Commander-in-Chief functions, but that did so by intruding into areas where Congress had been given an express, and likely dominant, role by the Constitution. (~~TS//SI~~ b1, b3 //~~NF~~)

The situation here presents a very different picture. First, the exercise of executive authority here is not several steps removed from the actual conduct of a military campaign. To the contrary, b1, b3 is an intelligence operation undertaken by the Department of Defense specifically to detect operational communications of enemy forces that will enable the United States to detect and disrupt planned attacks, largely by detecting enemy agents already within the United States. Al Qaeda has already demonstrated an ability, both on September 11 and subsequently (in cases such as Jose Padilla and Ali al-Marri[45]) to insert agents into the United States. As explained above, the efforts b1, b3 to intercept communications that would lead to the discovery of more such agents or other planned

[45] Al-Marri entered the United States on September 10, 2001. He was originally "detained in December 2001 as a material witness believed to have evidence about the terrorist attacks of September 11," and the President later determined he is "an enemy combatant affiliated with al Qaeda." *Al-Marri v. Rumsfeld*, 360 F.3d 707, 708 (7th Cir. 2004). (U)

attacks on the United States are a core exercise of Commander-in-Chief authority in the midst of an armed conflict. (~~TS//SI~~- b1, b3 //~~NF~~)

In addition, the theme that appeared most strongly in Justice Jackson's concurrence in *Youngstown* expressing a concern for a form of presidential boot-strapping simply does not apply in this context. Justice Jackson evinced a concern for two aspects of what might be termed boot-strapping in the Executive's position in *Youngstown*. First, the President had used his own inherent constitutional authority to commit U.S. troops to the Korean conflict. He was then attempting, without any express authorization for the conflict from Congress, to expand his authority further on the basis of the need to support the troops already committed to hostilities. Here, however, Congress expressly provided the President sweeping authority immediately after September 11, 2001 to use "all necessary and appropriate force" as he deemed required to protect the Nation from further attack. Congressional Authorization § 2(a). Second, in *Youngstown* Justice Jackson was concerned that the President was using an exercise of his Commander-in-Chief powers in the foreign realm to justify his assumption of authority over domestic matters within the United States. Again, this concern must be understood in light of both the particular context of the Korean conflict and the type of powers being asserted. There, the conflict was strictly confined to the Korean peninsula overseas, and there was no suggestion that the President's actions in the United States had any connection whatsoever to meeting an enemy threat *within the United States*. As a result, *Youngstown* must not be overread to suggest that the President's authorities for engaging the enemy are necessarily somehow less extensive inside the United States than they are abroad. The extent of the President's authorities will necessarily depend on where the enemy is found. Long before *Youngstown*, it was recognized that, in a large-scale conflict, the area of operations could readily extend to the continental United States, even when there are no major engagements of armed forces here. As long ago as 1920 in the context of the trial of a German officer for spying in World War I, it was recognized that "[w]ith the progress made in obtaining ways and means for devastation and destruction, the territory of the United States was certainly within the field of active operations" during the war, particularly in the port of New York, and that a spy in the United States might easily have aided the "hostile operations" of U-boats off the coast. *United States ex rel. Wessels v. McDonald*, 265 F. 754, 764 (E.D.N.Y. 1920). Similarly, in World War II, in *Ex parte Quirin*, 317 U.S. 1 (1942), the Supreme Court readily recognized that the President had authority as Commander in Chief to capture and try agents of the enemy in the United States, and indeed that he could do so even if they had never "entered the theatre or zone of active military operations." *Id.* at 38.[46] (~~TS//SI~~- b1, b3 //~~NF~~)

In this conflict, moreover, the battlefield was brought to the United States in the most literal way on September 11, 2001, and ongoing intelligence indicates that further attacks on the United States will be attempted. In addition, in this conflict, precisely because the enemy

