# Exhibit 8

# Exhibit 8



# UNITED STATES DEPARTMENT OF JUSTICE

## FAX COVER SHEET

### Foreign Intelligence Surveillance Court

**To:** _Arthur B. Spitzer_

**Organization:** _ACLU_

**Fax number:** _202-452-1868_

**Phone Number:** _____

**Subject:** _FISC Document(S)_

**Date:** _12-11-07_

**Pages:** _23 + Cover_

**COMMENTS:**

_____

_____

_____

From the desk of ...

**James L. Dunlap**
**FISC Security Officer**
**202-514-2094**

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.

IN RE MOTION FOR RELEASE           Docket No.: MISC. 07-01

OF COURT RECORDS

## ORDER

IT IS HEREBY ORDERED that the Motion of the American Civil Liberties Union for

Release of Court Records is DENIED, for the reasons set forth in the Memorandum Opinion

issued on this date.

                                          _____

                                          JOHN D. BATES
                                          Judge, Foreign Intelligence
                                          Surveillance Court

                                   _December 11, 2007_
                                            DATE

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.

IN RE MOTION FOR RELEASE

Docket No.: MISC. 07-01

OF COURT RECORDS

### MEMORANDUM OPINION[1]

This matter comes before the Court on the "Motion of the American Civil Liberties Union for Release of Court Records," filed on August 9, 2007 ("ACLU Motion"). In its motion, the American Civil Liberties Union (ACLU) seeks the release of what it identifies as court orders and government pleadings regarding a program of surveillance of suspected international terrorists by the National Security Agency (NSA) that had previously been conducted without court authorization. See ACLU Motion at 2 n.2, 3-9.[2] The ACLU "requests that all such documents . . . be made public as quickly as possible with only those redactions essential to

---

[1] The FISC Security Officer has compared this opinion and the accompanying order to the unclassified filing by the government in this case, and determined that the opinion and order do not contain any classified information.

[2] Specifically, in connection with such surveillance, the ACLU seeks

the unsealing of (i) orders issued by this Court on January 10th, 2007 ("the January 10th orders"); (ii) any subsequent orders that extended, modified, or vacated the January 10th orders; and (iii) any legal briefs submitted by the government in connection with the January 10th orders or in connection with subsequent orders that extended, modified, or vacated the January 10th orders.

ACLU Motion at 2 (footnotes omitted). In identifying these documents, the ACLU relies on public statements by government officials.

protect information that the Court determines, after independent review, to be properly classified." Id. at 2-3.

Under a scheduling order issued on August 16, 2007, the Government filed its "Opposition to the American Civil Liberties Union's Motion for Release of Court Records" ("Gov't Opp.") on August 31, 2007, and the "Reply of the American Civil Liberties Union in Support of Motion for Release of Court Records" ("ACLU Reply") was filed on September 14, 2007. The ACLU asserts that, under the First Amendment and the common law, the public has a qualified right of access to the records in question, such that any part of the records that is not properly classified must be released. The ACLU argues that the government should be ordered to perform a declassification review of the records, and that the Court should then independently review all classification determinations. The government responds that the Court lacks jurisdiction over the motion and, on the merits, that there is no right of public access to these records. The government further contends that these records are properly classified in their entirety.

This Court concludes that it has jurisdiction over the motion, but that the ACLU has not established a right of access to these records, nor has it made a persuasive case that, as a matter of discretion, this Court should grant the relief requested. The motion will accordingly be denied.

I.      The Motion Is Within the Jurisdiction of this Court.

The Foreign Intelligence Surveillance Court (FISC) was established in 1978 by the Foreign Intelligence Surveillance Act of 1978, codified as amended at 50 U.S.C. §§ 1801-1871 (FISA). Under 50 U.S.C. § 1803(a), the Chief Justice "shall publicly designate 11 district court

judges . . . who shall constitute a court which shall have jurisdiction to hear applications for and grant orders approving electronic surveillance anywhere within the United States." "As originally enacted, FISA covered only electronic surveillance." In re Sealed Case, 310 F.3d 717, 722 n.7 (FISC Rev. 2002). FISA has since been amended to give the FISC jurisdiction over government applications for authority to collect foreign intelligence by other means.[3] Here, the requested records pertain to proceedings on applications for electronic surveillance orders under 50 U.S.C. §§ 1804-1805.

Notwithstanding the esoteric nature of its caseload, the FISC is an inferior federal court established by Congress under Article III,[4] and like all such courts was vested with certain inherent powers upon its creation.[5] Most pertinently here, the Supreme Court has found that "[e]very court has supervisory power over its own records and files." Nixon v. Warner

---

[3]   See 50 U.S.C. § 1822(c) (physical search); § 1842(b) (pen registers and trap and trace devices); § 1861(b) (production of business records and other tangible things). Two provisions of FISA expressly authorize a party other than the government to seek relief from the FISC. A person subject to a FISC order to produce business records or other tangible things may bring a petition challenging the order under § 1861(f). And, pursuant to a recent enactment that is subject to a 180-day "sunset" provision and related transition procedures (see Protect America Act of 2007 § 6, Pub. L. No. 110-55, 121 Stat. 556), a person who has received a "directive" from the Attorney General and the Director of National Intelligence under § 1805b(e) to assist in the collection of foreign intelligence information may file a petition challenging the directive under § 1805b(h)(1)(A).  These  provisions are not relevant to the ACLU Motion.

