Mark Rumold (SBN 279060)
*mark@eff.org*
Jennifer Lynch (SBN 240701)
*jlynch@eff.org*
ELECTRONIC FRONTIER FOUNDATION
815 Eddy St.
San Francisco, CA 94109
Telephone:   (415) 436-9333
Facsimile:    (415) 436-9993

Attorneys for Plaintiff
Electronic Frontier Foundation

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | CASE NO. 4:11-CV-05221-YGR |
| Plaintiff, | **SECOND DECLARATION OF MARK RUMOLD IN SUPPORT OF PLAINTIFF'S SECOND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DEPARTMENT OF JUSTICE, | |
| Defendant. | |
| | Date:       June 3, 2014 |
| | Time:       2:00 p.m. |
| | Place:      Courtroom 1 – 4th Floor |
| | Hon. Yvonne Gonzalez Rogers |

**DECLARATION OF MARK RUMOLD**

1.      I am an attorney of record for Plaintiff Electronic Frontier Foundation ("EFF") in this matter. I am a member in good standing of the California State Bar and am admitted to practice before this Court. I have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

2.      EFF is a nonprofit corporation established under the laws of the Commonwealth of Massachusetts with offices in San Francisco, California and Washington, D.C. EFF is a donor-supported membership organization that works to inform policymakers and the general public about civil liberties issues related to technology and to act as a defender of those liberties. In support of its mission, EFF uses the Freedom of Information Act (FOIA) to obtain and disseminate information concerning the activities of federal agencies.

3.      Attached hereto as Exhibit A is a true and correct copy of:  Supplemental Opinion, *In re Production of Tangible Things From [Redacted]*, Dkt. No. BR 08-13 (FISC Dec. 12, 2008).

4.      Attached hereto as Exhibit B is a true and correct copy of:  Supplemental Order, *In Re Application of the Federal Bureau of Investigation for an Order Requiring the Production of Tangible Things From [Redacted]*, Dkt. No. BR 10-82 (FISC Nov. 23, 2010).

5.      Attached hereto as Exhibit C is a true and correct copy of: *Counterterrorism, National Security, and the Rule of Law*, Aspen Security Forum (July 18, 2013) (Excerpts of remarks of Raj De, General Counsel, National Security Agency).

6.      Attached hereto as Exhibit D is a true and correct copy of the following article: Geoffrey Stone, *Understanding Obama's NSA Proposals*, Daily Beast (Mar. 27, 2014).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Signed this 18th day of April, 2014.


_____/s/ Mark Rumold_____
Mark Rumold

# Exhibit A

# Exhibit A

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

IN RE PRODUCTION OF TANGIBLE THINGS FROM :

███████████████████████████████ :

                               :    Docket No.: BR 08-13

                               :

## SUPPLEMENTAL OPINION

This Supplemental Opinion memorializes the Court's reasons for concluding that the records to be produced pursuant to the orders issued in the above-referenced docket number are properly subject to production pursuant to 50 U.S.C.A. § 1861 (West 2003 & Supp. 2008), notwithstanding the provisions of 18 U.S.C.A. §§ 2702-2703 (West 2000 & Supp. 2008), amended by Public Law 110-401, § 501(b)(2) (2008).

As requested in the application, the Court is ordering production of telephone "call detail records or 'telephony metadata,'" which "includes comprehensive communications routing information, including but not limited to session identifying information . . ., trunk identifier, telephone calling card numbers, and time and duration of [the] calls," but "does not include the substantive content of any communication." Application at 9; Primary Order at 2. Similar productions have been ordered by judges of the Foreign Intelligence Surveillance Court ("FISC"). See Application at 17. However, this is the first application in which the government has identified the provisions of 18 U.S.C.A. §§ 2702-2703 as potentially relevant to whether such orders could properly be issued under 50 U.S.C.A. § 1861. See Application at 6-8.

Pursuant to section 1861, the government may apply to the FISC "for an order requiring the production of any tangible things (including books, records, papers, documents, and other items)." 50 U.S.C.A. § 1861(a)(1) (emphasis added). The FISC is authorized to issue the order, "as requested, or as modified," upon a finding that the application meets the requirements of that section. Id. at § 1861(c)(1). Under the rules of statutory construction, the use of the word "any" in a statute naturally connotes "an expansive meaning," extending to all members of a common set, unless Congress employed "language limiting [its] breadth." United States v. Gonzales, 520 U.S. 1, 5 (1997); accord Ali v. Federal Bureau of Prisons, 128 S. Ct. 831, 836 (2008)

("Congress' use of 'any' to modify 'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind.").[1]

However, section 2702, by its terms, describes an apparently exhaustive set of circumstances under which a telephone service provider may provide to the government non-content records pertaining to a customer or subscriber. See § 2702(a)(3) (except as provided in § 2702(c), a provider "shall not knowingly divulge a record or other [non-content] information pertaining to a subscriber or customer . . . to any governmental entity"). In complementary fashion, section 2703 describes an apparently exhaustive set of means by which the government may compel a provider to produce such records. See § 2703(c)(1) ("A governmental entity may require a provider . . . to disclose a record or other [non-content] information pertaining to a subscriber . . . or customer . . . only when the governmental entity" proceeds in one of the ways described in § 2703(c)(1)(A)-(E)) (emphasis added). Production of records pursuant to a FISC order under section 1861 is not expressly contemplated by either section 2702(c) or section 2703(c)(1)(A)-(E).

