TOP SECRET//SI//NOFORN

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ELECTRONIC FRONTIER FOUNDATION, )
)
)
Plaintiff, )
)
v. )
)
)
UNITED STATES DEPARMENT OF )
JUSTICE, )
)
Defendant. )
)

Case No. 4:11-cv-05221-YGR

FILED *IN CAMERA,*
*EX PARTE,* AND
UNDER SEAL

## (TS//SI//NF) *EX PARTE, IN CAMERA* DECLARATION OF DIANE M. JANOSEK, DEPUTY ASSOCIATE DIRECTOR FOR POLICY AND RECORDS, NATIONAL SECURITY AGENCY[1]

[1] (TS//SI//NF) The overall classification of this declaration is TOP SECRET//SI//NOFORN. Each paragraph of the declaration is portion-marked with the classification of the information contained therein. Some paragraphs that, standing alone, would otherwise be portion-marked UNCLASSIFIED ("U") are instead marked with a classification marking because the information in the context of this particular FOIA case would reveal classified facts—that NSA collects telecommunications metadata under Section 215 of the USA PATRIOT Act. *See infra.* ¶¶ 27-31.

(TS//SI//NF) The same is also true for other sections of this declaration such as the signature block and the fact that NSA is filing an *ex parte, in camera* declaration for this case to justify the withholding of its information in the responsive documents which is classified TOP SECRET//SI//NOFORN. Accordingly, neither the fact of NSA's filing of this declaration in this case nor any of the information contained in this declaration can appear on the public record, including any reference to an NSA declaration for this case docket, as to do so would reasonably be expected to cause exceptionally grave harm to the national security of the United States. Similarly, no information contained in this declaration can be removed from classified channels without approval from the NSA.

Derived From: NSA/CSSM 1-52
Dated: 20070108
Declassify On: ~~20621212~~

TOP SECRET//SI//NOFORN

(TS//SI//NF) I, DIANE M. JANOSEK, hereby declare and state:

1. (TS//SI//NF) I am currently the Deputy Associate Director for Policy and Records for the National Security Agency ("NSA" or "Agency"). I have served with NSA for 12 years, and prior to my current assignment, I held various leadership positions throughout the Agency. As the Deputy Associate Director of Policy and Records, I am responsible for the processing of all requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for NSA records or agency records containing NSA information.

2. (TS//SI//NF) In addition, I am a TOP SECRET classification authority pursuant to section 1.3 of Executive Order ("E.O.") 13526, 75 Fed. Reg. 707 (Jan. 5, 2010) and Department of Defense Directive No. 5200.1-R, Information Security Program Regulation, 32 C.F.R. § 159a.12 (2000). It is my responsibility to assert the FOIA exemptions over NSA information in the course of litigation. Through the exercise of my official duties, I have become familiar with the current litigation arising out of a request for information filed by the Plaintiff pursuant to the FOIA (the "FOIA Request") with the Department of Justice ("DOJ"), which DOJ has referred to NSA for review.

3. (TS//SI//NF) I am submitting this *ex parte, in camera* declaration in support of the Government's Motion for Summary Judgment and for Partial Summary Judgment in the above-captioned case. The purposes of this declaration are threefold. First, this declaration advises the Court that DOJ withheld responsive documents in their entirety on NSA's behalf because they are properly exempt from disclosure under the FOIA based on Exemption 1, 5 U.S.C. §552(b)(1), as set forth below. Second, this declaration advises the Court that DOJ withheld responsive documents in their entirety on NSA's behalf because they are properly exempt from

2

TOP SECRET//SI//NOFORN

TOP SECRET//SI//NOFORN

disclosure under the FOIA based on Exemption 3, 5 U.S.C. §552(b)(3), also as set forth below.

Lastly, this declaration advises the Court that NSA cannot be identified as the source for the

withholdings of these documents, nor can it be publicly revealed as the originator of information

in these documents, as identification of NSA's association with the documents themselves would

be a disclosure of classified information, which is properly classified as TOP

SECRET//SI//NOFORN. Moreover, this declaration advises the Court that the application of

two particular Exemption 3 statutes (section 6 of the National Security Agency Act of 1959,

Public Law 86-36 (50 U.S.C. § 402 note) and 18 U.S.C. § 798) cannot be publicly revealed by

the government or the Court because to identify the application of these two Exemption 3

statutes would associate NSA with the documents and, again, that association is properly

classified as TOP SECRET//SI//NOFORN.[2]

　　　4. (TS//SI//NF) As described below, this declaration is classified TOP

SECRET//SI//NOFORN pursuant to the standards in section 1.2 of E.O. 13526. Any reference

to NSA (to include the fact that NSA is submitting a declaration in this case) would reveal that

NSA is conducting intelligence activities under Section 215 of the USA PATRIOT Act (codified

at 50 U.S.C. § 1861) and reveal NSA sources and methods, all of which are currently and

properly classified TOP SECRET//SI//NOFORN. As described in detail below, any reference to

NSA in association with these responsive documents would disclose classified information that

---

[2] (TS//SI//NF) The DOJ has invoked a broader Exemption 3 statute, Section 102 A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), as a basis to withhold the responsive documents in addition to Exemption 1. *See* Declaration of Mark Bradley. This statute protects intelligence sources and methods from unauthorized disclosure, and DOJ's invocation of this statute does not associate NSA with the responsive document.