[46] *But see Padilla v. Rumsfeld*, 352 F.3d 695, 712 (2d Cir. 2003) (holding that an al Qaeda operative seized in Chicago could not be detained in South Carolina without statutory authorization because "the President lacks inherent constitutional authority as Commander-in-Chief to detain American citizens on American soil outside a zone of combat"), *cert. granted*, 124 S. Ct. 1353 (2004). (U)

operates by stealth and seeks to infiltrate the United States undetected, it is the intelligence front that is the most vital aspect of the battle for protecting America. Thus, while some justices in *Youngstown* expressed concern at the President's efforts to claim Commander-in-Chief powers for actions taken in the United States, that concern must be understood in the context of a conflict that was limited wholly to foreign soil. The North Koreans in 1950 had no ability to project force against the continental United States and the Court in *Youngstown* was not confronted with such a concern. Al Qaeda, by contrast, has demonstrated itself more successful at projecting force against the mainland United States than any foreign enemy since British troops burned Washington, D.C., in the War of 1812. There is certainly nothing in *Youngstown* to suggest that the Court would not agree that, after an attack such as September 11, American soil was most emphatically part of the battle zone and that the President's Commander-in-Chief powers would fully apply to seek out, engage, and defeat the enemy – even in the United States. Similarly, there is certainly no question of presidential bootstrapping from a "foreign venture" here. This conflict was thrust upon the Nation by a foreign attack carried out directly on American soil. (~~TS//SI~~ b1, b3 //~~NF~~)

Finally, an assertion of executive authority here does not involve extending presidential power into spheres ordinarily reserved for Congress. To the contrary, as outlined above, congressional authority in this field is hardly clear.

b1, b3, b5

(~~TS//SI~~ b1, b3 //~~NF~~)

In short, we do not think that *Youngstown* provides any persuasive precedent suggesting that Congress may constitutionally prohibit the President from engaging in the activities contemplated in b1, b3 (~~TS//SI~~ b1, b3 //~~NF~~)

b1, b3, b5

b1, b3, b5

Pages 65 – 68

Withheld in Full

b1, b3, b5

b1, b3, b5

b1, b3, b5

Taking into account all the considerations outlined above, we conclude that the signals intelligence activity undertaken to collect the content of enemy communications under

---

b1, b3, b5

b1, b3 comes within the core powers of the Commander in Chief in conducting a military campaign and that provisions in FISA or Title III that would prohibit it are unconstitutional as applied. It is critical to our conclusion that the issue arises in the context of a war instituted by an attack on the United States and necessitating the use of the armed forces to defend the Nation from attack. That brings this situation into the core of the President's Commander-in-Chief powers. It has long been recognized that the President has extensive unilateral authority even to initiate armed action to protect American lives abroad. *See, e.g.*, *Durand v. Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4186). If anything, we believe that power is greater when the Nation itself is under attack. It is fortunate that in our history the courts have not frequently had occasion to address the powers of the President in responding to such aggression. In the one precedent most squarely on point, however, the Supreme Court made abundantly clear that his authority is broad indeed. As the Court put it in the *Prize Cases*, "[i]f war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force," 67 U.S. (2 Black) at 668, and "[h]e must determine what degree of force the crisis demands," *id.* at 670. It is true that the Court had no occasion there to consider the relative powers of Congress and the President if they should come into conflict. Nevertheless, the Court's language in the *Prize Cases* suggests that if there is any area that lies at the core of the Commander in Chief's power, it is actions taken directly to engage the enemy in protecting the Nation from an attack. In this regard, it bears emphasis that the obligation to "protect each of [the States] against Invasion" is one of the few affirmative obligations the Constitution places on the federal government with respect to the States. U.S. Const. art. IV, § 4. It is primarily the President, moreover, who must carry out that charge. Indeed, defense of the Nation is an aspect of the explicit oath of office that the Constitution prescribes for the President, which states that the President shall "'to the best of [his] Ability, preserve, protect and defend the Constitution of the United States.'" U.S. Const. art. II, § 1. Here, we conclude that the b1, b3 activities b1, b3 are precisely a core exercise of Commander-in-Chief powers to detect and engage the enemy in protecting the Nation from attack in the midst of a war and that Congress may not by statute restrict the Commander in Chief's decisions about such a matter involving the conduct of a campaign. (~~TS//SI~~- b1, b3 //~~NF~~)