[4]   See In re Sealed Case, 310 F.3d at 731-32 (applying to the FISC "the constitutional bounds that restrict an Article III court"); In re Kevork, 634 F. Supp. 1002, 1014 (C.D. Cal. 1985) (district court judges retain "Article III status" when acting as members of the FISC), aff'd, 788 F.2d 566 (9th Cir. 1986).

[5]   See, e.g., Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991) ("It has long been understood that [c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution.") (internal quotations omitted); Eash v. Riggins Trucking Inc., 757 F.2d 557, 561-64 (3d Cir. 1985) (en banc) (describing the nature and sources of federal courts' inherent powers).

DEC.11.2007   2:09PM   DIRECTOR SEPS                          NO.304   P.5

Comme'ns, Inc., 435 U.S. 589, 598 (1978).[6] How the FISC exercises its supervisory power over its records, and the extent to which release of its records is either prohibited by statute (or by statutorily required security procedures) or compelled by the Constitution or the common law, go directly to the merits of the ACLU's claims, and not to the Court's jurisdiction over the ACLU's motion. Indeed, it would be quite odd if the FISC did not have jurisdiction in the first instance to adjudicate a claim of right to the court's very own records and files.[7]

Nor is this Court persuaded by the government's argument that 50 U.S.C. §§ 1806(f) , 1825(g), and 1845(f)(1) preclude anyone other than an aggrieved person from bringing a motion to "discover" or "obtain" "applications or orders or other [FISA] materials," and preclude any court other than a federal district court from adjudicating a motion for such relief. See Gov't Opp. at 4. These provisions are part of an elaborate statutory scheme to ensure that when the United States or a state intends to use FISA material in a proceeding against an "aggrieved person,"[8] the aggrieved person shall have an opportunity to contest the legality of the evidence

---

[6] Accord Gambale v. Deutsche Bank AG, 377 F.3d 133, 140 (2d Cir. 2004); Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n, 710 F.2d 1165, 1177 (6th Cir. 1983).

[7] The Court understands the holding in United States v. Pollard, 416 F.3d 48 (D.C. Cir. 2005), cert. denied, 547 U.S. 1021 (2006), that there was no jurisdiction to modify a protective order to be limited to the particular facts of that case, in which access to records was sought in order to support a clemency petition – a subject found to be in "the exclusive province of the Executive" and beyond the jurisdiction of the court. Id. at 57 (emphasis in original).

[8] With regard to electronic surveillance, an aggrieved person is "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). There are comparable definitions for persons subjected to other methods of obtaining information. See § 1821(2) (physical search); § 1841(3) (pen register or trap and trace device).

4

through a suppression motion. The statutory scheme also lays out careful parameters for a district court to apply in deciding such a motion. <u>See</u> 50 U.S.C. § 1806(f)-(g); § 1825(g)-(h); § 1845(f)-(g). But none of these provisions is applicable here. The ACLU comes to this Court claiming a right of access as a member of the public, not as an aggrieved person who has received the statutory notification. These provisions may have some limited bearing on the merits of the ACLU's claim (<u>see</u> Parts II-III <u>infra</u>), but they do not deprive this Court of the power to <u>entertain</u> that motion in the first place.

Finally, the FISC rules do not preclude the filing of this motion by the ACLU. FISC Rule 7(b)(ii) states that "[e]xcept when Orders or Opinions are provided to the government when issued, no Court records or other materials may be released without prior motion to and Order by the Court."[9] Although Rule 7(b)(ii) provides that any release of records must conform to the FISC security procedures, nothing in the text of the rule says that only the government can file a motion for release.[10] Furthermore, this Court's inherent power over its records supplies the authority to consider a claim of legal right to release of those records even if Rule 7(b)(ii) were thought to be unclear on this point.

For all of these reasons, the Court concludes that it has jurisdiction to entertain the ACLU Motion. Accordingly, the Court will proceed to the merits of the ACLU's request for the release of FISC records.

---

[9] The FISC's rules are available online at: <http://www.uscourts.gov/rules/FISC_Final_Rules_Feb_2006.pdf>.

[10] <u>But cf.</u> FISC Rule 13(b) (with one exception not pertinent here, all FISC hearings shall be ex parte).

DEC.11.2007  2:09PM  DIRECTOR SEPS                NO.304  P.7

II.  The Operation of the FISC.

The FISC is a unique court.  Its entire docket relates to the collection of foreign intelligence by the federal government.  The applications submitted to it by the government are classified, as are the overwhelming majority of the FISC's orders.[11]  Court sessions are held behind closed doors in a secure facility, and every proceeding in its history prior to this one has been ex parte, with the government the only party.[12]  In the entire history of the FISC, just two opinions have been publicly released.[13]  (This opinion makes it three.)  Other courts operate primarily in public, with secrecy the exception; the FISC operates primarily in secret, with public access the exception.