If the above-described statutory provisions are to be reconciled, they cannot all be given their full, literal effect. If section 1861 can be used to compel production of call detail records, then the prohibitions of section 2702 and 2703 must be understood to have an implicit exception for production in response to a section 1861 order. On the other hand, if sections 2702 and 2703 are understood to prohibit the use of section 1861 to compel production of call detail records, then the expansive description of tangible things obtainable under section 1861(a)(1) must be construed to exclude such records.

The apparent tension between these provisions stems from amendments enacted by Congress in the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act"), Public Law 107-56, October 26, 2001, 115 Stat. 272. Prior to the USA PATRIOT Act, only limited types of records, not

---

[1] The only express limitation on the type of tangible thing that can be subject to a section 1861 order is that the tangible thing "can be obtained with a subpoena duces tecum issued by a court of the United States in aid of a grand jury investigation or with any other order issued by a court of the United States directing the production of records or tangible things." Id. at § 1861(c)(2)(D). Call detail records satisfy this requirement, since they may be obtained by (among other means) a "court order for disclosure" under 18 U.S.C.A. § 2703(d). Section 2703(d) permits the government to obtain a court order for release of non-content records, or even in some cases of the contents of a communication, upon a demonstration of relevance to a criminal investigation.

TOP SECRET//COMINT//ORCON,NOFORN//MR

including call detail records, were subject to production pursuant to FISC orders.[2]  Section 215 of the USA PATRIOT Act replaced this prior language with the broad description of "any tangible thing" now codified at section 1861(a)(1).  At the same time, the USA PATRIOT Act amended sections 2702 and 2703 in ways that seemingly re-affirmed that communications service providers could divulge records to the government only in specified circumstances,[3] without expressly referencing FISC orders issued under section 1861.

The government argues that section 1861(a)(3) supports its contention that section 1861(a)(1) encompasses the records sought in this case.  Under section 1861(a)(3), which Congress enacted in 2006,[4] applications to the FISC for production of several categories of sensitive records, including "tax return records" and "educational records," may be made only by the Director, the Deputy Director or the Executive Assistant Director for National Security of the Federal Bureau of Investigation ("FBI").  18 U.S.C.A. § 1861(a)(3).  The disclosure of tax return records[5] and educational records[6] is specifically regulated by other federal statutes, which do not by their own terms contemplate production pursuant to a section 1861 order.  Nonetheless, Congress clearly intended that such records could be obtained under a section 1861 order, as demonstrated by their inclusion in section 1861(a)(3).  But, since the records of telephone service providers are not mentioned in section 1861(a)(3), this line of reasoning is not directly on point.  However, it does at least demonstrate that Congress may have intended the sweeping description of tangible items obtainable under section 1861 to encompass the records of telephone service providers, even though the specific provisions of sections 2702 and 2703 were not amended in order to make that intent unmistakably clear.

---

[2]  See 50 U.S.C.A. § 1862(a) (West 2000) (applying to records of transportation carriers, storage facilities, vehicle rental facilities, and public accommodation facilities).

[3]  Specifically, the USA PATRIOT Act inserted the prohibition on disclosure to governmental entities now codified at 18 U.S.C.A. § 2702(a)(3), and exceptions to this prohibition now codified at 18 U.S.C.A. § 2702(c).  See USA PATRIOT Act § 212(a)(1)(B)(iii) & (E).  The USA PATRIOT Act also amended the text of 18 U.S.C.A. § 2703(c)(1) to state that the government may require the disclosure of such records only in circumstances specified therein.  See USA PATRIOT Act § 212(b)(1)(C)(i).

[4]  See Public Law 109-177 § 106(a)(2) (2006).

[5]  See 26 U.S.C.A. § 6103(a) (West Supp. 2008), amended by Public Law 110-328 § 3(b)(1) (2008).

[6]  See 20 U.S.C.A. § 1232g(b) (West 2000 & Supp. 2008).

TOP SECRET//COMINT//ORCON,NOFORN//MR

The Court finds more instructive a separate provision of the USA PATRIOT Act, which also pertains to governmental access to non-content records from communications service providers. Section 505(a) of the USA PATRIOT Act amended provisions, codified at 18 U.S.C.A. § 2709 (West 2000 & Supp. 2008), enabling the FBI, without prior judicial review, to compel a telephone service provider to produce "subscriber information and toll billing records information." 18 U.S.C.A. § 2709(a).[7] Most pertinently, section 505(a)(3)(B) of the USA PATRIOT Act lowered the predicate required for obtaining such information to a certification submitted by designated FBI officials asserting its relevance to an authorized foreign intelligence investigation.[8]

Indisputably, section 2709 provides a means for the government to obtain non-content information in a manner consistent with the text of sections 2702-2703.[9] Yet section 2709 merely requires an FBI official to provide a certification of relevance. In comparison, section 1861 requires the government to provide to the FISC a "statement of facts showing that there are reasonable grounds to believe that the tangible things sought are relevant" to a foreign intelligence investigation,[10] and the FISC to determine that the application satisfies this

---

[7] This process involves service of a type of administrative subpoena, commonly known as a "national security letter." David S. Kris & J. Douglas Wilson, National Security Investigations and Prosecutions § 19:2 (2007).