3

would result in direct, immediate, and irreparable damage to the national security of the United States.

## (U) CLASSIFICATION OF DECLARATION

5. (TS//SI//NF) This declaration is classified TOP SECRET//SI//NOFORN pursuant to the standards in E.O. 13526. Under E.O. 13526, information is classified "TOP SECRET" if the unauthorized disclosure of the information could reasonably be expected to cause exceptionally grave damage to the national security, "SECRET" if the unauthorized disclosure of the information reasonably could be expected to cause serious damage to the national security, and "CONFIDENTIAL" if the unauthorized disclosure of the information reasonably could be expected to cause identifiable damage to the national security. At the beginning of each paragraph of this declaration, the letter or letters in parentheses designate(s) the degree of sensitivity of the information the paragraph contains. When used for this purpose, letters "U," "C," "S," and "TS" indicate respectively that the information is either UNCLASSIFIED, or is classified CONFIDENTIAL, SECRET, or TOP SECRET.

6. (TS//SI//NF) Additionally, this declaration contains Sensitive Compartmented Information ("SCI"), which is "information that not only is classified for national security reasons as TOP SECRET, SECRET, or CONFIDENTIAL, but also is subject to special access and handling requirements because it involves or derives from particularly sensitive intelligence sources and methods." 28 C.F.R. § 17.18(a); *see generally* Director of Central Intelligence Directive 6/1, effective March 1, 1995. Because of the exceptional sensitivity and vulnerability of such information, these special safeguards and access requirements exceed the access standards that are normally required for information of the same classification level. Specifically, this declaration references communications intelligence ("COMINT"), also referred

4

to as special intelligence ("SI"), which is a subcategory of SCI. COMINT or SI identifies SCI that was derived from exploiting cryptographic systems or other protected sources by applying methods or techniques, or from intercepted foreign communications.

7. (U) Finally, in addition to the fact that classified information contained herein may not be revealed to any person without authorization pursuant to E.O. 13526, this declaration contains intelligence information that may not be released to foreign governments, foreign nationals, or non-U.S. citizens without permission of the originator and in accordance with policy set by the Director of National Intelligence ("DNI"). This intelligence information is labeled "NOFORN" ("NF").

## (TS//SI//NF) ORIGIN AND MISSION OF NSA

8. (TS//SI//NF) The NSA was established by Presidential Directive in 1952 as a separately organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense. Pursuant to § 1.7(c) of E.O. 12333 (46 Fed. Reg. 59,941 (1981)), as amended by E.O. 13470 (73 Fed. Reg. 45,325 (2008)), National Security Decision Directive 298, and DoD-D 5100.20 (National Security Agency and the Central Security Service), NSA's cryptologic mission has three functions: to collect, process, and disseminate signals intelligence ("SIGINT") information for national foreign intelligence purposes; to conduct information security activities; and to conduct operations security training for the U.S. Government. NSA is the predominant source of SIGINT information for the U.S. Government, and pursuant to E.O. 12333, as amended, the Director of the National Security Agency is designated the Functional Manager for SIGINT.

9. (TS//SI//NF) NSA's SIGINT responsibilities include establishing and operating an effective unified organization to conduct SIGINT activities as set forth in E.O. 12333, § 1.7(c),

5

as amended. In performing its SIGINT mission, NSA exploits foreign electromagnetic signals to obtain intelligence information necessary to the national defense, national security, and the conduct of foreign affairs. NSA has developed a sophisticated worldwide SIGINT collection network that acquires, among other things, foreign and international electronic communications. The technological infrastructure that supports NSA's foreign intelligence information collection network has taken years to develop at a cost of billions of dollars and untold human effort. It relies on sophisticated collection and processing technology.

## (TS//SI//NF) IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

10. (TS//SI//NF) There are two primary reasons for gathering and analyzing SIGINT information. The first, and most important, is to gain the intelligence information required to direct U.S. resources as necessary to counter threats. The second reason is to obtain the intelligence information necessary to direct the foreign policy of the United States. Foreign intelligence information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President; the President's National Security Advisor; the Director of National Intelligence; the Attorney General; the Secretaries of Defense, State, Treasury and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency; the Federal Bureau of Investigation; the Drug Enforcement Administration; the Departments of the Army, Navy, and Air Force; and various intelligence components of the Department of Defense. Intelligence information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This

6

intelligence information is often critical to the formulation of U.S. foreign policy and the support
of U.S. military operations around the world. Moreover, intelligence information produced by
NSA is often unobtainable by other means.