Even if we did not conclude that b1, b3 was within the core of the Commander-in-Chief power with which Congress cannot interfere, we would conclude that the restrictions in FISA would frustrate the President's ability to carry out his constitutionally assigned functions as Commander in Chief and are impermissible on that basis. As noted above, even in prior opinions suggesting that Congress has the power to restrict the Executive's actions in foreign intelligence collection this Office has always preserved the caveat that such restrictions would be permissible only where they do not "go so far as to render it impossible for the President to perform his constitutionally prescribed functions." b5 Several factors combine to make the FISA process an insufficient mechanism for responding to the crisis the President has faced in the wake of the September 11 attacks. (~~TS//SI~~- b1, b3 //~~NF~~)

b1, b3, b5

Pages 71 – 73

Withheld in Full

b1, b3, b5

b1, b3, b5

To summarize, we conclude only that when the Nation has been thrust into an armed conflict by a foreign attack on the United States and the President determines in his role as Commander in Chief and sole organ for the Nation in foreign affairs that it is essential for defense against a further foreign attack to use the signals intelligence capabilities of the Department of Defense within the United States, he has inherent constitutional authority to direct electronic surveillance without a warrant to intercept the suspected communications of the enemy – an authority that Congress cannot curtail. We need not, and do not, express any view on whether the restrictions imposed in FISA are a constitutional exercise of congressional power in circumstances of more routine foreign intelligence gathering that do not implicate an armed conflict and direct efforts to safeguard the Nation from a credible danger of foreign attack. (~~TS//SI~~- b1, b3 //~~NF~~)

b1, b3, b5

b1, b3, b5

b1, b3, b5

Pages 75 – 99

Withheld in Full

b1, b3, b5

b1, b3, b5

b1, b3, b5

## V. b1, b3 Under the Fourth Amendment (~~TS//SI~~ b1, b3 //~~NF~~)

The analysis above establishes that the constraints imposed by FISA and title 18 that would seem to prohibit the activities undertaken in b1, b3 are either best construed to have been superseded by the Congressional Authorization for Use of Military Force, or, if applicable, are unconstitutional as applied in this context.

b5

The final step in our analysis requires an examination of b1, b3 under the Fourth Amendment. (~~TS//SI~~ b1, b3 //~~NF~~)

In determining the scope of executive power to conduct foreign intelligence searches, we have already concluded above that there is an exception to the Fourth Amendment's warrant requirement for such searches. *See* Part II.C.1, *supra*. For that analysis, we assumed that some activities b1, b3 would be subject to the Fourth Amendment. It remains for us now to turn to a more comprehensive examination of b1, b3 under the Fourth Amendment.

b1, b3 (~~TS//SI~~ b1, b3 //~~NF~~)

We recognize that there may be a sound argument for the proposition that the Fourth Amendment does not even apply to a military operation such as b1, b3 [84] Assuming *arguendo*, however, that it does apply, we analyze b1, b3 under the Fourth Amendment standard of reasonableness. As the Supreme Court has explained, this analysis requires a balancing of the governmental interest at stake against the degree of

---

[84] *See, e.g.*, Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority for Use of Military Force To Combat Terrorist Activities Within the United States* 25 (Oct. 23, 2001) ("In light of the well-settled understanding that constitutional constraints must give way in some respects to the exigencies of war, we think that the better view is that the Fourth Amendment does *not* apply to domestic military operations designed to deter and prevent further terrorist attacks."). (U)

intrusion into protected areas of privacy. *See, e.g.*, *Board of Educ. v. Earls*, 536 U.S. 822, 829 (2002) ("[W]e generally determine the reasonableness of a search by balancing the nature of the intrusion on the individual's privacy against the promotion of legitimate governmental interests."). Under that balancing, we conclude that the searches at issue here are reasonable. (~~TS//SI~~ b1, b3 //NF)

b1, b3, b5

**A. b1, b3 Interceptions Are Reasonable Under Balancing-of-Interests Analysis (~~TS//SI~~ b1, b3 //NF)**

Under the standard balancing of interests analysis used for gauging reasonableness, the b1, b3 interceptions would pass muster under the Fourth Amendment. As the Supreme Court has emphasized repeatedly, "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118-19 (2001). The Court has found a search reasonable when, under the totality of the circumstances, the "importance of the governmental interests" has outweighed the "nature and quality of the intrusion on the individual's Fourth Amendment interests." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). (~~TS//SI~~ b1, b3 //NF)