The operations of the FISC are governed by FISA, by Court rule, and by statutorily mandated security procedures issued by the Chief Justice of the United States.  Together, they represent a comprehensive scheme for the safeguarding and handling of FISC proceedings and

---

[11] Under Executive Order 12958, as amended by Executive Order 13292, information may become classified if several conditions are met, to include a determination by an authorized official that the unauthorized disclosure of the information reasonably could be expected to result in identifiable or describable damage to the national security.  See § 1.1(a) of E.O. 12958, as amended by E.O. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  "The ACLU recognizes that this Court's docket consists mainly of material that is properly classified."  ACLU Motion at 14.

[12] Even such adversarial proceedings as the FISC may conduct under recent amendments to FISA are subject to statutory requirements designed to protect sensitive documents and proceedings.  See 50 U.S.C. §§ 1803(e)(2) (in camera review); 1805b(j) & (k) (filings under seal, record of proceedings to be maintained pursuant to security procedures, ex parte and in camera review of classified submissions); 1861(f)(4) & (5) (same).

[13] See In re All Matters Submitted to the FISC, 218 F. Supp.2d 611 (FISC), rev'd sub nom. In re Sealed Case, 310 F.3d 717 (FISC Rev. 2002); In re Application of the United States for an Order Authorizing the Physical Search of Nonresidential Premises and Personal Property (FISC June 11, 1981), reprinted in S. Rep. 97-280 at 16-19 (1981).

DEC.11.2007  2:10PM  DIRECTOR SEPS        NO.304   P.8

records. To fully address the ACLU's claims, it is helpful to examine briefly this scheme and how the FISC has historically functioned within it.

Pursuant to FISA, court orders approving government applications for electronic surveillance are entered ex parte, see 50 U.S.C. § 1805(a),[14] and those applications and orders are retained subject to the FISC's special security procedures, see 50 U.S.C. § 1803(c) (described in more detail below). At the request of the applicant, an electronic surveillance order "shall direct ... that ... a specified communication or other common carrier, landlord, custodian, or other specified person ... furnish the applicant forthwith all information, facilities, or technical assistance necessary to accomplish the electronic surveillance in such a manner as will protect its secrecy." § 1805(c)(2)(B) (emphasis added). Such orders shall also direct "that such carrier, landlord, custodian, or other person maintain under security procedures approved by the Attorney General and the Director of National Intelligence, any records concerning the surveillance or the aid furnished that such person wishes to retain." § 1805(c)(2)(C) (emphasis added). If the government appeals a FISC denial of an application for electronic surveillance, the record is transmitted under seal to another special court, the Foreign Intelligence Surveillance Court of Review, which is also bound by the special security procedures and which shares the premises of the FISC. See 50 U.S.C. §§ 1803(b), 1803(c); Security Procedures Established Pursuant to Public L. No. 95-511, 92 Stat. 1783, by the Chief Justice of the United States for the Foreign

---

[14] For ease of reference, and because electronic surveillance records are at issue, this discussion refers to provisions of FISA pertaining to electronic surveillances authorized under 50 U.S.C. §§ 1804-1805, and not to comparable provisions relating to physical search, the use of pen registers and trap and trace devices, or the production of tangible things.

*Intelligence Surveillance Court and the Foreign Intelligence Surveillance Court of Review* (May 18, 1979) ("Security Procedures"), reprinted in H.R. Rep. No. 96-558, at 7-10 (1979).

The Security Procedures, which were issued by Chief Justice Burger in May 1979 pursuant to 50 U.S.C. § 1803(c), provide that the FISC's chambers and facilities must meet certain secure design specifications (¶ 2); that the Court appoint a security officer (¶ 5); and that the Clerk of Court, in consultation with the security officer, ensure that "all court records" are marked with appropriate security classifications in accordance with applicable Executive Orders and court procedures (¶ 6). Paragraph 7 of the Security Procedures provides:

> *Court Proceedings.* The court shall ensure that all court records, including notes, draft opinions and related materials, are maintained according to applicable security standards established in [a specified Director of Central Intelligence directive] or successor directives as concurred in by the Attorney General. Records of the court shall not be removed from its premises except in accordance with the Foreign Intelligence Surveillance Act.[15]

FISA expressly contemplates removal of records of electronic surveillance proceedings under 50 U.S.C. §§ 1804-1805 from the premises of the FISC in two settings:[16] 1) a petition for writ of certiorari by the United States to the Supreme Court, upon which the record relating to the

---

[15] Paragraph 7 of the Security Procedures further states:

> Court personnel shall have access to court records only as authorized by the court and only to the extent necessary to the performance of an official function. Reports and exhibits submitted in support of applications to the court may be returned by the court to the applicant on a trust receipt basis.