[8] Specifically, a designated FBI official must certify that the information or records sought are "relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 18 U.S.C.A. § 2709(b)(1)-(2) (West Supp. 2008). Prior to the USA PATRIOT Act, the required predicate for obtaining "local and long distance toll billing records of a person or entity" was "specific and articulable facts giving reason to believe that the person or entity . . . is a foreign power or an agent of a foreign power." See 18 U.S.C.A. § 2709(b)(1)(B) (West 2000).

[9] Section 2703(c)(2) permits the government to use "an administrative subpoena" to obtain certain categories of non-content information from a provider, and section 2709 concerns use of an administrative subpoena. See note 7 supra.

[10] 50 U.S.C.A. § 1861(b)(2)(A). More precisely, the investigation must be "an authorized investigation (other than a threat assessment) . . . to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities," id., "provided that such investigation of a United States

(continued...)

TOP SECRET//COMINT//ORCON,NOFORN//MR

requirement, see 50 U.S.C.A. § 1861(c)(1), before records are ordered produced. It would have been anomalous for Congress, in enacting the USA PATRIOT Act, to have deemed the FBI's application of a "relevance" standard, without prior judicial review, sufficient to obtain records subject to sections 2702-2703, but to have deemed the FISC's application of a closely similar "relevance" standard insufficient for the same purpose. This anomaly is avoided by interpreting sections 2702-2703 as implicitly permitting the production of records pursuant to a FISC order issued under section 1861.

It is the Court's responsibility to attempt to interpret a statute "as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (internal quotations and citations omitted). For the foregoing reasons, the Court is persuaded that this objective is better served by the interpretation that the records sought in this case are obtainable pursuant to a section 1861 order.

However, to the extent that any ambiguity may remain, it should be noted that the legislative history of the USA PATRIOT Act is consistent with this expansive interpretation of section 1861(a)(1). See 147 Cong. Rec. 20,703 (2001) (statement of Sen. Feingold) (section 215 of USA PATRIOT Act "permits the Government . . . to compel the production of records from any business regarding any person if that information is sought in connection with an investigation of terrorism or espionage;" "all business records can be compelled, including those containing sensitive personal information, such as medical records from hospitals or doctors, or educational records, or records of what books somebody has taken out from the library") (emphasis added). In this regard, it is significant that Senator Feingold introduced an amendment to limit the scope of section 1861 orders to records "not protected by any Federal or State law governing access to the records for intelligence or law enforcement purposes," but this limitation was not adopted. See 147 Cong. Rec. 19,530 (2001).

ENTERED this 12th day of December, 2008, regarding Docket No. BR 08-13.

REGGIE B. WALTON
Judge, United States Foreign
Intelligence Surveillance Court

---

[10](...continued)

person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution." Id. § 1861(a)(1). The application must also include minimization procedures in conformance with statutory requirements, which must also be reviewed by the FISC. Id. § 1861(b)(2)(B), (c)(1), & (g).

TOP SECRET//COMINT//ORCON,NOFORN//MR

# Exhibit B

Exhibit B

SECRET

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.

IN RE APPLICATION OF THE
FEDERAL BUREAU OF INVESTIGATION
FOR AN ORDER REQUIRING THE                    Docket No.: BR 10-82
PRODUCTION OF TANGIBLE THINGS
FROM (b) (1)

**SUPPLEMENTAL ORDER**

In granting the application in this matter, the Court has concluded that the Right to
Financial Privacy Act, 12 U.S.C. §§ 3401-3422 (RFPA), does not preclude the issuance of an
order requiring the production of financial records to the Federal Bureau of Investigation (FBI)
pursuant to the FISA business records provision, 50 U.S.C. § 1861. This Supplemental Order
briefly memorializes the Court's reasons for reaching that conclusion and addresses a separate
issue regarding minimization.

The RFPA generally provides that "no Government authority" may obtain "financial
records" from a "financial institution" unless one of several exceptions applies. See 12 U.S.C.
§ 3402; see also id. § 3403. Under one of those exceptions, the FBI may, without prior judicial
review, compel a financial institution to produce financial records, provided that a designated
FBI official has certified that the records are relevant to an authorized foreign intelligence
investigation. See 50 U.S.C. § 3414(a)(5)(A). Pursuant to Section 1861, the government may
request, and this Court may grant, "an order requiring the production of any tangible things
(including books, records, papers, documents, and other items)." 50 U.S.C. § 1861(a)(1)
(emphasis added). Section 1861 requires the government to provide the Court with a "statement
of facts showing that there are reasonable grounds to believe that the tangible things sought are
relevant" to a foreign intelligence investigation, id. § 1861(b)(2)(A), and the Court to determine
that the application satisfies this requirement, see id. § 1861(c)(1), before records are ordered to
be produced.