     11. (TS//SI//NF) NSA's ability to produce foreign intelligence information depends on
its access to foreign and international electronic communications. Further, SIGINT technology
is both expensive and fragile. Public disclosure of either the capability to collect specific
communications or the substance of the information itself can easily alert targets to the
vulnerability of their communications. Disclosure of even a single communication holds the
potential of revealing the intelligence collection techniques that are applied against targets
around the world. Once alerted, SIGINT targets can easily frustrate SIGINT collection by using
different or new encryption techniques, disseminating disinformation ████████████████
████████████. Such evasion techniques may inhibit access to a target's communications
and, therefore, deny the United States access to information crucial to the defense of the United
States both at home and abroad.

## (U) PROCESSING OF PLAINTIFF'S FOIA REQUEST

     12. (TS//SI//NF) By letter dated June 2, 2011, Plaintiff, Electronic Frontier Foundation,
submitted a FOIA request to the DOJ seeking "records from January 1, 2004 to the present
discussing, concerning, or reflecting the DOJ or any of its components' interpretation or use of
Section 215 orders." The DOJ conducted a search for responsive records and located documents
that originated with NSA and/or contained NSA equities. These documents were responsive to
the Plaintiff's request as narrowed by the parties through stipulation during the course of
litigation in this case.

13. (TS//SI//NF) The DOJ's National Security Division ("NSD") ultimately referred responsive documents to NSA for its review, because they either originated with NSA and/or contained NSA equities. NSA reviewed these responsive documents and determined that they must be withheld in their entirety because they describe and relate to an intelligence program and the activities of the NSA undertaken to implement this program, all of which are currently and properly classified matter in accordance with E.O. 13526. The intelligence program at issue, the Agency's collection of business records containing telephony metadata, is a highly sensitive intelligence program that NSA operated, and continues to operate today, with the approval and oversight of the Foreign Intelligence Surveillance Court ("FISC"). As further described below, any association of NSA with these documents in the context of Plaintiff's FOIA request or disclosure of any details contained therein would reveal highly sensitive NSA capabilities, sources, and methods. Public association of the documents responsive to the Plaintiff's FOIA request with NSA or public disclosure of any details contained within these documents could reasonably be expected to cause exceptionally grave damage to the U.S. national security.

14. (TS//SI//NF) Accordingly, NSA has informed DOJ's NSD that all of the information contained in the referred documents is currently and properly classified at the TOP SECRET level, that the information involves SENSITIVE COMPARTMENTED INFORMATION ("SCI"), that all of the responsive information must be withheld in full, and that NSA cannot be publicly revealed as the originator of or associated with any of the information in these documents, as the association of NSA with any documents responsive to Plaintiff's FOIA request is itself a classified fact.[3] *See* E.O. 13526, Section 3.6(b). NSA further informed DOJ's NSD

---

[3] (TS//SI//NF) If Plaintiff had sent its FOIA Request directly to the NSA, the Agency would have provided Plaintiff with a *Glomar* response, which would have informed the Plaintiff

8

TOP SECRET//SI//NOFORN

that all of the information contained in the referred documents is exempt from disclosure based upon Exemption 1 of the FOIA (5 U.S.C. §552(b)(1)), because the information is currently and properly classified in accordance with the criteria set forth in Section 1.4 of Executive Order 13526.

15. (TS//SI//NF) In addition to being exempt from disclosure pursuant to Exemption 1 of the FOIA, NSA informed DOJ's NSD that all of the information in the referred documents is also exempt pursuant to Exemption 3 of the FOIA (5 U.S.C. §522(b)(3)), because various statutes, discussed below, protect this information from disclosure. NSA requested that DOJ's NSD not publicly identify Exemption 3 of the FOIA as a basis for withholding the Report, because the invocation of two particular Exemption 3 statutes that are relevant here, Section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402 note) and 18 U.S.C. § 798) would associate NSA with the responsive information and thus would reveal properly classified information. During the course of this litigation, NSA has informed DOJ's NSD that it could invoke Section 102 A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1) as a basis for withholding the information under Exemption 3 because this statute does not associate NSA with the responsive documents.