We begin by addressing the individual privacy interests at stake. There can be no doubt that, as a general matter, interception of the content of telephone communications implicates a significant privacy interest of the individual whose conversation is intercepted. The Supreme Court has made clear at least since *Katz v. United States*, 389 U.S. 347 (1967), that individuals have a substantial and constitutionally protected reasonable expectation of privacy that their telephone conversations will not be subject to governmental eavesdropping. b1, b3, b5 Although the individual privacy interests at stake may be substantial, it is well recognized that a variety of governmental interests – including routine law enforcement and foreign-intelligence gathering – can overcome those interests. (~~TS//SI~~ b1, b3 //NF)

On the other side of the ledger here, the government's interest in conducting the surveillance is the most compelling interest possible – securing the Nation from foreign attack in the midst of an armed conflict. One attack has already taken thousands of lives and placed the Nation in state of armed conflict. Defending the Nation from attack is perhaps the most

---

b1, b3, b5

important function of the federal government – and one of the few express obligations of the government enshrined in the Constitution. *See* U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, *and shall protect each of them against Invasion* . . . .") (emphasis added). As the Supreme Court has declared, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). *Cf. The Federalist* No. 23, at 148 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) ("[T]here can be no limitation of that authority, which is to provide for the defence and protection of the community, in any matter essential to its efficacy."). (~~TS//SI~~ b1, b3 //~~NF~~)

As we have explained in previous memoranda, b1, b3, b5 the government's overwhelming interest in detecting and thwarting further al Qaeda attacks is easily sufficient to make reasonable the intrusion into privacy involved in intercepting selected communications. The nation has already suffered one attack that disrupted the Nation's financial center for days and that successfully struck at the command and control center for the Nation's military. In initiating b1, b3 moreover, the President specifically concluded that al Qaeda had the ability and intent to carry out further attacks that could result in massive loss of life and destruction of property and that might even threaten the continuity of the federal government. As noted above, the September 11 attack incorporated some aspects of a deliberate de-capitation strike aimed at the Nation's capital.

b1, b3

(~~TS//SI~~ b1, b3 //~~NF~~)

Of course, because the magnitude of the government's interest here depends in part upon the threat posed by al Qaeda, it might be possible for the weight that interest carries in the balance to change over time.

b1, b3, b5

It is thus significant for the reasonableness of the b1, b3 program that the President has established a system under which the surveillance is authorized only for a limited period, typically for 30 to 45 days. This ensures that the justification for the program is regularly reexamined. Indeed, each reauthorization is accompanied by a fresh reassessment of the current threat posed by al Qaeda. As explained above, before each reauthorization, the Director of Central Intelligence and the b5 prepare a memorandum for the President highlighting some of the current information relating to threats from al Qaeda and providing their assessment as to whether al Qaeda still poses a substantial threat of carrying out an attack in the United States. Each Presidential Authorization of the program is thus based on a current threat assessment and includes the President's specific determination that, based upon information available to him from all sources,

b1, b3, b5

We should also note here b1, b3, b5 that, even based upon the limited range of information available to us – which is less than the totality of information upon which the President bases his decisions concerning the continuation of b1, b3 – there is ample basis on which to conclude that the threat posed by al Qaeda continues to be of a sufficient magnitude to justify the b1, b3 program for Fourth Amendment purposes. We note here only some of the highlights that have appeared in the threat-related intelligence reporting available to the President and relevant for evaluating the current threat posed by al Qaeda: (~~TS//SI~~ b1, b3 /~~NF~~)