[16] Although not expressly addressed by the statutory text, the FISC, without motion, routinely provides copies of its orders and opinions to the government upon issuance. See FISC Rule 7(b)(ii). Because these records set out the terms and limitations of surveillance authority, it is necessary for the government to have copies of them in order for the surveillance to be conducted properly. Also, FISA requires the Attorney General to provide copies of certain FISC decisions and opinions to Congress, "in a manner consistent with the protection of the national security." 50 U.S.C. § 1871(a).

DEC.11.2007   2:10PM   DIRECTOR SEPS   NO.304   P.10

denial of a government application is to be sent to the Supreme Court "under seal," see 50 U.S.C. § 1803(b); and 2) when FISC records are sent to a district court for its review pursuant to 50 U.S.C. § 1806. As to the latter, if the government seeks to use information obtained or derived from a FISA electronic surveillance in a proceeding against an aggrieved person, the aggrieved person is notified of the intended use and may contest the lawfulness of the surveillance in district court and seek to suppress the use of such information as evidence. See § 1806(c)-(f). The statute also contemplates that the aggrieved person may move to discover or obtain the government's applications or this Court's orders. See § 1806(f). In such cases, the district court

> shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance . . . was lawfully authorized and conducted. In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

Id. (emphasis added). If the district court determines that the surveillance was unlawful, then it is to grant the motion of the aggrieved person; if it finds that the surveillance was lawful, it shall deny the motion of the aggrieved person "except to the extent that due process requires discovery or disclosure." § 1806(g).[17]

Finally, the FISC rules reiterate the need for the court and its staff to comply "[i]n all matters" with the Security Procedures, as well as Executive Orders regarding classified information (FISC Rule 3); require that court records be released "in conformance with" the

---

[17] The Government asserts that, in practice, "no court has ever granted an aggrieved person access to any part of orders authorizing surveillance." Gov't Opp. at 4 n.4.

DEC.11.2007  2:11PM  DIRECTOR SEPS  NO.304  P.11

Security Procedures (FISC Rule 7(b)(ii)); and provide for the potential publication of a Court Opinion upon the request of a judge of this Court, after review by the Executive Branch and redaction, as necessary, "to ensure that properly classified information is appropriately protected" (FISC Rule 5(c)).

The collective effect of these provisions is that applications, orders, and other records relating to electronic surveillance proceedings under 50 U.S.C. §§ 1804-1805 – whether in the possession of the FISC, the Court of Review, the Supreme Court, a person rendering assistance under § 1805(c)(2)(B), or a district court for review under § 1806(f)-(g), or even when submitted to Congress under § 1871(a) – shall, as a rule, be maintained in a secure and nonpublic fashion. It is this highly classified, and fundamentally secret, nature of FISC records that distinguishes them from the records of other courts. With that, the Court turns to the ACLU's claims of a right of access to FISC records.

III.     The Common Law Provides No Public Right of Access to the Requested Records.

Courts have recognized "a general right to inspect and copy public records and documents, including judicial records and documents." Nixon v. Warner Commc'ns, 435 U.S. at 597 (footnotes omitted); see also Center for Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918, 936 (D.C. Cir. 2003) ("common law right of access extends . . . to the 'public records' of all three branches of government") (quoting Washington Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 903-04 (D.C. Cir. 1996)). In Nixon v. Warner Commc'ns, the Supreme Court noted that, although the contours of this common law right had not been comprehensively defined, the right was not absolute. 435 U.S. at 597-98 (noting that access had been denied where court files might become a vehicle for improper purposes, such as disclosing confidential

10

business information or disseminating libelous statements). One important limitation on the common law right of access is that it does not apply to documents "which have traditionally been keep secret for important policy reasons," such as records that would disclose grand jury proceedings. Times Mirror Co. v. United States, 873 F.2d 1210, 1219 (9th Cir. 1989); accord In re Motions of Dow Jones & Co., 142 F.3d 496, 504 (D.C. Cir. 1998); United States v. Smith, 123 F.3d 140, 156 (3d Cir. 1997) ("grand jury materials have historically been inaccessible to the press and the general public, and are therefore not judicial records" to which a common law right of presumptive access attaches).

In the FISA context, there is an unquestioned tradition of secrecy, based on the vitally important need to protect national security. See Haig v. Agee, 453 U.S. 280, 307 (1981) (there is no governmental interest more compelling than the security of the nation). The requested records are being maintained under a comprehensive statutory scheme designed to protect FISC records from routine public disclosure. Thus, the statute, and the Security Procedures adopted thereunder, "occupy this field and would supercede the common law right [of access] even if one existed." United States v. Gonzales, 150 F.3d 1246, 1263 (10th Cir. 1998); see also In Re Motions of Dow Jones & Co., 142 F.3d at 504 (any common law right of access to proceeding ancillary to grand jury operations "has been supplanted" by Fed.R.Crim.P. 6(e)).

The fact that the ACLU excludes from its request "information that the Court determines, after independent review, to be properly classified" (ACLU Motion at 3) does not establish a common law right of access to any information that this Court might think was improperly classified. Under FISA and the applicable Security Procedures, there is no role for this Court independently to review, and potentially override, Executive Branch classification decisions. See

11

Part II supra. Hence, the controlling statute and Security Procedures pre-empt any right of common law access that otherwise might arguably exist. For the reasons discussed in Part IV infra, moreover, if the FISC were to assume the role of independently making declassification and release decisions in the probing manner requested by the ACLU, there would be a real risk of harm to national security interests and ultimately to the FISA process itself.[18] An asserted common law right of access fails when "the ends of justice would be frustrated, not served, if the public were allowed access." Times Mirror Co., 873 F.2d at 1219.