Although the RFPA contains no provision explicitly allowing the production of financial
records pursuant to a Section 1861 order, the Court agrees with the government that it would
have been anomalous for Congress to have deemed the FBI's application of a "relevance"
standard, without prior judicial review, sufficient to obtain records subject to the RFPA, but to
have deemed this Court's application of a closely similar "relevance" standard insufficient for the
same purpose. The anomaly is avoided by interpreting the RFPA as permitting the production of

SECRET

  — 

~~SECRET~~

records pursuant to a Section 1861 order. See Docket No. BR 08-13, December 12, 2008 Supplemental Opinion (relying on similar reasoning in holding that 18 U.S.C. §§ 2702 and 2703 implicitly permit the production of call detail records pursuant to an order issued under Section 1861).[1]



Issued this **23**rd day of November, 2010.

JOHN D. BATES
Judge, United States Foreign
Intelligence Surveillance Court

---

[1] In granting the application in this matter, the Court did not rely upon 12 U.S.C. § 3413(d), a separate exception to the RFPA that the government also argued-is applicable.

(b) (6), (b) (7)(C)

# Exhibit C

# Exhibit C

THE ASPEN INSTITUTE

ASPEN SECURITY FORUM 2013

COUNTERTERRORISM, NATIONAL SECURITY, AND THE RULE OF LAW

Thursday, July 18, 2013

LIST OF PARTICIPANTS

MICHAEL ISIKOFF
Investigative Journalist, NBC News; Author

RAJ DE
General Counsel, National Security Agency

NEIL MacBRIDE
U.S. Attorney for the Eastern District of Virginia

JEH JOHNSON
Civil, Criminal Trial Lawyer
Former General Counsel of the Department of Defense

JANE HARMAN
Director, President and CEO, Woodrow Wilson Center
Former U.S. Representative

ANTHONY ROMERO
Executive Director, ACLU

                    *   *   *   *   *

COUNTERTERRORISM, NATIONAL SECURITY, AND THE RULE OF LAW

MR ERVIN:  All right, everybody, if we could start making our way back into the auditorium and get started.  All right, everyone.  Well, as I think most of you know -- I think nearly everybody here this morning was here last night, so you know that I'm Clark Ervin, the director of the Homeland Security Program here at the Aspen Institute and the director of the Aspen Security forum.  Thank you very much for being here.

Just a couple of quick administrative housekeeping things that I want to say right now, because otherwise I will forget.  Of course given the composition of our audience and speakers there is a lot of security consciousness, appropriately enough.  So, the security detail has been picking up bags that have been unattended. So if you could please take your bag with you when you step out of the room and also if you could insert a business card right on the reverse, that will allow the security detail to return it to you afterwards.

Secondly, many, if not most, of our speakers and moderators are themselves authors, including Mike Isikoff, and so we are selling -- available in the back there thanks to Explorer bookstores here in Aspen are the books of many of the speakers and moderators.  So I commend that to you -- to those of you who are interested.

With that, the title of this panel, as you see, is Counterterrorism, National Security, and the Rule of Law.  And I think this one sentence that I drafted, the tension between what the law demands and what the national defense requires is in essence what this panel is all about.  And to moderate this panel we are very pleased to have one of America's premier investigative journalists, Mike Isikoff.

Mike joined *NBC News* in 2010 as the national investigative correspondent, where, as we all know, he covered among other things the Boston Marathon Bombing and the Newtown Shooting Massacre.  He appears regularly on *NBC News* and *MSNBC* programs.  And he also the author, speaking of books, of two bestselling books, *New York*

*Times* bestselling books, *Hubris: The Inside Story of Spin, Scandal, and the Selling of the Iraq*, co-written with David Corn, and also *Uncovering Clinton: A Reporter's Story* on the Monica Lewinsky matter.

    With that, Mike Isikoff.

    MR. ISIKOFF:  Thank you, Clark.  And I want to thank you again for assembling such great panels.  Every year you get newsmakers and future newsmakers to serve on these panels.  Last year, for example, I served on a panel with Paula Broadwell.  We went on.  And while I don't expect any of our distinguished panelists to be making news quite like that this year, I think they all will be in the spotlight in some form or another.

    Very quickly, to my left, Raj De, is the general counsel of the National Security Agency, which puts him right in the hot seat of all the issues that have been at front and center since the Snowden disclosures.  Before that, Raj was the staff secretary for the president, President Obama.  And my understanding is that gave him access to everything that went to the president's desk, which is pretty ominous when you think about it.  And I first encountered Raj when he was a counsel for the 9/11 Commission, investigating what went -- what happened there.

    To his left, Neil MacBride, is the U.S. Attorney for the Eastern District of Virginia and which has put him at the forefront of investigations on terrorism and quite a few media leak investigations, leak investigations involving the media, a subject I want to get to on this panel.  Before that, he was a -- he served in the Justice Department in the DAAGs office and was a counsel to then Senator Joe Biden.