### (U) SECTION 215 OF THE USA PATRIOT ACT

16. (TS//SI//NF) Plaintiff seeks records about the U.S. Government's activities under Section 215 of the USA PATRIOT Act. NSA has carried out a successful counterterrorism

---

that NSA could not acknowledge the existence or non-existence of responsive information as any affirmative or negative response would reveal a matter that is currently and properly classified and protected from release by three statutes, namely whether or not NSA is involved with the implementation of a program under Section 215 of the USA PATRIOT Act. The refusal to confirm or deny the existence or nonexistence of records responsive to a FOIA request is commonly referred to as a *Glomar* response, under terminology derived from the D.C. Circuit's decision in *Phillipi v. CIA*, 546 F.2d 1009 (1976).

TOP SECRET//SI//NOFORN

program under this authority.[4] The Foreign Intelligence Surveillance Court, which is composed of federal district court judges appointed by the Chief Justice of the Supreme Court, has authorized NSA's program under Section 215 of the USA PATRIOT Act involving NSA's collection of telephony metadata, or call detail records. Telephony metadata includes comprehensive communications routing information obtained from telecommunications providers about telephone communications, such as the dates, times, and duration of telephone calls, as well as the phone numbers used to place and receive calls. Telephony metadata does not include the content of any communication. NSA's access to the acquired telephony metadata under Section 215 is narrowly tailored so that the NSA can produce foreign intelligence related to the activities of ███████████████████████████████████████

███████████████████████. Of import, this authority has enabled NSA to close a previously existing information gap regarding its collection capabilities.

17. (TS//SI//NF) The documents reviewed by NSA generally comprise three (3) categories of information: (1) NSA or DOJ correspondence to Congressional oversight committees; (2) U.S. Government filings to the FISC and FISC Orders as well as other correspondence such as briefings; and (3) internal NSA records to include training documents,

---

[4] (TS//SI//NF) In addition to NSA's activities under Section 215, many of the responsive documents address a similar but different NSA counterterrorism program that operated under the authority of the Foreign Intelligence Surveillance Court from July 2004 until December 2011. This highly sensitive program was conducted pursuant to Section 402 of the FISA. Under orders of the FISC issued pursuant to the authority of Section 402 of the FISA, NSA was authorized to collect in bulk certain Internet metadata through the use of a pen register and trap and trace (PR/TT) device. Like its collection under Section 215, NSA did not collect the content of any Internet communications pursuant to Section 402 of the FISA. While the NSA's PR/TT FISA program is no longer active (it was discontinued in December 2011), ███████████████████████

███████████████████████████████████. Accordingly, any disclosure that NSA ███████████████████████████ could cause our adversaries to take steps to deny NSA this important source of collection.

guidance provided by NSA's OGC, and standard operating procedures. All of the material contained in these three categories of information, as set forth below, is exempt from release in its entirety based on Exemption One because this information is currently and properly classified in accordance with E.O. 13526. Additionally, I will explain why this same information is exempt from release based on Exemption Three of the FOIA because the information falls squarely within one or more of three invoked statutes, specifically, Section 6 of the National Security Agency Act of 1959, 50 U.S.C. §402 note (Pub. L. No. 86-36); 18 U.S.C. §798; and Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. §403-1(i)(1). However, since Section 215 of the USA PATRIOT Act is the authority used to carry out this bulk telephony metadata collection program and this fact is classified TOP SECRET//COMINT//NOFORN, the Court cannot attribute NSA as the source of the withholdings for these documents or rely upon Section 6 or 18 U.S.C. §798 as a basis to uphold the DoJ's withholdings of these documents, as such a reliance necessarily associates NSA with the responsive material.

18. (TS//SI//NF) The information contained in the responsive documents referred to NSA for review reveal the specific activities undertaken by NSA under both Section 215 of the USA PATRIOT Act and Section 402 of the FISA, including the "who," "how," "when," and "where" of NSA's programs involving the bulk collection of communications metadata and the fact that NSA collects certain business records from certain telecommunication service providers. These documents further reveal the important oversight that had been and continues to be provided by the Foreign Intelligence Surveillance Court, as well as the oversight provided by the Congressional Intelligence and Judiciary Committees. Lastly, these documents reveal the importance of NSA's programs under Section 215 and Section 402 to the U.S. Government in

11

combating terrorism, including the fact that these programs provided NSA with unique tools that produce intelligence otherwise unavailable to the U.S. Government.

## (U) FOIA EXEMPTION ONE

19.  (U) Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of the national defense or foreign policy, and are in fact properly classified pursuant to such Executive Order. The current Executive Order that establishes such criteria is E.O. 13526.

20.  (U) Section 1.4 of E.O. 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information. The categories of classified information in the document at issue here are those found in Section 1.4(c), which include intelligence activities (including covert action), intelligence sources and methods, or cryptology; and Section 1.4(g), which include vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security.