- b1, b3

- b1, b3

- b1, b3

b1, b3

b1, b3

- b1, b3

- b1, b3

- b1, b3

Finally, as part of the balancing of interests to evaluate Fourth Amendment reasonableness, we think it is significant that b1, b3 is limited solely to those international communications for which "there are reasonable grounds to believe . . . [that] a party to such communication is a group engaged in international terrorism, or activities in preparation therefor, or any agent of such a group." March 11, 2004 Authorization

The interception is thus targeted precisely at communications for which there is already a reasonable basis to think there is a terrorism connection. This is relevant because the Supreme

Court has indicated that in evaluating reasonableness, one should consider the "efficacy of [the] means for addressing the problem." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995); *see also Earls*, 536 U.S. at 834 ("Finally, this Court must consider the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them."). This does not mean, of course, that reasonableness requires the "least intrusive" or most "narrowly tailored" means for obtaining information. To the contrary, the Supreme Court has repeatedly rejected such suggestions. *See, e.g., Earls*, 536 U.S. at 837 ("[T]his Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.") (internal quotation marks omitted); *Vernonia*, 515 U.S. at 663 ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."). Nevertheless, the Court has indicated that some consideration of the efficacy of the search being implemented – that is, some measure of fit between the search and the desired objective – is relevant to the reasonableness analysis.[86] Thus, a program of surveillance that operated by listening to the content of every telephone call in the United States in order to find those calls that might relate to terrorism would require us to consider a rather difference balance here. b1, b3 however, is precisely targeted to intercept solely those international communications for which there are reasonable grounds already to believe there is a terrorism connection, a limitation which further strongly supports the reasonableness of the searches. (~~TS//SI~~ b1, b3 //~~NF~~)

In light of the considerations outlined above, taking into account the totality of the circumstances, including the nature of the privacy interest at stake, the overwhelming governmental interest involved, the threat that al Qaeda continues to pose to the United States, and the targeted nature of the surveillance at issue, we conclude that the b1, b3 continues to be reasonable under the Fourth Amendment. (~~TS//SI~~ b1, b3 //~~NF~~)

[86] This consideration has often been relevant in cases that involve some form of suspicionless search. Even in those cases, moreover, the Court has made clear that the measure of efficacy required is not a stringent or demanding numerical measure of success. For example, in considering the use of warrantless road blocks to accomplish temporary seizures of automobiles to screen drivers for signs of drunken driving, the Court noted that the road blocks resulted in the arrest for drunken driving of only 1.6 percent of the drivers passing through the checkpoint. The Court concluded that this success rate established sufficient "efficacy" to sustain the constitutionality of the practice. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 454-55 (1990). Similarly, the Court has approved the use of roadblocks that detected illegal immigrants in only 0.12 percent of the vehicles passing through the checkpoint. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976). What the Court has warned against is the use of random and standardless searches, giving potentially arbitrary discretion to officers conducting the searches, for which there is "*no* empirical evidence" to support the conclusion that they will promote the government objective at hand. *Sitz*, 496 U.S. at 454. (U)

b1, b3, b5

b1, b3, b5

b1, b3, b5

b1, b3, b5

---

b1, b3, b5

b1, b3, b5

b1, b3, b5

b1, b3, b5

---

b1, b3, b5

b1, b3, b5

b1, b3, b5

## CONCLUSION (U)

For the foregoing reasons, we conclude that, notwithstanding the prohibitions of FISA and title 18, under the current circumstances of the ongoing armed conflict with al Qaeda and in light of the broad authority conferred in the Congressional Authorization, the President, as Commander in Chief and Chief Executive, has legal authority to authorize the NSA to conduct the signals-intelligence activities described above; that the activities, to the extent they are searches subject to the Fourth Amendment, comport with the requirements of the Fourth Amendment; and thus that the operation of the b1, b3 program as described above is lawful. (~~TS//SI~~ b1, b3 ~~//NF~~)

Please let me know if we can be of further assistance. (U)

Jack L. Goldsmith, III
Jack L. Goldsmith, III
Assistant Attorney General

---

b1, b3, b5

b1, b3, b5