For all these reasons, the Court rejects the ACLU's claim of a common law right of access to the records at issue.[19] As explained below, the ACLU's claim premised on constitutional grounds fares no better.

---

[18] That risk would be lessened or eliminated if this Court's review were conducted under the same standards as a district court's review of the Executive Branch's denial of a request for classified documents under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). See, e.g., Krikorian v. Dep't of State, 984 F.2d 461, 464 (D.C. Cir. 1993) (according "substantial weight" to agency's explanation of classification decisions when reviewing those decisions in FOIA litigation) (emphasis in original; internal quotations omitted). But in any event, the availability of judicial review under FOIA would militate against recognizing a common law right of access to the records of this unique (and uniquely nonpublic) court. Cf. Nixon v. Warner Commc'ns, 435 U.S. at 606 (assuming arguendo that qualified common law right of access existed, the presence of an alternative means of public access tipped the scales in favor of denying release).

[19] The government argues that, by bringing this motion, "the ACLU has improperly attempted an end run" around FOIA. Gov't Opp. at 5. If the government is arguing generally that FOIA provides the exclusive means for raising claims of access to documents held by any court, whenever copies of those documents are also in the possession of the Executive Branch and therefore subject to FOIA, then that argument is rejected. Nothing in FOIA divests federal courts of supervisory power over their own records, nor would an agency record's exemption from disclosure under FOIA necessarily displace a right of access to a copy of the same document in a court's files, especially if that right is grounded in the First Amendment.

12

IV.   The First Amendment Provides No Public Right of Access to the Requested Records.

The Supreme Court has recognized a First Amendment right of public access to criminal

trials and to at least some related proceedings. See Press-Enterprise Co. v. Superior Court, 478

U.S. 1 (1986) (Press-Enterprise II) (preliminary hearing under California law); Press-Enterprise

Co. v. Superior Court, 464 U.S. 501 (1984) (Press-Enterprise I) (selection of jurors); Globe

Newspaper Co. v. Superior Court, 457 U.S. 596 (1982) (criminal trial).  In Press-Enterprise II,

the Court adopted two tests, known as the "experience and logic" tests, for determining whether a

qualified First Amendment right of access attaches.

"First, because, a tradition of accessibility implies the favorable judgment of experiences,

we have considered whether the place and process have historically been open to the press and

general public." Press-Enterprise II, 478 U.S. at 8 (citations and internal quotation marks

omitted).  "Second, in this setting the Court has traditionally considered whether public access

plays a significant positive role in the functioning of the particular process in question." Id.  In

discussing this second test, the Court noted that there are some kinds of government operations

that would be totally frustrated if conducted openly, such as the functioning of the grand jury

system, while other proceedings, such as the selection of petit jurors in a criminal trial, plainly

require public access.  Id. at 9.

The Supreme Court further noted that "[t]hese considerations of experience and logic are,

of course, related, for history and experience shape the functioning of governmental processes.  If

the particular proceeding in question passes these tests of experience and logic, a qualified First

Amendment right of public access attaches." Id.  Once a qualified right of access attaches, it may

be overcome only by an overriding interest based on findings that closure of the proceedings is

13

essential to preserve higher values (such as the right of the accused to a fair trial) and is narrowly tailored to serve that interest. Id.

The qualified First Amendment right of access recognized by the Supreme Court can apply to court documents as well as hearings or trials, see, e.g., United States v. Comprehensive Drug Testing, Inc., 473 F.3d 915, 942 (9th Cir. 2006), and this Court will assume, arguendo, that the right is not limited to criminal cases but also extends to other proceedings where the Supreme Court's two tests are met.[20] Electronic surveillance proceedings under 50 U.S.C. §§ 1804-1805 do not, however, meet those tests, and hence there is no First Amendment right to access to the requested documents.

The experience test of Press-Enterprise II asks whether "the place and the process have historically been open to the press and general public." 478 U.S. at 8 (citations and internal quotations omitted). The FISC has no such tradition of openness. Indeed, the FISC has never held a public hearing in its history, and a total of two opinions have been released to the public in nearly three decades of operation. During that period, the FISC has issued literally thousands of classified orders to which the public has had no access. Similarly, there is no tradition of public access to government briefing materials filed with the FISC.

The ACLU acknowledges that there is no tradition of public access to FISC orders. The ACLU argues, nonetheless, that the orders at issue here are distinguishable because they are "of broader significance and include legal analysis and legal rulings concerning the meaning of

---

[20] Several courts have applied the "experience and logic" tests to noncriminal proceedings. See, e.g., Hartford Courant Co. v. Pellegrino, 380 F.3d 83 (2d Cir. 2004) (applied to civil docket sheets); North Jersey Media Group, Inc., v. Ashcroft, 308 F.3d 198 (3d Cir. 2002) (applied to deportation proceedings); Cincinnati Gas & Elec. Co. v. General Elec. Co., 854 F.2d 900 (6th Cir. 1988) (applied to "summary trial" in civil case).