    Jeh Johnson was the general counsel for the Defense Department until last year.  And that gave him a legal overview about everything the U.S. Military and Defense Department was doing, a lot of which are the matters we are going to discuss here.  Before that, he was the general counsel for the Air Force and an assistant U.S attorney, I understand hired in New York by Rudy Giuliani

back in the day that he was -- served on that.

Jane Harman needs no introduction to anybody here.  She is now the executive director or director of the Woodrow Wilson Center.  Served for how many terms in Congress?

MS. HARMAN:  Nine.

MR. ISIKOFF:  Nine terms in Congress.  Was ranking member on the House Intelligence Committee for many years and then the Homeland Security Committee.

And Anthony Romero is the executive director of the ACLU and has been a consistent voice for civil liberties on all the issues we are going to talk about.

So let's start right off with the NSA program. I know some of it was covered in the previous panel.  But I want to get into with Raj a little bit how it actually works.  And I'm talking about the metadata program, which was probably the biggest disclosure by Edward Snowden, the fact that millions and millions of records of American's phone calls were being collected/stored -- I'll let people use the word they want -- by the NSA under a provision of the Patriot Act section 215.

Raj, walk us through exactly how this program works in practice, who has access to it, what those records can be used for?

MR. DE:  Sure.  Well, thanks, Mike.  And thanks to the Aspen Institute and to Clark for pulling this all together.  I'm especially appreciative because what I wanted to start out with is that I firmly believe that the U.S. government, the intelligence community, NSA in particular needs to be as transparent as possible, consistent with our need to protect national security. And obviously it's that last piece that's the rub and it makes it so difficult to talk about classified programs. But I would like to be as informative and helpful in this discussion as possible.

So with that -- and the reason I say that is my

job as the general counsel is to make sure our activities are lawful.  But I think that the legitimacy of NSA's activities is just as important as the lawfulness of its activities.

So let me turn to the program you asked about, Mike.  Even on the prior panel there was some conflation between the two major programs that were exposed.  There are a number of issues that have been out in the press lately, but there's two major programs that were exposed.  One -- and I will refer to them as the 702 program and 215 program.

Just to put it to the side, the 702 program is about the collection of content of communications, e-mails and phone calls, but it may only be targeted at non U.S. persons reasonably believed to be located aboard for valid foreign intelligence purpose.  That is not what we are talking about with respect to the 215 program.  To target the contents of the communications of a U.S. person under FISA anywhere in the world, whether it's in the U.S. or in the farthest flung corner of the world requires a showing of probable cause to a federal judge.

Turning to the 215 program, we call it the 215 program because it's conducted pursuant to section 215 of the Patriot Act.  That provision allows the director of the FBI to apply to the FISC to obtain business records that maybe relevant to an authorized national security investigation.  The FBI uses this provision for lots of different things.  The only program that NSA uses it for in connection with the FBI is the business records metadata program that we are discussing today.

So what is that program all about?  Before I get into the details, I think it would be helpful for everyone to understand what's the point of the program and why did it evolve.  So in the aftermath of the 9/11 attacks one of the major issues that was exposed was a scene between our foreign intelligence collection and our domestic counterterrorism efforts.  People in shorthand refer it to as the foreign-domestic divide.

The 9/11 Commission, for which I served as a

6

staff member, focused on this issue and the U.S.
government over the past decade has taken a number of
efforts to address this divide.  Some of them
institutional like setting up the National
Counterterrorism Center and some of them utilizing certain
programs like the telephone metadata program.  The idea
behind the program is to help connect when there is a
foreign threat that may have a domestic nexus.

So how does it work?  This program is about the
bulk collection of telephone metadata, and what that means
is things like numbers dialed, date and time of call and
duration of call.  It does not include any subscriber
identifying information.  There's no names associated with
the numbers that are submitted to the FBI and to NSA.
There is no locational data that is provided, whether
that's GPS data or cell site locational information.  And
most importantly and probably most obvious there is no
content.

I say that just so that everyone has a level set
on the facts here as to how it's implemented.  Pursuant to
court order this data comes to NSA on a daily basis.  It
needs to be put pursuant to court order in a segregated
database so it can't be comingled with other data at NSA.
It has strict access and use controls that are imposed by
the FISC.  And so let me walk through some of those for
you.

MR. ISIKOFF:  Well, can I just --

MR. DE:  Sure.

MR. ISIKOFF:  I want to get back to this.  But
you talked about transparency here and understanding.  And
I want to -- and this is called the 215 program because of
the provision in the Patriot Act.  Jane, you were in the
Congress when it passed the Patriot Act and 215 was
definitely one of the issues that people were debating.

MS. HARMAN:  Right.

MR. ISIKOFF:  Did you understand when you voted
for and supported the Patriot Act that it would be used

7

for the bulk collection of everybody's phone records in
the United States?

          MS. HARMAN:  I understood that we needed to
collect records in order to -- through all the means we've
discussed in prior panels today in order to find those
people in the United States or outside the United States
who are linked to people in the United who are trying to
harm us after 9/11.

          And I voted for a provision that authorized
people under strict supervision to figure out the best way
to do that.  I don't think as a sitting member of Congress
and somebody -- I certainly know a lot about the
intelligence business, but I'm not a trained intelligence
analyst that I'm the best person to decide the parameters
of the program.