21. (TS//SI//NF) In my role as a TOP SECRET original classification authority, I have reviewed the material that is responsive to the Plaintiff's FOIA Request, which was forwarded to NSA for review because it contains information about NSA programs and was originally classified by NSA. For the reasons described below, I have determined that all of the responsive material was properly withheld in full, as all of this information is currently and properly classified at the TOP SECRET- SCI level in accordance with E.O. 13526. Accordingly, the release of this intelligence information could reasonably be expected to cause exceptionally grave damage to the national security. Additionally, this intelligence information is subject to

special access and handling restrictions because it involves Sensitive Compartmented Information. The exceptionally grave damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified information is described below.

22. (TS//SI//NF) The responsive material reveals the existence of two highly sensitive bulk metadata collection programs operated by NSA and contains operational details about these programs. NSA's counterterrorism program under Section 215 involving the bulk collection of telephony metadata, which remains in effect today, is a vital tool designed to protect the United States from a catastrophic terrorist attack. Similarly, while NSA no longer collects Internet metadata pursuant to section 402 of the FISA, the Agency does ████████████████████

████████████████████████████████████████████. Accordingly, public disclosure of this material would reveal information about specific NSA intelligence sources and methods, as described in Section 1.4(c) of E.O. 13526.

23. (TS//SI//NF) Additionally, the mere association of the responsive material with NSA in the context of the Plaintiff's FOIA Request, which specifically seeks records related to Section 215, would necessarily reveal intelligence sources and methods. Because Section 215 provides for U.S. Government access to business records in order to protect against international terrorism, any association of NSA with the responsive material would reveal that NSA is conducting intelligence collection activities pursuant to Section 215. Specifically, this association would reveal that NSA collects telephony metadata in furtherance of its foreign intelligence mission, which is currently and properly classified TOP SECRT//COMINT//NOFORN. Any disclosure of the operational details of this counterterrorism program would provide our adversaries with critical information about NSA's capabilities and

13

limitations, such as the types of communications that may be accessible to NSA detection. Specifically, the bulk collection of Internet and telephony metadata allows the NSA to use critical and unique analytical capabilities to track the contacts and communication patterns of ███████████████████████████████████████████████████████ through the use of highly sophisticated tools. With respect to metadata collected under Section 215, NSA queries the metadata solely with identified selection terms for which there are facts giving rise to a reasonable, articulable suspicion that the selection term is associated with ████ ███████████████████████████████████████████ This bulk collection of telephony metadata is necessary to allow the utilization of sophisticated analytical tools for tracking the contacts and/or connections of ████ ████████████████████████████████████████████ Telephony metadata collection and analysis are highly valuable tools in tracking terrorists and are therefore highly classified and strictly compartmented.

24. (TS//SI//NF) Accordingly, any disclosure of the responsive materials would provide our adversaries with information about the types of communications information NSA is collecting (*e.g.*, only metadata, as opposed to the content of communications, is collected and analyzed under these programs), the fact that NSA collects communications metadata under the USA PATRIOT Act ████████ the types of metadata that NSA believes are relevant in its counterterrorism mission, and the fact that records of our adversaries' communications are vulnerable to NSA collection operations. With such information ████████████████ ███████████████ could evade NSA detection as well as alert other foreign adversaries to these critical intelligence-gathering methods.

25. (TS//SI//NF) Additionally, the responsive information reveals the "vulnerabilities or capabilities of systems . . . relating to the national security," as described in Section 1.4(g) of E.O. 13526. Targeted individuals and foreign nationals are known to analyze any public disclosure of NSA's capabilities. As such, the public disclosure of NSA's capability to collect communications metadata in bulk, which would be revealed even by acknowledging the existence of NSA equities in the responsive documents alone, would easily alert targets to the vulnerability of their communications metadata. Targeted individuals would know, upon a disclosure of NSA's capabilities as set forth in the responsive information, which of their communications-related data are vulnerable to NSA's surveillance. Once alerted, these targeted individuals could employ countermeasures to avoid or degrade NSA's collection of telecommunications metadata. These evasion techniques could include

. Applying any or all of these techniques would cause severe damage to NSA's ability to acquire and use telecommunications metadata for counterterrorism purposes, and would therefore result in a loss of access to information crucial to the defense of the United States.

26. (TS//SI//NF) For these reasons, all of the responsive information is currently and properly classified TOP SECRET//SI//NOFORN in accordance with E.O. 13526 as the disclosure of any operational details of NSA's bulk collection activities, as set forth in this information, or indeed NSA's very association with the responsive material, could reasonably be expected to cause exceptionally grave damage to the national security of the United States, and thus is exempt from disclosure pursuant to Exemption 1 of the FOIA.