FISA." ACLU Reply at 13. Even assuming that it is proper to apply the "experience" test to a

narrow subset of FISC decisions of broad legal significance,[21] however, the FISC has in fact

issued other legally significant decisions that remain classified and have not been released to the

public (although in fairness to the ACLU it has no way of knowing this). The two published

opinions, then, simply do not establish a <u>tradition</u> of public access, even with regard only to cases

presenting legal issues of broad significance.[22] Thus, the FISC is not a court whose place or

process has historically been open to the public, and the ACLU Motion does not satisfy the

experience test for a First Amendment right of access.[23]

---

[21] There is reason to question the correctness of this assumption. <u>See</u> <u>Globe Newspaper Co.</u> v. <u>Superior Court</u>, 457 U.S. at 605 n.13 (inquiry is properly focused on fact "that as a general matter criminal trials have long been presumptively open," so that it is "unavailing" to argue against a qualified First Amendment right of access on the ground that they "have not always been open . . . during the testimony of minor sex victims").

[22] FISA requires the Attorney General to submit a semiannual report to the Judiciary and Intelligence Committees of each House of Congress; "in a manner consistent with the national security." 50 U.S.C. § 1871. These reports shall include "a summary of significant legal interpretations" of FISA, "including interpretations presented in applications or pleadings filed" with this Court and the Court of Review, as well as "copies of all decisions (not including orders) or opinions" of either Court "that include significant construction or interpretation of the provisions" of FISA. § 1871(a)(4), (5). This requirement, added by amendment in 2004, suggests an understanding on the part of Congress that even legally significant decisions would not routinely be available to the public, so that it was necessary to make special provision to ensure that these Committees received them, consistent with appropriate security requirements.

[23] <u>See</u> <u>In re Motions of Dow Jones & Co.</u>, 142 F.3d at 503 ("no long-standing tradition of public access . . . regarding ancillary proceedings relating to the grand jury"); <u>Smith</u>, 123 F.3d at 148 (no tradition of access to proceedings ancillary to grand jury operations); <u>Baltimore Sun Co.</u> v. <u>Goetz</u>, 886 F.2d 60, 64 (4th Cir. 1989) (no tradition of access to proceedings to obtain search warrants or supporting affidavits); <u>Times Mirror Co.</u>, 873 F.2d at 1213-14 ("no historical tradition of public access" for proceedings on search warrant requests); <u>United States</u> v. <u>Inzunza</u>, 303 F. Supp.2d 1041 (S.D. Cal. 2004) (no tradition of access to results of law enforcement wiretaps or to affidavits in support of search warrants prior to litigation of suppression issues). But see <u>In re Search Warrant for Secretarial Area</u>, 855 F.2d 569, 573 (8th Cir. 1988) (experience
(continued...)

15

In <u>Press-Enterprise II</u>, the Supreme Court held that a qualified First Amendment right of public access attaches if "the particular proceeding in question passes these tests of experience <u>and</u> logic." 478 U.S. at 9 (emphasis added). Thus, under <u>Press-Enterprise II</u>, both tests must be satisfied. Because the ACLU's First Amendment claim runs counter to a long-established and virtually unbroken practice of excluding the public from FISA applications and orders – i.e., it fails the "experience" test – the claim fails regardless of whether it passes the "logic" test. <u>Accord</u> <u>Baltimore Sun Co.</u> v. <u>Goetz</u>, 886 F.2d 60, 64 (4th Cir. 1989) (failure to establish right of access because first prong is not satisfied); <u>United States</u> v. <u>El-Sayegh</u>, 131 F.3d 158, 161 (D.C. Cir. 1997) (same).[24] But in any event, the ACLU's claim does not pass the "logic" test either.

The ACLU is correct in asserting that certain benefits could be expected from public access to the requested materials. There might be greater understanding of the FISC's decisionmaking. Enhanced public scrutiny could provide an additional safeguard against mistakes, overreaching or abuse. And the public could participate in a better-informed manner in debates over legislative proposals relating to FISA.

But these benefits fall short of satisfying the "logic" test under <u>Press-Enterprise II</u>. To begin with, to a considerable degree, comparable benefits could be ascribed to public access to

---

[23] (...continued)
test satisfied for access to search warrant affidavits, because the court found that they are routinely filed without seal).

[24] Some courts have concluded that the failure to satisfy the "experience" test does not necessarily foreclose the existence of a qualified right of access under the First Amendment. <u>See</u> <u>Gonzales</u>, 150 F.3d at 1258; <u>Seattle Times Co.</u> v. <u>United States Dist. Court</u>, 845 F.2d 1513, 1516 (9th Cir. 1988). However, this approach is at odds with the controlling language in <u>Press-Enterprise II</u>.

any type of proceeding.[25]  The argument accordingly "proves too much," since it provides a rationale under which "even grand jury proceedings would be public."  In re Boston Herald, Inc., 321 F.3d 174, 187 (1st Cir. 2003).