          But when I voted for it, one, Congress narrowed
some of the initial proposals, and two, we sunsetted this
thing.  This thing has to be renewed every three years.
And can I just add a little historical context, because I
think it's important and I think a lot of people here do
not understand?

          MR. ISIKOFF:  I just want to get you to -- did
you understand that it would be used for the purpose that
Raj is explaining here?

          MS. HARMAN:  I understood, well, business
records could certainly be phone company records.

          MR. ISIKOFF:  All phone records in the United
States.

          MS. HARMAN:  The -- exactly how it would be
implemented -- I trusted people to implement it fairly
because those in Congress who were on the relevant
committees played -- certainly, I did -- a major role in
overseeing what was happening.  Now my knowledge -- I left
the Intelligence Committee at the end of 2006, but then I
headed the Intelligence Subcommittee of the Homeland
Committee for another four years.  So I stayed in this
game.  Did I oversee every single bit of it?  No.  Do I

think that maybe now, now that there is a much more public debate Congress should narrow some of these provisions? Yes.

Congress did narrow some of these provisions. There was the so-called library piece of 215 and there was a hue and cry about grandma going to the library and taking out a book and who could see that. And the reason the library provision was added is that there are often Internets at libraries. And in case anybody missed it, a lot of the way communication works between bad guys to bad guys is through the Internet and those sites maybe ought to be subject to the provisions of section 215.

So once it was narrowed to clarify that grandma was exempted, Congress did that in response to public outcry. People have known about this program. It was revealed in the *New York Times* in 2005. George Bush then finally partially declassified it. And I learned for the first time to my extreme dismay that in the first three and a half years of this program, which was developed by the Bush administration, the president had used his Article II authority -- he is the commander-in-chief -- to run the program rather than the provisions of law, FISA, which Congress enacted in 1978.

It's a fact that you ought to all know. FISA, the Foreign Intelligence Surveillance Act was passed by Congress in 1978 in response to the abuses of the Nixon administration and the recommendations of the Church Commission and it set up a careful system of a FISA Court, which I think you all understand how that works, composed of federal judges and intelligence committees on the Hill which were set up then to monitor these FISA applications. And it worked very well in my view through 2001.

And then the Bush administration yanked it and ran it in a different way. Congress after that, pulled it back under FISA. And I think -- I believe strongly that maybe the amount of metadata is excessive. I'm sure my buddy here Anthony thinks this. But -- and that ought to be debated and maybe the program should be narrowed. But there has been robust oversight over these years.

9

MR. ISIKOFF:  Let me come back to Raj about the actual implementation, because I want to get back -- I want to be very clear on this.  Who can access this data and for what specific purposes?

MR. DE:  Certainly.  And so I'll just add one fact, because facts are always good.  We sent a -- I think this is in a letter that went to the Hill yesterday from the Justice Department.  White papers classified were sent to Congress in December of 2009, in February of 2011 expressly describing the bulk collection use of this program.  I can't speak to any individual member of Congress currently now as to their knowledge of the program, but I think that fact is an important one.

But getting to the use of the program; so in terms of access.  Access is strictly controlled.  And what does that mean?  So in order to accrue the data one has to have a reasonable articulable suspicion that a particular selector, which is a phone number, has a tie to a specific terrorist group that is identified in a court order.

MR. ISIKOFF:  So just a terrorist group.  So if Neil MacBride calls you up tomorrow and says "I've got a foreign espionage investigation going on right now and I think my target might be about to leave the United States. I need to check out this phone number to see whether he is in communication with a co-conspirator, are you going to give him the information from that data collection"?

MR. DE:  No.  It will be illegal.

MR. ISIKOFF:  You tell him, no, he can't have it?

MR. DE:  That's right.  Not only will would it --

MR. ISIKOFF:  Neil, how do you get the information?

MR. MacBRIDE:  Ask again.  Please.

(Laughter)

10

MR. DE:  We are friends, but not that close.

MR. ISIKOFF:  How would you get the information for that investigation that you need?

MR. MacBRIDE:  Well, the -- you know, let me back up from the specifics for a minute and quickly get to that, Mike.  So in any investigation post 9/11 the FBI and the intelligence community and other government actors are working seamlessly in a way that really didn't happen before 9/11.  I mean I -- when Jeh was general counsel we would have -- there were weeks when we had many occasions when we had to talk.  We work closely with the Military, with Admiral McRaven community, with Admiral Gortney down in Norfolk, with various command forces.  So there are conversations occurring across the defense intelligence, law enforcement communities in ways which are helpful in terms of permissible information sharing and dot connecting.

To your specific question, if there was a -- as I understand your hypothetical, if there was an operational terrorist within the United States, I would hope that we would already have their number and --

MR. ISIKOFF:  Not a terrorist.  I said a spy.

MR. MacBRIDE:  A spy.  Well, there certainly have been examples where there were individuals in this country.  We have prosecuted a couple in my office just in the last year or so.  One who was here as an unregistered agent of the ISI from Pakistani intelligence; another who was here at the behest of Syrian intelligence.  And those individuals came to our attention, the investigations ensued and we were able to obtain the information we needed.