15

## (U) COMPILATION

27. (TS//SI//NF) Pursuant to guidance provided by the Information Security Oversight Office ("ISOO"),[5] when NSA determines that a document is classified, it must mark the overall classification level for the entire document, at the top and bottom of each page, based on the compilation of the information contained within the document as a whole. *See* 32 C.F.R. §§ 2001.13(c) and 2001.24(g), E.O. 13526, Section 1.7(e). Also pursuant to ISOO guidance, NSA individually marks each paragraph, or portion of information for classification, and the classification level for each portion of information is based on a review of this information standing alone without additional context. *See id.* However, a paragraph that has been portion-marked UNCLASSIFIED because, standing alone, it does not reveal classified information, may in fact be classified if compiled with additional information that provides context or detail. Thus, the information that was previously unclassified becomes classified due to the addition of context or detail, and it also must be protected from release.

28. (TS//SI//NF) With all responsive documents, NSA has properly classified its equities in them overall as TOP SECRET-SCI. Accordingly, the documents are individually marked TOP SECRET//COMINT//NOFORN at both the top and bottom of each page of each document. NSA also portion-marked each individual paragraph for each NSA document. Essentially all of the paragraphs are portion-marked "TS//SI//NF," indicating that the information in those paragraphs, standing alone, is classified at the TOP SECRET level, and contains SCI information, specifically SIGINT. However, there are paragraphs in certain documents, namely,

---

[5] (U) The Information Security Oversight Office is part of the National Archives and Records Administration and is responsible to the President for oversight of the Government-wide classification program.

letters from NSA's Legislative Affairs Office to the congressional intelligence oversight committees that have paragraphs that are portion-marked "U," indicating that the information in those paragraphs, standing alone, is unclassified.

29. (TS//SI//NF) In my role as a TOP SECRET original classification authority, I have reviewed the information portion-marked "U" in the responsive material, and I have determined that, both in the context that such information exists in documents that the U.S. Government has deemed to be responsive to the Plaintiff's FOIA Request and in the context of the overall documents themselves, these paragraphs are, in compilation, currently and properly classified TOP SECRET – SCI based on the procedure of classification by compilation. *See* E.O. 13526, Section 1.7(e) ("Compilation of items of information that are individually unclassified may be classified if the compiled information reveals an additional association or relationship that: (1) meets the standard for classification under this order; and (2) is not otherwise revealed in the individual items of information."); 32 C.F.R. § 2001.24 (g) ("the overall markings will reflect the classification of the compiled information even if all the portions are marked (U)"). *Cf. CIA v. Sims*, 471 U.S. 159, 178 (1985) ("[B]its and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself. . . . Thus, what may seem trivial to the uninformed, may appear of great moment to one who has a broader view of the scene and may put the questioned item of information in its proper context." (internal quotations and citations omitted)).

30. (TS//SI//NF) Accordingly, the release of the information in the paragraphs marked (U) reasonably could be expected to cause exceptionally grave damage to the national security. Additionally, the information in the paragraphs marked (U) is subject to special access and handling restrictions because it reveals sensitive compartmented information. The exceptionally

17

TOP SECRET//SI//NOFORN

grave damage to national security that reasonably could be expected to result from the

unauthorized disclosure of this classified information is described below.

31. (TS//SI//NF) As described below, release of any information in the paragraphs

portion-marked (U), when acknowledged to be within documents responsive to the Plaintiff's

FOIA Request, would associate NSA with these responsive documents. For all the reasons

stated in paragraph 22 above, the association of NSA with the responsive material is currently

and properly classified TOP SECRET//SI//NOFORN because it would reveal intelligence

sources and methods of an NSA activity, namely NSA's bulk collection of telephony metadata

under Section 215.[6]

---

[6] (TS//SI//NF) Additionally, some of the paragraphs portion-marked (U) are classified in the context of existing within documents that are responsive to the Plaintiff's FOIA Request because they would reveal other information that is currently and properly classified TOP SECRET-SCI. For example, one responsive document, "Report on the National Security Agency's Bulk Collection Program for USA Patriot Act Reauthorization," (hereinafter "Report") contains a paragraph portion-marked ("U") that includes handling instructions for the Report:

> (U) The information contained in this Report describes some of the most
> sensitive foreign intelligence collection programs conducted by the United
> States Government. This information is highly classified and only a limited
> number of executive branch officials have access to it. Publicly disclosing
> any of this information would be expected to cause exceptionally grave
> damage to our Nation's intelligence capabilities and to national security.
> Therefore it is imperative that all who have access to this information
> abide by their obligation not to disclose this information to any person
> unauthorized to receive it.