Moreover, the detrimental consequences of broad public access to FISC proceedings or records would greatly outweigh any such benefits.  The identification of targets and methods of surveillance would permit adversaries to evade surveillance, conceal their activities, and possibly mislead investigators through false information.  Public identification of targets, and those in communication with them, would also likely result in harassment of, or more grievous injury to, persons who might be exonerated after full investigation.  Disclosures about confidential sources of information would chill current and potential sources from providing information, and might put some in personal jeopardy.  Disclosure of some forms of intelligence gathering could harm national security in other ways, such as damaging relations with foreign governments.  All these possible harms are real and significant, and, quite frankly, beyond debate.

Some of these considerations are comparable to those relied on by courts in finding that the "logic" requirement for a First Amendment right of access was not satisfied regarding various types of proceedings and records.[26]  Others are distinctive to FISA's national security context, but

---

[25]  "'Every judicial proceeding, indeed every governmental process, arguably benefits from public scrutiny to some degree, in that openness leads to a better-informed citizenry and tends to deter government officials from abusing the powers of government'"; nonetheless, such claims "'cannot be used as an incantation to open these proceedings to the public.'" Gonzales, 150 F.3d at 1260 (quoting Times Mirror Co., 873 F.2d at 1213).

[26]  See, e.g., In re Boston Herald, Inc., 321 F.3d at 188 (citing privacy concerns and the chilling of sources of information regarding public access to records regarding eligibility for assistance under Criminal Justice Act (CJA));  Smith, 123 F.3d at 148  (making grand jury proceedings public could result in flight of those about to be indicted and expose the "accused
(continued...)

they are equally supportive of the conclusion that public access to FISA surveillance records does not and would not play "a significant positive role in the functioning of the particular process in question." Press-Enterprise II, 478 U.S. at 8.  Indeed, the national security context applicable here makes these detrimental consequences even more weighty.

Because the ACLU motion seeks only those portions of the requested materials that the Court finds are not properly classified, it could be argued that the ACLU's claim does not entail all of the deleterious consequences described above.  See ACLU Reply at 10-11 (suggesting that legal analysis could be disclosed but discussion of intelligence sources and methods could be withheld).  In fact, the essence of the relief sought by the ACLU is to have this Court conduct an "independent review" of the Executive Branch's determination that the requested records are classified in their entirety,[27] under a standard less deferential than "ordinary district courts accord."[28]

But even if it is assumed for the sake of argument that the analysis under Press-Enterprise II should be applied to a subset of the classified documents – i.e., only those parts of

---

[26](...continued)
but exonerated . . . to public ridicule") (internal quotations omitted); Baltimore Sun Co., 886 F.2d at 64 (access to search warrant affidavit may disclose wiretaps not yet terminated or reveal identities of, and thereby endanger, informants); United States v. Corbitt, 879 F.2d 224, 230-35 (7th Cir. 1989) (noting privacy concerns of defendants and third parties, and the risks of impeding flow of information from confidential sources and of compromising ongoing investigations, regarding claim of public access to presentence report); Times Mirror Co., 873 F.2d at 1215-16 (access to search warrant proceedings, or to supporting affidavits while investigation is ongoing, would risk destruction of evidence, coordination of false testimony, and flight of suspects, and result in public embarrassment of persons named).  But see In re Search Warrant for Secretarial Area, 855 F.2d at 573 (logic prong satisfied for access to search warrant affidavits).

[27] See ACLU Motion at 3.

[28] ACLU Reply at 8.

18

the requested materials that the Court, after independent review, has determined need not be withheld to protect properly classified information[29] – the "logic" requirement would still not be satisfied. The benefits from a partial release of declassified portions of the requested materials would be diminished, insofar as release with redactions may confuse or obscure, rather than illuminate, the decisions in question.[30] And these diminished benefits would come at a heavy cost.

For one thing, to the extent that the Court, applying the less deferential standard sought by the ACLU, might err by releasing information that in fact should remain classified, damage to the national security would result.[31] That possibility itself may be a price too high to pay.

---

[29] In fact, it is doubtful that the "logic" test should be so narrowly applied. See Globe Newspaper Co. v. Pokaski, 868 F.2d 497, 509-10 (1st Cir. 1989) ("The First Amendment right of access attaches only to those governmental processes that as a general matter benefit from openness. . . . Thus, the fact that in certain cases access . . . may not be detrimental to the functioning of the grand jury system, and perhaps may even be beneficial to it . . . is not a sufficient reason to create a presumption in favor of openness.") (emphasis in original).

[30] Cf. Gonzales, 150 F.3d at 1261 (access to redacted CJA materials would be a "Pyrrhic victory," with little benefit).