MR. ISIKOFF:  No, but I'm asking a specific question about how you get records of phone numbers on ongoing investigations that have real-time consequences.  It could be a spy investigation.  It could be a drug cartel that's importing guns onto the streets of Alexandria and were used in five murders in the last

several months.  You need this information right away and
you want to know who is making phone calls to this -- who
is making these phone calls.  How do you get the
information?

          MR. MacBRIDE:  Well, it's -- I think --

          MR. ISIKOFF:  You can get it, can't you?

          MR. MacBRIDE:  Yeah, and we do get it.  And --

          MR. ISIKOFF:  And by a subpoena.

          MR. MacBRIDE:  Sure.  By a subpoena, from an
informant, from any number of ways.  And so that in
garden-variety criminal investigations, our ability to
identify where an alleged bad guy lives or their phone
number or their e-mail address our ability to find it is
not all that difficult.  Before we can --

          MR. ISIKOFF:  Not all that difficult and not all
that time consuming.  You can get it pretty quickly if you
need it for an ongoing investigation, operational --
somebody is about to leave the country, you need that
phone number in order to get a search warrant, you can get
it pretty quickly, can't you?

          MR. MacBRIDE:  Well, it would depend on the
particular case.  But in contrast to what Raj is
describing, which is sort of, you know, macro issues and
bulk collection, your example I think contemplates a known
individual who has been under the scrutiny or the view of
law enforcement or other agencies.  And so at the micro
level it has not proved to be a difficult thing in our
investigations.

          MR. ISIKOFF:  So I guess the question, Raj, is
since Neil can get the information he needs pretty quickly
for a lot of really serious investigations that have
operational components, why can't you use the same method
for the terrorism investigations that you are collecting
this data for?

          MR. DE:  So I think the question -- the bigger

picture is, why can't the data just stay with the
providers and then on a one-off basis go to them, right?
That's --

          MR. ISIKOFF:  Which is what happens when Neil
needs them for his investigations.

          MR. DE:  So just as a -- using a hypothetical
example I think will be helpful, instructive for me
anyway, is this came about in part after the 9/11 attacks.
We realized that one of the operatives who had been living
in the U.S. for some time in San Diego it turns out after
the fact we learned had been receiving calls from a known
Al-Qaeda safe house in Sana'a, Yemen.

          So that's a -- I think that's a good example to
use here.  So we know there is a Yemini number, for
example, that is a bad number, has a reasonable suspicion
that it is tied to a terrorist organization.  If we wanted
to in short order try to figure out where that number may
be connected to other numbers in the U.S. because we may
have intercepted under another program the content of that
communication to or from that number, the way that would
play out in practice today if we went with the traditional
law enforcement model, would be to need to go to multiple
providers to ask them to search what number that number
had been in contact with.

          So as opposed to a subscriber of one of those
companies, this would be a situation where they don't have
the records handy for a Yemini phone number.  They would
have to do a search against their records against that
number.  So it's different than the hypothetical you
posited earlier.  So there is operational consequences
there.

          Two, in order to do the sort of analytics that
need to happen on that data, the data needs to be
aggregated to most effectively do that in short time.  And
so with three different providers that would also be
additional step of bringing the data back, putting it
together and trying to analyze it in short order.

          And the third point I would make is today there

13

is no legal obligation for any of these companies to hold on to their data.  They do it for their own commercial purposes.  That's why it's called the business records exception.  So tomorrow we could turnaround and any of these companies could decide that in their business purposes they don't want to hold on to these records.  And so we could be faced with a situation which would equally impact the types of investigations Neil deals with, where we wouldn't have the data readily available.  So those are some of the things we would have to think through if we went to an alternative model.

        MR. ISIKOFF:  Anthony, I think -- what I was getting at is probably what the ACLU has been saying, there ought to be specific targeted requests for this information.  Raj has just said, "Well, that would create all sorts of problems.  We don't know how long the phone companies would hold it for."  Does he have a point?

        MR. ROMERO:  No.

        (Laughter)

        MR. ROMERO:  I mean it's great to be back at Aspen, I should say that.  I was last here debating Alberto Gonzales and John Yoo.  And now I'm debating friends who serve in the Obama administration or who have served, and so much has changed and so much has not changed.

        And to be clear to Raj's point, the program whether it's legitimate in the public eye or legal, the answer to it is illegitimate and illegal in our minds, both section 215 and section 702.  Let's break it down.

        The 215 standard -- it's really important to read the words of the law, "a statement of facts showing that there are reasonable grounds to believe that the tangible things" -- any tangible things that they conceive -- " that are sought are relevant to a foreign intelligence, international terrorism or espionage investigation" -- "relevant."

        Now, it defies the knowledge or the

                                14

# Exhibit D

# Exhibit D

Understanding Obama's NSA Proposals - The Daily Beast

THE DAILY BEAST     POLITICS   ENTERTAINMENT   WORLD NEWS   TECH + HEALTH



*AFP/Getty*

**POLITICS** *03.27.14*


*Geoffrey R. Stone*

# Understanding Obama's NSA Proposals

The president's metadata plans will curb the NSA's ability to infringe on civil liberties and still allow intelligence agencies to track the terrorists.