(TS//SI//NF) Without context, NSA could release this paragraph to the public at large because the public would not know what programs this paragraph applies to. But by acknowledging that this paragraph is responsive to the information sought by Plaintiff as described in its FOIA Request, NSA would be officially acknowledging extremely sensitive and classified details about Section 215 of the USA PATRIOT Act. Specifically, by releasing this paragraph in response to Plaintiff's FOIA request about Section 215, the U.S. Government would reveal the existence of at least two foreign intelligence collection programs by its use of the plural "programs." From another paragraph of this Report that is portion-marked (U), it would be

18

## (U) OVERALL CLASSIFICATION MARKINGS AND PORTION-MARKS

32. ~~(TS//SI//NF)~~ Given the context of this FOIA Request (*i.e.*, requests for information concerning the operation of Section 215 of the USA PATRIOT Act), it is not possible to release any part of the responsive material, even in heavily redacted form. Indeed, as explained below, in the context of this FOIA Request, the particular content of the paragraphs portion-marked (U) in the responsive material is immaterial because the classification designations at the top and bottom of each page themselves reveal NSA's participation in a classified intelligence collection operation under Section 215. Ordinarily, when the U.S. Government releases in part a document based on the redaction of classified material or due to a declassification decision, the U.S. Government will place a line through the classification markings so that the reader will know the prior classification level of the information contained in the document. In this case, if DOJ's NSD were to release any responsive document in redacted form, this lining through would appear as follows: ~~TOP SECRET//COMINT//NOFORN~~. COMINT is a specific SCI identifier for signals intelligence ("SIGINT"). Because NSA is responsible for collecting, processing and disseminating SIGINT information, the inclusion of the SCI identifier COMINT in such a document would necessarily identify NSA as associated with this document. Because such documents has been deemed to be responsive to the Plaintiff's FOIA Request, which specifically seeks information related to Section 215, the NSA would necessarily be identified with Section 215, and it would be thereby be revealed that SIGINT operations are being conducted by NSA pursuant to Section 215.

---

clear to our adversaries that this other program was being conducted pursuant to Section 402 of the FISA. NSA's programs under Section 215 and Section 402 are classified TOP SECRET-SCI, as set forth above.

19

33. (TS//SI//NF) Further, it is not feasible, in the unique context presented here, to release any part of the responsive material with the SCI identifiers redacted. In other instances, NSA has redacted the SCI identifiers "COMINT" or "SI" in a document if the NSA association with the material in that document is classified and if a plausible explanation exists that would not associate the redacted SCI term back to the NSA, *i.e.*, it is plausible that the material being withheld pertains to another agency who imposed its own special handling restrictions for its SCI material. In this case, such a redaction would appear as follows: TOP SECRET// //NOFORN. However, in this case, DOJ is the agency that has, to date, been publicly associated with the responsive documents, and is the agency responding to the Plaintiff's FOIA Request. DOJ, however, would not ordinarily redact its own classification markings. *See Ex Parte In Camera* Declaration of Mark Bradley. If DOJ's NSD were to release any responsive document in redacted form, with redacted classification markings, it would necessarily reveal that another agency, to whom those redacted classified markings would be attributed, was associated with the responsive material.[7] Furthermore, our adversaries would be able to deduce that the other agency discussed in the responsive material was not the Federal Bureau of Investigation ("FBI"), as Section 215 specifically refers to the FBI, and FBI's association with Section 215 is therefore clearly not classified. Given the nature of the authority provided in Section 215, which contemplates access to business records in national security investigations, any adversary with basic knowledge of the mission of NSA, as described in paragraphs 8-11 above, could conclude that NSA is the agency most plausibly conducting a program under this authority.

---

[7] (U) When the U.S. Government releases a document in part under FOIA, it redacts the exempt material, but does not otherwise change or manipulate the responsive record.

20

34. (TS//SI//NF) For these reasons, all of the information in the responsive material, including those paragraphs portion-marked (U) and any unmarked section titles, is currently and properly classified in accordance with E.O. 13526 as the disclosure of any such information would associate NSA with the responsive material and therefore with Section 215. As noted in paragraphs 22-24, above, NSA's association with Section 215 could reasonably be expected to cause exceptionally grave damage to the national security of the United States, and thus all of the information in the responsive material is exempt from disclosure pursuant to Exemption 1 of the FOIA.

## (U) FOIA EXEMPTION THREE

35. (U) Section 552(b)(3) of the FOIA provides that the FOIA does not require the release of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establish particular criteria for withholding or refers to particular types of matter to be withheld. *See* 5 U.S.C. sec. 552(b)(3). Review of the application of Exemption 3 statutes consists solely of determining that the statute relied upon qualifies as an Exemption 3 statute and that the information withheld falls within the scope of the statute.