[31] The ACLU claims that this Court could appropriately conduct a more searching review of the Executive Branch's classification decisions than could a district court because the FISC is a "specialized body with considerable expertise in the area of national security." ACLU Reply at 8. But the ACLU overstates the FISC's expertise. Although the FISC handles a great deal of classified material, FISC judges do not make classification decisions and are not intended to become national security experts. See H.R. Rep. 95-1283, pt. 1, at 25-26 (1978) (FISC judges not expected or desired to become experts in foreign policy matters or foreign intelligence activities, and do not make substantive judgments on the propriety or need for a particular surveillance). Furthermore, even if a typical FISC judge had more expertise in national security matters than a typical district court judge, that expertise would still not equal that of the Executive Branch, which is constitutionally entrusted with protecting the national security. See, e.g., Krikorian, 984 F.2d at 464 ("a reviewing court must recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights" into national security harms that might follow from disclosure) (internal quotations omitted). For
(continued...)

In addition, however, the proper functioning of the FISA process would be adversely affected if submitting sensitive information to the FISC could subject the Executive Branch's classification to a heightened form of judicial review. The greater risk of declassification and disclosure over Executive Branch objections would chill the government's interactions with the Court. That chilling effect could damage national security interests, if, for example, the government opted to forgo surveillance or search of legitimate targets in order to retain control of sensitive information that a FISA application would contain. Moreover, government officials might choose to conduct a search or surveillance without FISC approval where the need for such approval is unclear; creating such an incentive for government officials to avoid judicial review is not preferable. See Ornelas v. United States, 517 U.S. 690, 699 (1996) (noting strong Fourth Amendment preference for searches conducted pursuant to a warrant and adopting a standard of review that would provide an incentive for law enforcement to seek warrants). Finally, in cases that are submitted, the free flow of information to the FISC that is needed for an ex parte proceeding to result in sound decisionmaking and effective oversight could also be threatened.

In arguing for FISC classification review of the documents, the ACLU points to public discussion by administration officials relating to the documents in question. The ACLU contends that the government cannot argue, on the one hand, that the documents in question are properly classified in their entirety, yet, on the other, release information purporting to describe what the FISC has done. The ACLU suggests that the government has engaged in "selective and politically motivated" disclosures. ACLU Motion at 13.

---

[31](...continued)
these reasons, the more searching review requested by the ACLU would be inappropriate.

Perhaps the government's public statements weaken its contention that the documents at issue are properly classified in their entirety. Perhaps not. This Court will not decide or comment on the issue, however, because the Court concludes that the ACLU's claim of inappropriate classification, and the government's public statements, do not alter the Court's determination that the "logic" test is not satisfied. In particular, the FISC could not engage in a classification review more searching than that of a district court without undue risk to the national security and the FISA process for the reasons stated above.[32]

In applying the "logic" test, other courts have found that there is no First Amendment right of access where disclosure would result in a diminished flow of information, to the detriment of the process in question.[33] That same reasoning applies to the FISA process, and compels the conclusion that the "logic" test under Press-Enterprise II is not satisfied here.

---

[32] It is true that the negative effect of the FISC making its own release decisions about classified documents would be lessened or eliminated if the FISC, contrary to the ACLU's request, were to conduct a review under the same standards as a district court would in FOIA litigation. But there would be no point in this Court's merely duplicating the judicial review that the ACLU, and anyone else, can obtain by submitting a FOIA request to the Department of Justice for these same records.

[33] See In re Boston Herald, 321 F.3d at 188 (in CJA context, the "specter of disclosure . . . might lead defendants (or other sources called upon by the court) to withhold information"); Gonzales, 150 F.3d at 1259 (analogizing to grand juries, which "function best in secret . . . because secrecy 'encourage[s] free and untrammeled disclosures,'" and finding that "[w]ithout an assurance that the information revealed at CJA hearings and in documents submitted to the court will not be disclosed, a defendant and his or her counsel would be discouraged from fully disclosing information") (quoting Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 219 n.10 (1979)); Corbitt, 879 F.2d at 232-35 (relying on need to preserve "free flow of information" to sentencing judge, and "untoward effects" disclosure could have "on the gathering of information in future presentence investigations," in rejecting claimed First Amendment right of access to presentence report).

21

Hence, with both the "experience" and "logic" tests unsatisfied, the Court concludes that there is no First Amendment right of access to the requested materials.

V.    The Court Will Not Exercise any Residual Discretion to Order Release.

Finally, the ACLU's motion can perhaps be read as asking this Court to exercise its discretion to release the FISC records at issue (or, more precisely, any portions of those documents that the Court determines, over the government's objections, ought to be declassified), regardless of whether the ACLU has a cognizable legal right to such release. Assuming, arguendo, that this Court retains such residual discretion, it declines to undertake the searching review of the Executive Branch's classification decisions requested by the ACLU, because of the serious negative consequences that might ensue, as detailed above. See Part IV supra. Of course, nothing in this decision forecloses the ACLU from pursuing whatever remedies may be available to it in a district court through a FOIA request addressed to the Executive Branch.

CONCLUSION

For all the reasons set forth above, the motion of the ACLU for release of certain FISC records will be denied. A separate order has been issued.

JOHN D. BATES
Judge, Foreign Intelligence
Surveillance Court

December 11, 2007
Date

22