President Obama announced this morning that he will propose legislation calling for significant changes in the NSA's telephone metadata program. This is good news, indeed.

The enactment of these proposals would strike a much better balance between the interests of liberty and security. They would preserve the value of the NSA's program in terms of protecting the national security, while at the same time providing much greater, and much needed, protection to individual privacy and civil liberties.

The proposals are based on recommendations made by the president's five-member Review Group, of which I was a member. To understand why we came up with these suggestions, it is necessary first to understand how the program operates.

Under the telephone metadata program, which was created in 2006, telephone service companies like Sprint, Verizon and AT&T are required to turn over to the NSA, on an ongoing daily basis, huge quantities of telephone metadata involving the phone records of millions of Americans, none of whom are themselves suspected of anything.

The metadata at issue includes

Even though the program to-date has functioned properly, history teaches that there is always the risk of another J. Edgar Hoover or Richard Nixon.

information about phone numbers (both called and received), but it does not include any information about the content of the calls or the identities of the participants. Once the NSA has the metadata in its system, it retains it for five years, before destroying it on a rolling basis.

Under rules governing the program, the NSA is authorized to access the telephone data whenever its own analysts find that there are facts giving rise to a reasonable, articulable suspicion ("RAS") that a particular telephone number (usually outside the United States) is associated with a foreign terrorist organization.

In 2012, the last year for which there is complete data, the NSA "queried" 288 phone numbers, known as "seeds," each of which was certified by NSA analysts to meet the RAS standard. When a seed phone number is queried, the NSA derives from the database a list of every telephone number that either called or was called by the seed phone number in the past five years. This is known as the "first hop." For example, if the seed phone number was in contact with 100 different phone numbers in the past five years, the NSA would obtain a list of those 100 phone numbers.

The NSA then seeks to determine whether there is reason to believe that any of those 100 numbers are also associated with a foreign terrorist organization. If so, the query has uncovered a possible connection to a potential terrorist network that merits further investigation. Conversely, if none of the 100 numbers is believed to be associated with possible terrorist activity, there is less reason to be concerned that the potential terrorist is in contact with co-conspirators inside the United States.

In most cases, the NSA makes a second "hop." That is, it queries the database to obtain a list of every phone number that called or was called by the 100 numbers it obtained in the first hop. Thus, if we assume that the average telephone number calls or is called by 100 phone numbers over the course of a five-year period, then the second hop will produce a list of 10,000 phone numbers (100 x 100) that are two steps away from the seed number that is reasonably believed to be associated with a foreign terrorist organization. If any of those 10,000 phone numbers is also thought to be associated with a terrorist organization, that too is potentially useful information.

In 2012, the NSA's 288 queries resulted in a total of twelve "tips" to the FBI that called for further investigation. Although this information has sometimes proved useful, there has been no instance in which the information obtained through this program has directly prevented a planned terrorist attack. At the same time, though, it is certainly possible to imagine a situation in which the program might produce highly valuable information that would, in fact, help

prevent such an attack.

Our Review Group was appointed by the president last August to advise him on these and related issues. I am pleased—indeed, delighted—to report that the proposed legislation tracks almost perfectly the Review Group's recommendations.

As the president's proposed legislation suggests, three specific changes in the telephone metadata program are necessary. First, the NSA will no longer itself hold the vast store of telephone metadata. This is essential, because one of the most serious concerns about this program is that, in the wrong hands, access to this information can wreak havoc on the privacy and civil liberties of Americans.

Even though the program to-date has functioned properly, history teaches that there is always the risk of another J. Edgar Hoover or Richard Nixon. It is essential to limit the potential for abuse. As the Review Group recommended, the proposed legislation would leave all the metadata in the hands of the private telephone companies, rather than allowing the government itself to collect and store it in bulk. This is a critical safeguard.

Second, when the government wants to access the metadata, the proposed legislation would require the NSA to obtain an order from the Foreign Intelligence Surveillance Court, rather than being able to access the information whenever NSA analysts decide that RAS exists. It has long been understood that when government officials who are engaged in the enterprise of ferreting out criminals are given the authority to decide for themselves when to act, their judgment is likely to be affected by their own priorities. For that reason, it is essential for a neutral and detached judge to make the decision whether any particular query is warranted.

Third, instead of requiring the metadata to be retained for five years, the president's proposed legislation would compel the telephone companies to hold the data for only 18 months. This makes great sense both because the older data is less likely to be useful and because, by limiting the amount of data available, the risks of abuse are limited as well.

The president should be applauded for supporting these reforms. I can say that it was not at all obvious or inevitable that the White House would come to this point. During the course of the Review Group's deliberations with the White House, serious opposition was raised to these recommendations. It is to the great credit of President Obama and to his senior advisers in the White House that we now have the opportunity to take this critical step forward.

 SHARE      TWEET      POST      EMAIL

19 COMMENTS ⌄

STORIES WE LIKE
▼

 POLITICAL WIRE