36. (TS//SI//NF) The information at issue here falls squarely within the scope of several statutes. The first of these statutes is a statutory privilege unique to NSA. As set forth in section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402 note), **"[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof. . . . "** (emphasis added). Congress, in enacting the language in this statute, decided that disclosure of any information relating to NSA activities is

potentially harmful. *Hayden v. NSA,* 608 F.2d 1381, 1390 (D.C. Cir. 1979); *see also Wilner v. NSA,* 592 F.3d 60, 75 (2d Cir. 2010); *Larson v. Department of State,* 565 F.3d 857, 868 (D.C. Cir. 2009); *Students Against Genocide v. Department of State,* 257 F.3d 828 (D.C. Cir. 2001); *Lahr v. National Transp. Safety Bd.*, 453 F. Supp. 2d 1153, 1171-73 (C.D. Cal. 2006); *People for the American Way v. NSA,* 462 F. Supp. 2d 21, 30 (D.D.C. 2006), *Florida Immigrant Advocacy Center v. NSA,* 380 F. Supp. 2d 1332, 1340-41 (S.D. Fla. 2005). Federal courts have held that the protection provided by this statutory privilege is, by its very terms, absolute. *See, e.g., Linder v. NSA,* 94 F. 3d 693 (D.C. Cir. 1996). Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities. *See Hayden,* 608 F.2d at 1389. Further, while in this case the harm would be very exceptionally grave, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege, but only to show that the information relates to its activities. *Id.* at 1390. To invoke this privilege, NSA must demonstrate only that the information it seeks to protect falls within the scope of section 6. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

37. (TS//SI//NF) The second applicable statute is 18 U.S.C. § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States; or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government. The term "communications intelligence," as defined by 18 U.S.C. § 798(b), means all procedures and methods used in the interception of communications and the obtaining of information from such

22

communications by other than the intended recipients. *See New York Times Co. v. U.S. Department of Defense*, 499 F. Supp. 2d 501, 513 (S.D.N.Y. Jun 28, 2007).

38. (TS//SI//NF) The third applicable statute is Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." NSA, as a member agency of the U.S. Intelligence Community, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute. *See Central Intelligence Agency v. Sims*, 471 U.S. 159 (1985). Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 403-l(i)(1). *Id.*

39. (TS//SI//NF) As described above, Congress has enacted three statutes to protect the fragile nature of NSA's SIGINT efforts, to include but not limited to, the existence and depth of signals intelligence-related successes, weaknesses and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures and the significance of the loss of valuable intelligence information to national policymakers and the Intelligence Community. Given that Congress specifically prohibited the disclosure of information related to NSA's functions and activities and its communications intelligence activities, as well as the sources and methods used by the Intelligence Community as a whole, I have determined that NSA's SIGINT activities and functions, and its intelligence sources and methods would be revealed if any of the information about NSA's bulk collection programs contained within this responsive material were disclosed.

23

40. (TS//SI//NF) Accordingly, all of the responsive material is protected from disclosure by statute pursuant to the following three authorities: (1) Section 6 of the National Security Act of 1959 (Pub. L. 86-36) (50 U.S.C. § 402 note), because this information concerns the organizations, function and activities of the NSA as described above; (2) 18 U.S.C. § 798, because disclosure would reveal classified information about NSA's exploitation of communications or communications-related information for signals intelligence purposes; and (3) 50 U.S.C. § 403-1(i)(1), because this information describes intelligence sources and methods.

41. (TS//SI//NF) NSA respectfully submits, however, that this Court cannot, in a public decision, uphold the U.S. Government's withholding of NSA information in these documents pursuant to Section 6 of the National Security Act of 1959 (Pub.L. No. 86-36) (50 U.S.C. § 402 note) or 18 U.S.C. §798. Any public decision that references the fact that there is NSA originated information in these documents pursuant to these two Exemption 3 statutes would reveal a currently and properly classified matter, namely —NSA's association with Section 215 of the USA Patriot Act. DOJ can and has invoked 50 U.S.C. § 403-1(i)(1) as a basis for withholding the Report under Exemption 3 (*see* Declaration of Mark Bradley). It would be appropriate for the Court to publicly uphold the U.S. Government's withholdings based on this statute. But, there can be no reference to the fact that the information being withheld originated with NSA, was originally classified by NSA, and/or contains NSA equities.

42. (U) These documents contain no reasonably segregable, non-exempt information. Any unclassified material in these documents, to the extent it exists, is so inextricably intertwined with the classified material that the release of any non-exempt information would produce only incomplete, fragmented, unintelligible sentences and phrases that are devoid of any

24

TOP SECRET//SI//NOFORN

meaning. The unclassified information in these documents, to the extent that any exists, does not contain any meaningful information responsive to the Plaintiff's FOIA Request.

43. (U) I declare under penalty of perjury that the facts set forth above are true and correct.

(U) Executed, this __6th__ day of November 2012, pursuant to 28 U.S.C. § 1746.

(TS//SI//NF) _____
(TS//SI//NF) DIANE M. JANOSEK
(TS//SI//NF) Deputy Associate Director for Policy and Records
(TS//SI//NF) National Security Agency

25

TOP SECRET//SI//NOFORN